FILED

LAW OFFICES OF JOHN R. WALTON, P.C.
John R. Walton, Esq. (SBN 130666)
jwalton@graveswalton.com
35 N. Lake Ave., Ste. 700
Pasadena, California 91101
Telephone: (626) 578-6000
Facsimile: (626) 578-6012

2012 MAR 14  PM 4:03

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY:_____

Attorneys for Plaintiff TriPharma LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRIPHARMA, LLC, a Delaware limited liability company,<br><br>                    Plaintiff<br><br>vs.<br><br>FIRST FRUITS BUSINESS MINISTRY LLC, a South Carolina limited company; FIRST FRUITS BEVERAGE COMPANY LLC, a Georgia limited liability company; ROGER J. CATARINO; and Does 1-100,<br><br>                    Defendants. | Case No. **SACV12-00404 JST (MLGx)**<br><br>**COMPLAINT FOR DECLARATORY RELIEF, DAMAGES AND INJUNCTIVE RELIEF**<br><br><br><br>(JURY TRIAL DEMANDED) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

1    For its Complaint, TriPharma, LLC alleges as follows:

2    <center>**JURISDICTION AND VENUE**</center>

3    1.    <u>Subject Matter Jurisdiction</u>: This Court has subject matter jurisdiction

4    over these patent and trademark claims under 35 U.S.C. Sections 100 *et seq.*, 15

5    U.S.C. Sections 1114 and 1125(a), and 28 U.S.C. Section1338(a).  This Court has

6    federal question jurisdiction under 28 U.S.C. Sections 1331 and 1335.  This Court

7    may exercise supplemental jurisdiction over the related state law claims.

8    2.    <u>Personal Jurisdiction</u>: This Court has personal jurisdiction over each of

9    the defendants because, at all times relevant to this Complaint, they each directed

10   their conduct at California residents, including plaintiff; they conducted significant

11   business in California and in this District, including sales of product that infringed

12   plaintiff's rights as to exclusive marketing;  by directing their marketing and sales

13   efforts to California residents through interactive internet websites to advertise and

14   sell their products.

15   3.    <u>Venue</u>:  Venue is proper in this Court under 28 U.S.C. Sections

16   1391(b), 1395 and 1400(b), since numerous defendants reside in and/or are

17   conducting substantial business activities within this District, and because a

18   substantial part of the events and omissions giving rise to the claims for relief

19   occurred within this District, and because the defendants' patent infringement

20   occurred within this District.

21   <center>**THE PARTIES**</center>

22   4.    Plaintiff TriPharma, LLC ("TriPharma") is and was at all times

23   relevant to this action a limited liability company organized under the laws of the

24   State of Delaware with its principal place of business in Laguna Beach, California.

25   At all times relevant to this action, plaintiff was authorized to conduct, and was in

26   fact conducting, business in California.

27

28

<center>1
**COMPLAINT**</center>

5.      Defendant First Fruits Business Ministry, LLC ("FF Ministry")  is a South Carolina limited liability company ("FF Ministry") with its principal place of business in Leaning Tree, South Carolina.

6.      Defendant First Fruits Beverage Company, LLC ("FF Beverage") is a Delaware limited liability company with its principal place in Virginia.

7.      On information and belief, Defendant Roger J. Catarino is an individual whose residence is believed to be in South Carolina.  Catarino is represented to the public as being the CEO of FF Beverage and FF Ministry.

8.      Defendants are regularly conducting substantial business activity within this District, including marketing themselves and their images, soliciting customers, and by and through other selling and marketing activities, including but not limited to the use of print copy materials and interactive Internet websites that are accessible and in fact accessed by individuals residing in this District.

9.      TriPharma is informed and believes, and alleges thereon, that some or all of the individual Defendants was at all times relevant hereto a controlling person, agent, and/or alter ego of each of the other Defendants, and in doing the acts as herein alleged, was acting within the course and scope of his or its authority as such with the expressed and implied permission, instruction, knowledge, consent, and ratification of each other Defendant.  Each Defendant did influence and govern each other Defendant with such a degree of unity of interest and ownership so that the individuality, and/or separateness, of each Defendant have ceased to exist.

10.     Tripharma further alleges on information and belief that the Defendants Catarino and some of Does 1-100 are the alter-ego of FF Beverage and/or FF Ministry, and that the obligations of FF Beverage and/or FF Ministry as set forth in the claims for relief are also the obligations of those Defendants in that (a) FF Beverage and/or FF Ministry are influenced and governed by such defendants; (b) FF Beverage and/or FF Ministry were at all material times herein

1   corporate instrumentalities used for the benefit of such Defendants; (c) the

2   Defendants personally directed and participated in the wrongful conduct alleged

3   against FF Beverage and/or FF Ministry; (d) the corporate form, entity, and

4   structure of FF Beverage and/or FF Ministry were at all times disregarded by such

5   Defendants; and (e) that there was such a unity of interest and absence of real

6   distinction that adherence to the fiction of FF Beverage and/or FF Ministry's

7   separate existence as corporate entities would sanction a fraud and promote

8   injustice.

9        11.    The true names and capacities, whether individual, corporate, associate

10   or otherwise of the defendants named herein as DOES 1 through 100, inclusive, are

11   unknown to TriPharma at this time, who therefore sue DOES 1 through 100 by

12   fictitious names and will ask leave of the Court to amend this Complaint to show

13   the true names and capacities of DOES 1 through 10 when the same are

14   ascertained; DOES 1 through 10 are sued as principals and/or agents, servants,

15   attorneys, and employees of said principals, and all the acts performed by them

16   were within the course and scope of their authority and employment.  TriPharma is

17   informed and believes and thereupon alleges that each of DOES 1 through 100 is

18   legally responsible in some manner for the events and happenings referred to

19   herein, and directly and proximately caused the damages and injuries to TriPharma

20   as hereinafter alleged.

21   **THE PATENT AT ISSUE**

22        12.    TriPharma is the exclusive licensee under United States Patent and

23   Trademark Office Patent No. 6,899,892, entitled "Methods to Reduce Body Fat,"

24   issued in May 2005 to the Regents of the University of Minnesota ("UMinn"),

25   covering methods and compositions for reducing the percentage of body fat in a

26   mammal and the level of leptin in the bloodstream of the mammal (the "892

27   Patent").  An accurate copy of the 892 Patent is attached as **Exhibit A** and

28   incorporated by reference.  Leptin is a signaling hormone secreted by fat cells.  It

1  regulates body fat storage through the central nervous system by modulating

2  satiation, appetite, glycemic control, and metabolism.  Leptin is also a mediator of

3  long-term regulation of energy balance, suppressing food intake and thereby

4  inducing weight loss.  The 892 Patent works by administering specified amounts of

5  certain high viscosity polysaccharides for a specified period of time sufficient to

6  lower serum levels of leptin and the percentage of body fat in the mammal.

7  Products falling within the claims of the 892 Patent are sometimes referred to

8  herein as "Original Product."

9  **EXCLUSIVE LICENSE RIGHTS AT ISSUE**

10      13.    The 892 Patent was originally the subject of an exclusive license from

11  UMinn (as patent holder) to Imagenetix, Inc.  Imagenetix is a Nevada corporation

12  with its principal place of business in San Diego, California.  Imaginetix, Inc., in

13  turn, granted TriPharma the exclusive right to market, distribute and sell all

14  products covered by the 892 Patent, as well as products based upon the clinical

15  study conducted by the University of Connecticut that proved effectiveness in

16  promoting weight loss (the "UConn Study") .  An accurate copy of the agreement

17  between TriPharma and Imagenetix, Inc., as amended by the parties, (the "Exlusive

18  Marketing Agreement") is attached as **Exhibit B**.  Under the Exclusive Marketing

19  Agreement, Imagenetix reserved to itself none of the patent rights acquired from

20  UMinn except for the right to sell exclusively to TriPharma the clinically-tested

21  ingredients of the Product, which TriPharma was obligated to purchase from

22  Imagenetix.  As explained below, however, Imagenetix subsequently disqualified

23  itself from fulfilling that role, such that it has no remaining interests under the

24  Exclusive Marketing Agreement.

25      14.    In 2010, TriPharma discovered that Imagenetix was secretly violating

26  TriPharma's rights of exclusivity under the Exclusive Marketing Agreement.  In

27  response, Imagenetix claimed that TriPharma's rights under the Exclusive

28  Marketing Agreement were not exclusive, and further claimed that it had

1   terminated the Exclusive Marketing Agreement with TriPharma.  Imagenetix

2   sought determination of these claims through arbitration, and TriPharma

3   counterclaimed.  On or about September 12, 2011, the arbitrator issued his interim

4   award, which confirmed the broad exclusive rights granted to TriPharma under the

5   892 Patent and the UConn clinical study, and requested briefing and evidence on

6   attorneys' fees and interest.

7       15.   On or about November 2, 2011, the arbitrator issued his final award,

8   denying Imaginetix's claims and rendering an award in favor of TriPharma (the

9   "Final Arbitration Award").  In addition to awarding damages, costs and attorneys

10  fees of approximately $4 million to TriPharma, the award confirmed that the

11  Exclusive Marketing Agreement granted TriPharma "an exclusive sublicense to

12  market, sell and distribute any and all products covered by the 892 Patent and the

13  UConn clinical study, to the exclusion of all others."  An accurate copy of the Final

14  Arbitration Award is attached as **Exhibit C**.   On or about March 5, 2012, that

15  award was confirmed in all respects by the Superior Court for the County of San

16  Diego.

17              **FACTUAL ALLEGATIONS**

18      16.   After the dispute arose between Imaginetix and TriPharma over the

19  scope and continuation of Tripharma's rights, Defendants FF Beverage and Roger

20  Catarino were approached by TriPharma in an attempt to structure a resolution.  FF

21  Beverage had direct knowledge of TriPharma's rights under the Exclusive

22  Marketing Agreement.  Indeed, earlier in 2010, they themselves had taken a

23  sublicense from TriPharma with respect to beverage applications of the 892 Patent

24  that derived from the Exclusive Marketing Agreement.

25      17.   Between approximately September 2010 and January 2011, TriPharma

26  and its principal, Evan Dameshek, communicated with FF Beverage and its CEO,

27  Roger Catarino, about having FF Beverage purchase the 892 Patent in order to,

28  inter alia, (a) bolster FF Beverage's rights vis-à-vis TriPharma, and (b) as part of a

settlement in the dispute between TriPharma and Imagenetix, which would lower TriPharma and FF Beverage's cost of goods.  As part of these discussions, Catarino and his group also sought to purchase for themselves a share of ownership in the patent and in TriPharma's beverage brand.  Settlement discussions between counsel for TriPharma and counsel for FF Beverage thereafter continued until the summer of 2011.

18.     In the summer of 2011, TriPharma learned that Imagenetix had purchased the 892 Patent from UMinn, reportedly with money provided by FF Beverage and its financial backers.  FF Beverage, however, hotly denied the claim. Specifically, on June 27, 2011, Heather Redmond, a partner at Dorsey & Whitney and counsel for FF Beverage, wrote:

> "Your email accuses First Fruits of breaching agreements with TriPharma (that did not yet exist) and of interfering with some unidentified 'business affairs' between Bill Spencer and TriPharma.  **First Fruits did not know that Imagenetix had acquired the patent until we received your email**. Neither First Fruits nor its investor financed that acquisition." (emphasis added)

19.     Beginning in early July 2011, TriPharma's dispute with Imagenetix was arbitrated before the Hon. Terry Friedman (Ret'd) in San Diego.  Immediately prior to the close of the arbitration (and after it was abundantly clear that Imagenetix had lost its claim of having terminated the Exclusive Marketing Agreement with TriPharma), FF Business recorded with the USPTO the assignment of the 892 Patent from Imagenetix to FF Business, which it had actually purchased in March 2011.

20.     Predictably, the arbitration award came out entirely in TriPharma's favor and rejected all of Imagenetix's claims, including the claim that it had effectively terminated TriPharma's Exclusive Marketing Agreement.

21.     Since the Final Arbitration Award, Imagenetix has failed and refused to supply product to TriPharma under the Exclusive Marketing Agreement, claiming that its assignment of the 892 Patent to FF Business legally precludes it from honoring its contract with TriPharma.

22.     In November 2011, Imagenetix filed a motion to vacate the arbitration with the United States District Court for the Southern District of California.  As part of its motion, Imagenetix filed the Declaration of Roger Catarino, an accurate copy of which is attached as **Exhibit D.**  In it, Mr. Catarino asserts under penalty of perjury:

    a.  That in order to fulfill FF Beverage and/or FF Business's desire to "acqui[re] patent rights to a weight loss product to be used in a consumer beverage and for other, commercial purposes," he personally negotiated for the purchase of the 892 Patent from Imagenetix;

    b.  In early 2011, he reached agreement with Imagenetix for Imagenetix to acquire the patent and then transfer it to FF Beverage and/or FF Business in order to provide FF Beverage and/or FF Business with "full ownership of the '892 Patent and all rights relating to that patent";

    c.  That on March 1, 2011 Imagenetix acquired the 892 Patent for that purpose;

    d.  That on March 7, 2011, Imagenetix assigned the 892 Patent to FF Business pursuant to the agreement;

    e.  That FF Business claimed to be unaware of any "legal impediment to Imagenetix assigning exclusive rights to the '892 Patent to First Fruits";

    f.  That "[o]nce Imagenetix sold the '892 Patent to First Fruits Business Ministry, LLC in March, 2011, Imagenetix no longer had

the legal right to manufacture and sell TriPharma [sic] the weight loss product covered by the '892 Patent";

g. "If, on the other hand, TriPharma decided to obtain the raw materials and manufacture and distribute the weight loss product on its own, it would violate and infringe upon First Fruits' exclusive Federal patent rights under the '892 Patent, since only First Fruits Business Ministry, LLC has the right to manufacture and distribute the patented weight loss product."

23.     Since approximately June 2011, Defendants have begun marketing a beverage covered by the 892 Patent under the trademark "TrimFit." TrimFit is marketing nationally, both on television and on the web.  It is advertised and sold directly to consumers in California.  On information and belief, Defendants have employees and/or agents in California specifically for such purpose.

24.     The label on TrimFit confirms that it claims it is covered by the 892 Patent.  The label also claims that its effectiveness is confirmed by "clinical studies" and that that those "clinical studies" dictate that consumers should drink three bottles per day for best results.

25.     Similarly, Roger Catarino has appeared on national television advertising TrimFit.  Catarino claims that TrimFit "is a patented ingredient called Trisynex that is clinically studied and proven to work naturally."  Catarino goes on to specifically reference the 892 patent as covering TrimFit, saying "The University of Minnesota took 7 years working and receiving the patent, which we have purchased from them.  The proprietary formula that we developed, the TriSynex, then we studied it in clinical studies at the University of Connecticut.  And the results were amazing.  The people, the women, who were on the active ingredient in 8 weeks lost an average of 20 pounds and 17 percent body fat and inches around the waist, buttocks and thighs."

26.    Defendants, acting in concert and conspiracy, are trading intentionally and wrongfully on the 892 Patent, the Studies, and the reputation and goodwill of TriPharma and the Original Product by falsely advertising and marketing to the general public TrimFit as being subject to exclusive patent rights in FF Beverage and/or FF Business.  Defendants intentionally are using the Original Product, the reference to the 892 Patent and the Studies without TriPharma's permission and in a manner that is likely to deceive, confuse and mislead the public as to the affiliation, sponsorship and/or connection of the Studies, 892 Patent, and the Original Product with TrimFit.

27.    Defendants' conduct as alleged herein constitutes patent infringement and false advertising in violation of federal law, and also constitutes tortious interference with contractual relations under the laws of the State of California as set forth herein.  As a result of Defendants' conduct, TriPharma has suffered and will continue to suffer irreparable injury and accordingly brings this action for restitution and monetary and injunctive relief.

## FIRST COUNT

### Declaratory Relief

(TriPharma Against Defendants FF Beverage and FF Business)

28.    TriPharma incorporates paragraphs 1 through 27 in support of this claim for relief.

29.    A dispute has now arisen between the parties regarding the respective rights of each of the parties.  TriPharma contends that it still holds and maintains all rights granted to it pursuant to the Exclusive Marketing Agreement, including but not limited to the exclusive rights to market and sell in North America products covered by the 892 Patent, as well as to use the UConn Studies as advertising for such products, whereas Defendants contend that FF Business's acquisition of the 892 Patent gave it and its affiliates such rights to the exclusion of TriPharma.

1   30.   A judicial declaration is therefore required declaring that: (1)

2   Defendants have no right to continue to market, advertise, distribute and sell the

3   Product in derogation of TriPharma's rights under the Exclusive Marketing

4   Agreement; (2) Defendants have no right to continue to use the UConn Studies in

5   support of the efficacy of the Product; and (3) TriPharma is entitled to be

6   compensated by Defendants for the wrongful distribution of TrimFit and the

7   wrongful use of the UConn Studies.

8                          **SECOND COUNT**

9              Violation of 15 U.S.C. §1125, et seq. [False Advertising,

10              False Designation of Origin, and Injunctive Relief]

11   (TriPharma Against Defendants FF Beverage, FF Business, Roger Catarino and

12                          Does 1-100)

13   31.   TriPharma incorporates paragraphs 1 through 27 in support of this

14   claim for relief.

15   32.   Defendants' conduct constitutes false advertising and false designation

16   of origin in violation of Section 43 of the Lanham Act, 15 U.S.C. Section 1125(a).

17   33.   The false statements actually deceived and/or had the tendency to

18   deceive a substantial segment of Defendants' intended audience.  The deception

19   was material, in that it was likely to influence the consumers' purchasing decisions.

20   34.   Defendants caused the false statements to enter interstate commerce.

21   35.   TriPharma and consumers have been or are likely to be injured as a

22   result of the false statements either by a direct diversion of sales from TriPharma to

23   Defendants or by a lessening of the goodwill associated with TriPharma's products.

24   36.   As a direct and proximate result of Defendants' conduct, TriPharma

25   has been harmed in an amount according to proof, and will suffer further,

26   irreparable injury unless the requested relief is granted.

27

28

1      37.    Defendants' conduct as alleged herein was intentional, willful, wanton,

2 malicious, oppressive and reckless, thus warranting enhanced and/or treble damages

3 and attorneys' fees pursuant to 15 U.S.C. Section 1117(a).

4      38.    TriPharma is also entitled to injunctive relief to enjoin Defendants

5 from the actions identified herein regarding the continued marketing, advertising,

6 distribution, and sales of TrimFit.

7 **THIRD COUNT**

8 Violation of 15 U.S.C. §1125, et seq. [Unfair Competition]

9 (TriPharma Against Defendants FF Beverage, FF Business, Roger Catarino and

10 Does 1-100)

11      39.    TriPharma incorporates paragraphs 1 through 27 in support of this

12 claim for relief.

13      40.    Defendants' conduct constitutes unfair competition in violation of

14 Section 43 of the Lanham Act, 15 U.S.C. Section 1125(a).

15      41.    As a direct and proximate result of Defendants' conduct, TriPharma

16 has been harmed in an amount according to proof, and will suffer further,

17 irreparable injury unless the requested relief is granted.

18      42.    Defendants' conduct is intentional, willful, wanton, malicious,

19 oppressive, and reckless, thus warranting enhanced and/or treble damages and

20 attorneys' fees pursuant to 15 U.S.C. Section 1117(a).

21 **FOURTH COUNT**

22 Tortious Interference with Contractual Relations

23 (TriPharma Against Defendants FF Beverage, FF Business, Roger Catarino

24 and Does 1-100)

25      43.    TriPharma incorporates paragraphs 1 through 27 in support of this

26 claim for relief.

27

28

44.     As confirmed by the Final Arbitration Award, the Exclusive Marketing Agreement between TriPharma and Imagenetix was a valid and existing contract at all times from at least January 2010 to the present.

45.     Defendants had actual knowledge of the existence of such contract and its material terms.

46.     Defendants intended to disrupt the performance of the contract.

47.     Defendants' conduct prevented performance by Imagenetix and/or TriPharma or, alternatively, made performance more expensive or difficult.

48.     TriPharma has suffered damages from the interference with its contractual relations, in an amount subject to proof but as much as $100,000,000.00.

49.     Defendants' conduct was a substantial factor in causing TriPharma's harm.

50.     In engaging in the acts of interference, Defendants acted willfully, with fraud in lying to TriPharma about its actual purchase of the 892 Patent, with malice toward TriPharma based on its anger that TriPharma's dispute with Imagenetix jeopardized its own license rights from TriPharma, and motivated by a desire to oppress TriPharma by seeking to leave TriPharma without an effective remedy against an insolvent Imagenetix after the arbitration, while Defendants themselves reaped the "fruit" of TriPharma's hard-won rights and years of R&D effort.  As such, TriPharma is entitled to an award of exemplary damages against these defendants.

### FIFTH COUNT

Preliminary and Permanent Injunctive Relief

(TriPharma Against Defendants FF Beverage, FF Business, Roger Catarino and Does 1-100)

51.     TriPharma incorporates paragraphs 1 through 27 in support of this claim for relief.

52.     Defendants have intentionally or negligently interfered with TriPharma's future and prospective sales and have attained ill-gotten profits from the marketing and distribution of TrimFit using unfair, deceptive and fraudulent business activities as alleged herein.  These acts have caused and, unless restrained by this Court by a preliminary injunction and permanent injunction, will continue to cause TriPharma to suffer irreparable injury.

53.     Defendants intentionally or negligently interfered with TriPharma's future and prospective sales and have attained ill-gotten profits from the marketing, advertising and sale of TrimFit and/or Trisynex.  These acts have caused and, unless restrained by this Court by a preliminary injunction and permanent injunction, will continue to cause TriPharma to suffer irreparable injury.

54.     TriPharma has no adequate remedy at law.  Damages at law are inadequate.  TriPharma therefore seeks injunctive and/or other appropriate equitable relief from this Court.

## SIXTH COUNT

Unjust Enrichment and Imposition of Constructive Trust

(TriPharma Against Defendants FF Beverage, FF Business, Roger Catarino and Does 1-100)

55.     TriPharma incorporates paragraphs 1 through 27 in support of this claim for relief.

56.     Defendants' conduct as alleged herein constitutes unjust enrichment under the laws of the State of California.

57.     As a direct and proximate result of Defendants' conduct, TriPharma has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.  Accordingly, TriPharma demands that a constructive trust be imposed for TriPharma's benefit on all revenues derived from the sale of TrimFit and/or Trisynex.

58.     Defendants 'conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced and punitive damages and attorneys' fees.

### SEVENTH COUNT

Accounting

(TriPharma Against Defendants FF Beverage, FF Business, Roger Catarino and Does 1-100)

59.     TriPharma incorporates paragraphs 1 through 27 in support of this claim for relief.

60.     Due to the Defendants' misconduct, TriPharma is entitled to all of the profits derived by them from the sale of TrimFit.  An accounting is therefore required to determine the amount of such compensation owed from Defendants.

### DEMAND/PRAYER FOR RELIEF

TriPharma prays for an order and judgment thereon as to each Defendant, and all of them, jointly and severally, as follows:

For an order and judgment thereon that the purchase of the 892 Patent by First Fruits Business Ministry, LLC was subject to and subordinate to all rights granted to TriPharma pursuant to the Exclusive Marketing Agreement;

For general damages, including statutory damages, in a sum in excess of the jurisdictional minimum of this Court, according to proof, but as much as $100,000,000;

For compensatory and consequential damages in excess of the jurisdictional minimum of this Court, according to proof, but as much as $100,000,000;

For njunctive relief enjoining Defendants from continuing to sell TrimFit or Trisynex without any rights to do so and regarding the following:

Defendants, and their agents, employees, servants, representatives, successors in interest, and all those in concert with Defendants, be permanently enjoined from engaging in the conduct set forth herein;

1  Advertising, marketing, counterfeiting, or otherwise using in any
2  manner the Product or TrimFit or TriSynex without TriPharma's permission
3  and approval;

4  Manufacturing, creating, designing, marketing, selling, advertising
5  producing, making, or otherwise using in any manner any product, that is
6  likely to cause confusion, deception, or mistake or that dilutes or is likely to
7  infringe upon TriPharma's rights under the Exclusive Marketing Agreement
8  or its trademarked products;

9  Engaging in any other conduct that tends to falsely represent, or is
10 likely to confuse, mislead, or deceive purchasers, Defendants' customers,
11 TriPharma's customers, and other members of the public to believe that
12 Defendants' products are connected with Studies, the 892 Patent or in
13 TriPharma's trademarked products;

14 Further damaging TriPharma's goodwill;

15 Further engaging in unfair competition against TriPharma; and

16 Assisting, aiding, or abetting any other person or business entity in
17 engaging in or performing any of the activities referred to herein;

18 For this Court to issue a permanent injunction ordering that Defendants issue
19 and distribute a written mandate ordering each and all of its distributors, and their
20 agents, employees, servants, representatives, successors in interest, to refrain from
21 the conduct set forth herein, or be subject to sanctions as deemed appropriate by
22 this Court;

23 TriPharma be awarded compensatory damages in an amount to be
24 determined at the time of trial but believed to be in excess of $100,000,000 and that
25 such damages be enhanced and/or trebled pursuant to 15 U.S.C. Section 1117(b)
26 together with reasonable attorneys' fees;

27 All profits earned by Defendants through the time of trial s a result of their
28 infringing, diluting, and otherwise wrongful conduct alleged herein be determined

1    in an accounting, and thereafter disgorged and held in constructive trust and paid

2    over to TriPharma, and enhanced in the form of compensatory damages as

3    appropriate under the exceptional circumstances of this case;

4        TriPharma recover its reasonable attorneys' fees, costs, and expenses

5    incurred herein, as appropriate under the exceptional circumstances of this case;

6        TriPharma be awarded prejudgment and post-judgment interest at the legal

7    rate; and

8        That TriPharma recover such other and further relief as this Court deems just

9    and proper.

10

11   Dated: March 14, 2012    LAW OFFICES OF JOHN R. WALTON, P.C.

12

13

14       John R. Walton
         Attorneys for PLAINTIFF TRIPHARMA LLC

15

16

17   **JURY TRIAL DEMAND**

18       TriPharma demands a jury trial on all claims for relief.

19

20   Dated: March 14, 2012    LAW OFFICES OF JOHN R. WALTON, P.C.

21

22

23       John R. Walton
         Attorneys for PLAINTIFF TRIPHARMA LLC

24

25

26

27

28

**COMPLAINT**

# Exhibit A

US006899892B2

(12) **United States Patent**
Gallaher et al.

(10) Patent No.: **US 6,899,892 B2**
(45) Date of Patent: **May 31, 2005**

(54) **METHODS TO REDUCE BODY FAT**

(75) Inventors: **Daniel D. Gallaher**, Roseville, MN (US); **Laura Freiburger**, St. Paul, MN (US)

(73) Assignee: **Regents of the University of Minnesota**, Minneapolis, MN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 90 days.

(21) Appl. No.: **10/025,633**

(22) Filed: **Dec. 19, 2001**

(65) **Prior Publication Data**

US 2003/0124170 A1 Jul. 3, 2003

(51) Int. Cl.[7] .......................... A61K 47/00; A61K 9/00; A61K 7/00

(52) U.S. Cl. ........................ **424/439**; 424/400; 424/401

(58) Field of Search ................................ 424/400, 401, 424/439

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,388,082 A | 6/1968 | Rogers et al. ................. 260/17 |
| 3,627,872 A | 12/1971 | Parkinson ..................... 424/79 |
| 4,432,968 A | 2/1984 | Page et al. |
| 5,576,306 A | 11/1996 | Dressman  t al. |
| 5,585,366 A | 12/1996 | Gallaher et al. |
| 5,721,221 A | 2/1998 | Gallaher et al. |
| 5,756,461 A | 5/1998 | Stephens |
| 5,773,416 A | 6/1998 | Chehab |
| 5,780,258 A | 7/1998 | de la Brousse et al. |
| 5,789,393 A | 8/1998 | Dressman et al. |
| 5,919,902 A | 7/1999 | Becker et al. |
| 5,965,521 A | 10/1999 | Stephens et al. |
| 5,972,621 A | 10/1999 | Tartaglia et al. |
| 6,001,816 A | 12/1999 | Morsy et al. |
| 6,007,988 A | 12/1999 | Choo et al. ..................... 435/6 |

| | | | |
|---|---|---|---|
| 6,020,324 A | 2/2000 | Jamas et al. |
| 6,048,837 A | 4/2000 | Friedman et al. |
| 6,124,439 A | 9/2000 | Friedman et al. |
| 6,143,731 A | * 11/2000 | Jamas et al. .................. 514/54 |
| 6,251,433 B1 | 6/2001 | Zuckermann et al. |
| 2002/0019334 A1 | * 2/2002 | Portman ........................ 514/2 |
| 2003/0013679 A1 | 1/2003 | Wolf et al. .................. 514/54 |
| 2003/0039708 A1 | * 2/2003 | Fleischner .................. 424/729 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0502666 | 9/1992 | |
| WO | WO 9850398 A1 | * 11/1998 | ............ C07H/1/00 |

OTHER PUBLICATIONS

Abstract, Leptin in fnctional hypothalamic amenorrhea, Andrico et al, Aug. 2002. vol. 17, Iss. 8; p. 2043.*
Bouche, Clara , et al., "Five–Week, Low–Glycemic Index Diet Decreases Total Fat Mass and Improves Plasma Lipid Profile inModerately Overweight Nondiabetic Men", *Diabetes Care*, vol. 25, No. 5, May 2002, Clinical Care/ Education/Nutrition (Original Article), 822–828.
Kamphuis, MMJW , et al., "The effect of conjugated linoleic acid supplementation after weight loss on body weight regain, body composition, and resting metabolic rate in overweight subjects", *International Journal of Obesity*, 27, (2003),840–847.

(Continued)

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Humera N. Sheikh
(74) *Attorney, Agent, or Firm*—Schwegman, Lundberg, Woessner & Kluth, P.A.

(57)                        **ABSTRACT**

The invention provides methods and compositions for reducing the percentage of body fat in a mammal and/or the level of leptin in the bloodstream of the mammal. Such methods involve administering to the mammal a diet containing viscous polysaccharides.

**29 Claims, 4 Drawing Sheets**



**EXHIBIT A**

**US 6,899,892 B2**

Page 2

OTHER PUBLICATIONS

Larsen, Thomas M., et al., "Efficacy and safety of dietary supplements containing Conjugated Linoleic Acid (CLA) for the treatment of obesity—evidence from animal and human studies", *JLR Papers in Press. Published on Aug. 16, 2003 as Manuscript R300011–JLR206.* Copyrighted 2003 by Lipid Research, Inc.,(2003),1–23.

Pawlak, Dorota B., et al., "High Glycemic Index Starch Promotes Hypersecretion of Insulin and Higher Body Fat in Rats without Affecting Insulin Sensitivity", *American Society for Nutritional Sciences (Manuscript)*, Manuscript received May 30, 2000, Initial review completed Aug. 7, 2000, Revisions accepted Oct. 17, 2000,99–104.

Toda, Toshitaka, et al., "Change in Body Fat, But Not Body Weight or Metabolic Correlates of Obesity, Is related To symptomatic Relief of Obese Patients with Knee Osteoarthritis After a Weight Control Program", *The Journal of Rheumatology*, vol. 25, No. 11, (1998), 2181–2186.

Ducy, P., et al., "The Osteoblast: A Sophisticated Fibroblast Under Central Surveillance", *Science*, vol. 289, 15011504, (Sep. 1, 2000).

Fried, S.K., et al., "Symposium: Adipocyte Function, Differentiation and Metabolism—Regulatin of Leptin Production in Humans", *American Society for Nutritional Sciences*, 3127S–3131S.

Frigard, T., et al., "Fiber–Degrading Enzyme Increases Body Weight and Total Serum Cholesterol in Broiler Chickens Fed a Rye–Based Diet1,2", *The Journal of Nutrition, Official Publication of the American Institute of Nutrition*, vol. 124, No. 12, 2422–2430, (Dec. 1994).

Gallaher, C.M., et al., "Cholesterol Reduction by Glucomannan and Chitosan is Mediated by Changes in Cholesterol Absorption and Bile Acid and Fat Excretion in Rats", *American Society for Nutritional Sciences*, 2753–2759, (2000).

Gallaher, D.D., et al., "Relationships between Viscosity of Hydroxypropyl Methylcellulose and Plasma Cholesterol in Hamsters", *Nutrient Metabolism*, 1732–1738, (Sep. 9, 1992).

Gallaher, D.D., et al., "Viscosity and Fermentability as Attributes of Dietary Fiber Responsible for the Hypocholesterolemic Effect in Hamsters1–3", *American Institute of Nutrition*, 244–252, (Apr. 14, 1992).

Nightingale, J.S., "Lipid Binding From Aqueous Solution by Lipid Conjugated Hydroxyproplmethylcellulose", *Ph.D., Thesis, University of Washington*, 1–163, (1988).

Topping, D., "Hydroxyproplmethylcellulose, Viscosity, and Plasma Cholesterol Control", *Nutrition Reviews*, vol. 52, No. 5, 176–178.

Topping, D.L., et al., "A Viscous Fibre (Methylcellulose) Lowers Blood Glucose and Plasma Triacyglycerols and Increases Liver Glycogen Independently of Volatile Fatty Acid Production in the rat", *British Journal of Nutrition* (1988), 59, 21–30, 21–30, (Mar. 10, 1987).

* cited by examiner

**EXHIBIT A**

**U.S. Patent**          May 31, 2005          Sheet 1 of 4          US 6,899,892 B2



Fig.1



Fig.2

**EXHIBIT A**

**U.S. Patent**          May 31, 2005          Sheet 2 of 4          US 6,899,892 B2



*Fig.3*



*Fig.4*

**EXHIBIT A**

**U.S. Patent**          May 31, 2005          Sheet 3 of 4          US 6,899,892 B2



*Fig.5*



*Fig.6*

**EXHIBIT A**

**U.S. Patent**    May 31, 2005    Sheet 4 of 4    US 6,899,892 B2



*Fig. 7*

**EXHIBIT A**

US 6,899,892 B2

**1**

## METHODS TO REDUCE BODY FAT

### FIELD OF THE INVENTION

The present invention relates to the use of non-nutritive, viscous polysaccharides to reduce the percentage of body fat and the level of leptin in mammals. Examples of such polysaccharides include water-soluble cellulose-like polysaccharides such as β-glucans and hydroxypropyl methylcellulose.

### BACKGROUND OF THE INVENTION

Obesity affects an ever-increasing proportion of the population of Western cultures. Nearly one-third of adults in the United States are in excess of their ideal body weight by at least 20%. Obesity has become a major public health problem, at least in part because it is associated with other health problems such as hypertension, elevated blood lipids, coronary artery disease, osteoarthritis and Type II or non-insulin-dependent diabetes mellitus (NIDDM). In the United States alone, there are an estimated 6–10 million individuals with NIDDM, including 18% of the population over 65 years of age and most of these individuals are obese (Harris et al. Diabetes 36:523–534, 1987).

According to conventional wisdom, stability in body composition requires that energy intake equals expenditure, at least over a prolonged period of time. Such wisdom therefore requires that obese persons reduce their food intake in order to reduce their weight and their percent body fat. However, while reduction of caloric intake can lead to short-term weight loss, the lost weight is often regained. Moreover, some evidence indicates that repeated fluctuation of body weight can lead to weight increases and to increased body fat content.

It appears that there may be a signaling system that adjusts appetite, and accordingly food intake, to preserve a constant total adipose tissue mass. The nature of this signaling system has been examined in a variety of animal experiments involving induced weight change (Coh. et al., Yale J. Biol. Med. 34:598–607, 1962; Harris et al., Proc. Soc. Exp. Biol. Med. 191:82–89, 1989; and Wilson et al., Am. J. Physiol. 259: R1148–R1155, 1990); lipectomy (Forger et al., Metabolism 37:782–86, 1988; Liebelt et al., Ann. N.Y. Acad. Sci. 131:559–82, 1965; and Chlouverakis et al., Metabolism 23:133–37, 1974); plasma transfer from obese or satiated animals to hungry animals (Davis et al., Science 156:1247–48, 1967; Davis et al., J. Comp. Physiol. Psychol. 67:407–14, 1969; and King, Physiol. Psychol. 4:405–08, 1976); and parabiosis between obese and lean animals (Hervey, J. Physiol. 145:336–52, 1959; Parameswaran et al., Am. J. Physiol. 232:R150–R157, 1977; Nishizawa et al., Am. J. Physiol. 239:R344–351, 1980; Harris et al., Am. J. Physiol. 257: R326–R336, 1989; Schmidt et al., Acta Physiol. Acad. Sci. Hung. Tomus 36:293–98, 1969; Coleman et al., Diabetologia 9:294–98, 1973; Harris et al., Int. J. Obesity 11:275–83, 1987; and Coleman et al., Am. J. Physiol. 217:1298–1304, 1969).

Such studies may have identified certain factors that are involved in regulating obesity and body fat content, but confusion exists as to how to use such information to treat obesity. For example, Fried et al., 130 J. Nutr. 3127S–3131S (2000) has disclosed that serum leptin levels are usually elevated in obesity, indicating that lower serum levels of leptin may be beneficial for treating obesity. However, earlier animal data indicated that a leptin deficiency might lead to obesity. Mice that have homozygous mutant ob genes

**2**

(ob/ob) have been reported to be obese but when given daily injections of recombinant leptin, their food intake was markedly inhibited and they experienced a reduction in body weight and fat. It is known that leptin is a protein expressed by the ob gene and that it is secreted by adipose tissue. Some researches have provided data indicating that leptin is a satiety factor and a regulator of metabolism (Levin et al., 1996 Proc. Natl. Acad. Sci. USA 93:1726–1730). Hence, the relationship between leptin levels and body fat has been contradictory. See also, Pelleymounter et al., 1995, Science 269:540–543; Halaas et al., 1995 Science 269: 543–546; and Campfield et al., 1995 Science 269:546–549.

A number of studies have been conducted on the role of dietary fiber in health and disease. Some studies comparing the effects of various fiber sources on cholesterol have concluded that soluble cellulose-like materials reduce cholesterol levels. For example, U.S. Pat. Nos. 5,585,366 and 5,721,221 to Gallaher et al. disclose methods for reducing cholesterol levels in mammalian blood by administering high viscosity water-soluble cellulose derivatives such as hydroxypropyl methylcellulose. U.S. Pat. No. 6,020,324 to Jamas et al. discloses dietary supplements containing intact whole β-glucan in an amount sufficient to lower serum cholesterol levels. However, these patents do not provide treatments for reducing body fat.

Current weight loss treatment regimens generally either have negative side effects or are not particularly effective. Accordingly, a new approach is needed to regulating body fat content.

### SUMMARY OF THE INVENTION

The invention provides methods and compositions for reducing the percentage of body fat in a mammal and the level of leptin in the bloodstream of a mammal comprising administering a sufficient amount of viscous, water-soluble, non-nutritive, non-starch, indigestible polysaccharide to the mammal for a time sufficient to reduce the percentage of body fat in the mammal. Such polysaccharides are polymers of monosaccharides substantially connected by beta (β) glycosidic linkages. The monosaccharides can be arabinose, fructose, glucose, glucosamine, glucuronic acid, galactose, galactosammine, mannose, N-acetylmuramic acid, N-acetylneuraminic acid, rhamnose, xylose or a mixture thereof. The beta glycosidic linkages are 1→2 beta-glycosidic bonds, 1→3 beta-glycosidic bonds, 1→4 beta-glycosidic bonds, 1→6 beta-glycosidic or a mixture thereof. Examples of polysaccharides contemplated by the invention include locust bean gum, guar gum, carrageenan, alginate, modified cellulose, beta-glucan, or glucomannan.

In one embodiment, the polysaccharide has Formula I:



wherein

each R is separately hydroxy, lower alkyloxy, or hydroxy (lower(alkyloxy));

n is an integer ranging from about 500 to about 2500; and

X is an R group or a covalent bond to the oxygen at the first position of the adjacent monosaccharide.

**EXHIBIT A**

US 6,899,892 B2

**3**

Such polysaccharides can also be methylcellulose, hydroxypropyl methylcellulose, 2-hydroxypropyl methylcellulose, 2-hydroxyethyl methylcellulose, 2-hydroxybutyl methylcellulose, 2-hydroxyethyl ethylcellulose, 2-hydroxypropyl cellulose, methyl ethylcellulose, or 2-hydroxyethylcellulose.

Preferred polysaccharides are β-glucan and hydroxypropyl methylcellulose.

The compositions and polysaccharides of the invention can be administered or incorporated into a foodstuff. For example, the compositions and polysaccharides of the invention can be administered or incorporated into the an applesauce, a cereal, a cookie, a cracker, a flavored drink, a fruit juice, an ice cream, a milk shake, a pudding or a snack bar.

An example of a sufficient amount of polysaccharide is an amount that provides an intestinal viscosity of about 1000 mPa·s to about 3000 mPa·s, preferably about 1500 mPa·s to about 2500 mPa·s.

An example of a sufficient amount of polysaccharide to be administered or consumed is about 1 g to about 5 g polysaccharide per meal, preferably about 2 g to about 3 g polysaccharide per meal. A time sufficient for reducing the percentage of body fat is at least about two to at least about ten weeks, preferably at least about three weeks to at least about eight weeks, more preferably at least about four to at least about six weeks. However, the polysaccharide or composition thereof can be administered indefinitely.

In one embodiment, the percentage of body fat is reduced by about 5% to about 40%, preferably 10% to about 30%, more preferably about 15% to about 25%.

## DESCRIPTION OF THE FIGURES

FIG. 1 graphically illustrates the relationship between the percent of fat mass and the viscosity of a supernatant of the intestinal contents of rats. As illustrated, there is a negative correlation between the intestinal viscosity and the percent fat mass, indicating that percent body fat decreases as the viscosity of the diet increases.

FIG. 2 graphically illustrates the relationship between plasma leptin concentration and the viscosity of a supernatant of the intestinal contents of rats. As illustrated, there is a negative correlation between the intestinal viscosity and the concentration of leptin in the plasma, indicating that leptin concentration decreases as the viscosity of the diet increases.

FIG. 3 graphically illustrates the relationship between plasma leptin concentration and the viscosity of a supernatant of the intestinal contents of rats. As illustrated, there is a negative correlation between the intestinal viscosity and the concentration of leptin in the plasma, indicating that leptin concentration decreases as the viscosity of the diet increases.

FIG. 4 graphically illustrates the relationship between plasma leptin concentration and the percent fat pads of body weight of rats. As illustrated, there is a positive correlation between percent fat and the concentration of leptin in the plasma, indicating that lower leptin concentrations are correlated with lower body fat.

FIG. 5 graphically illustrates the relationship between plasma leptin concentration and the percent epididymal fat of body weight of rats, after correction for body weight. As illustrated, there is a positive correlation between the percent epididymal fat and the concentration of leptin in the plasma, indicating that body fat increases as leptin concentration increases.

**4**

FIG. 6 is a bar graph illustrating the relationship between plasma leptin concentration and the type of diet, before and after correction for body weight. The five diet types differed only in the type of polysaccharide fiber added: Cellulose (CE, control diet); Beta-Trim (beta glucan) low viscosity (BT-LV); Beta-Trim (beta glucan) high viscosity (BT-HV); Hydroxypropyl methylcellulose (HPMC) low viscosity (HPMC-LV); and Hydroxy-propyl methylcellulose (HPMC) high viscosity (HPMC-LV). As illustrated, the high and low viscosity HPMC diets lead to lower concentrations of leptin in the plasma.

FIG. 7 is a bar graph illustrating the relationship between retroperitoneal fat pad weight and the type of diet. The five diet types differed only in the type of polysaccharide fiber added: Cellulose (CE, control diet); Beta-Trim (beta glucan) low viscosity (BT-LV); Beta-Trim (beta glucan) high viscosity (BT-HV); Hydroxypropyl methylcellulose (HPMC) low viscosity (HPMC-LV); and Hydroxy-propyl methylcellulose (HPMC) high viscosity (HPMC-LV). As illustrated, the high viscosity Beta-Trim (beta glucan) diet and the high and low viscosity HPMC diets lead to lower retroperitoneal body fat.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention provides methods and compositions for reducing the percentage of body fat and/or the serum levels of leptin in a mammal by administering a viscous polysaccharide. In general, the viscous polysaccharides of the invention are water-soluble, non-nutritive, non-starch-like and indigestible. High viscosity polysaccharides are often very useful for reducing the percentage of body fat and for lowering leptin levels in the blood. However, it is the viscosity of the water-soluble fraction of the intestinal contents that is most important for achieving optimal reduction in body fat and leptin levels. Accordingly, a lower viscosity polysaccharide can be administered so long as the amount administered provides sufficient viscosity within the soluble portion of the intestinal contents.

Any water-soluble, non-nutritive, indigestible, non-starch, viscous polysaccharide available to one of skill in the art can be used in the compositions and methods of the invention. The viscous polysaccharides employed in this invention are further characterized in that they are non-toxic, non-ionic, non-caloric, biologically inert but edible. Examples of viscous polysaccharides that can be used include locust bean gum, guar gum, carrageenans, alginates, modified celluloses, beta-glucans, glucomannans and the like.

The viscous polysaccharides of the invention are branched or non-branched polymers of monosaccharides. A variety of monosaccharide subunits can be present in the viscous polysaccharides of the invention including arabinose, fructose, glucose, glucosamine, glucuronic acid, galactose, galactosamine, mannose, N-acetylmuramic acid, N-acetylneuraminic acid, rhamnose, xylose and the like. Such viscous polysaccharides can have a single type of monosaccharide subunit, e.g. only glucose, or a mixture of a variety of monosaccharide subunits.

The covalent linkages connecting the monosaccharide subunits are generally beta (β) glycosidic linkages, although a small number of alpha (α) glycosidic linkages can be present, for example, at branch points. Examples of linkages that exist between the monosaccharides include $1 \rightarrow 2$ beta-glycosidic bonds, $1 \rightarrow 3$ beta-glycosidic bonds, $1 \rightarrow 4$ beta-glycosidic bonds, $1 \rightarrow 6$ beta-glycosidic bonds.

**EXHIBIT A**

US 6,899,892 B2

| 5 | 6 |

In one embodiment, the viscous polysaccharide is a water-soluble, cellulose-like polysaccharide. Such water-soluble cellulose-like polysaccharides include polymers of glycosides having either $1 \rightarrow 3$ or $1 \rightarrow 4$ beta-glycosidic bonds, or a mixture of $1 \rightarrow 3$ and $1 \rightarrow 4$ beta-glycosidic bonds.

The cellulose-like polysaccharides used in the invention have a mixture of $1 \rightarrow 3$ and $1 \rightarrow 4$ beta-glycosidic bonds and/or have only $1 \rightarrow 3$ or $1 \rightarrow 4$ beta-glycosidic bonds with various substituents in place of the hydroxyl groups found on cellulose so that the cellulose-like polysaccharide is soluble in aqueous solution. Beta-glucans have mixed $1 \rightarrow 3$ and $1 \rightarrow 4$ beta-glycosidic bonds and are found in natural materials such as oats and barley.

Examples of the structures of cellulose, with $1 \rightarrow 4$ beta-glycosidic bonds, and of beta-glucan, with a mixture of $1 \rightarrow 3$ and $1 \rightarrow 4$ beta-glycosidic bonds, are provided below, where a portion of each structure is illustrated.



cellulose [(1→4)-β-D-glucan]



mixed linkage β-glucan [(1→3)(1→4)-β-D-glucan]

Cellulose is a natural beta-glycosidic polymer having $1 \rightarrow 4$ beta-glycosidic bonds where substantially all of the glycosidic subunits are substituted with hydroxyl groups. However, cellulose tends to be insoluble in aqueous solution. Accordingly, unmodified cellulose is preferably not used in the compositions and methods of the invention.

In contrast, the viscous polysaccharides of the invention are water-soluble. "Water soluble" for purposes of this application means that 2 grams of powdered viscous polysaccharide can be dispersed by stirring into 100 grams of water at a temperature between $0°$ C.–$100°$ C. to provide a substantially clear, stable aqueous composition or dispersion, when the dispersion is brought to a temperature of about $20°$ C.

Water-soluble cellulose-like materials with $1 \rightarrow 4$ beta-glycosidic bonds that contain lower alkyloxy or hydroxy (lower(alkyloxy)) substituents can also be used in the compositions and methods of the invention. Similarly, water-soluble cellulose-like materials with $1 \rightarrow 3$ beta-glycosidic bonds, or a mixture of $1 \rightarrow 3$ and $1 \rightarrow 4$ beta-glycosidic bonds, that have lower alkyloxy or hydroxy (lower(alkyloxy)) substituents can be used. Such alkyloxy substituents preferably have one to four carbon atoms (i.e. $C_1$ to $C_4$ alkyloxy substituents). Preferred substituents include methoxy and hydroxypropyloxy groups. Cellulose-like polysaccharides with lower alkyloxy or hydroxy (lower(alkyloxy)) substituents are described in U.S. Pat. Nos. 4,900,573, 4,734,285, 4,704,285, and in Kirk-Othmer-Concise Encyclopedia of Chemical Technology, M. Grayson, ed., Wiley-Interscience NY (1985) at pages 231–232, the disclosures of which are incorporated herein by reference.

Representative water-soluble cellulose-like polysaccharides used in the invention are therefore of Formula I:



where
    each R is separately a hydroxy, lower alkyloxy, or hydroxy (lower(alkyloxy)) group;
    n is an integer ranging from about 500 to about 2500; and
    X is an R group or a covalent bond to the oxygen at the first position of the adjacent β-glycoside.

Many such water-soluble cellulose-like polysaccharides are commercially available, or can be readily obtained via conventional organic synthetic methodology. Examples of the water-soluble cellulose-like polysaccharides that can be used in the invention are methylcellulose, hydroxypropyl methylcellulose or 2-hydroxypropyl methylcellulose, 2-hydroxyethyl methylcellulose, 2-hydroxybutyl methylcellulose, 2-hydroxyethyl ethylcellulose, 2-hydroxypropyl cellulose, methyl ethylcellulose, and 2-hydroxyethylcellulose. Water-soluble β-glucan and hydroxypropyl methylcellulose are examples of preferred compounds for the compositions and methods of the invention. A portion of the structure of hydroxypropyl methyl-cellulose is provided below.



The invention provides methods of reducing body fat percentages and/or leptin serum levels in a mammal by administering to the mammal a viscous polysaccharide in an amount and for a time sufficient to reduce the percentage of body fat and/or leptin serum levels.

"Mammal" refers to any animal classified as a mammal, including humans, domestic and farm animals, nonhuman primates, and zoo animals, sports animals, or pet animals, such as dogs, cats, horses, cows, etc.

A time sufficient for reducing the percentage of body fat and/or leptin serum levels can vary depending on the level and duration of intestinal viscosity achieved, the amount of viscous polysaccharide consumed, the general health of the mammal, the level of activity of the mammal and related factors. However, with routine administration or consumption of a viscous polysaccharide of the invention, the percentage of body fat and the level of leptin in the blood generally begins to decrease within about two to about ten weeks, often within about three weeks to about eight weeks and particularly within about four to six weeks.

The viscous polysaccharides of the invention can be administered or consumed indefinitely. Accordingly, there is no precise upper limit on the amount of time during which the viscous polysaccharides can be consumed. The decision

US 6,899,892 B2

7

to stop consuming viscous polysaccharides can therefore be based upon whether the desired percentage body fat and/or leptin serum levels have been reached. In general, it may be beneficial to administer or consume an appropriate amount of the viscous polysaccharides of the invention for about twelve weeks, preferably about sixteen weeks, more preferably about twenty weeks. Moreover, even when the desired level of body fat or serum leptin has been achieved, one may choose to continue administration or consumption of a adequate amounts of viscous polysaccharide to help maintain the desired level of body fat and/or leptin levels.

Accordingly, the time for administration and/or consumption of the viscous polysaccharides of the invention can be varied to suit the needs of the person or mammal receiving the polysaccharides. In particular, because the polysaccharides of the invention are non-toxic and non-nutritive, the beneficial effects of administration can be realized by sustained or even indefinite administration or consumption of such polysaccharides.

Although viscous polysaccharides have been used in a variety of foodstuffs to improve certain functional properties, such as emulsification, texture or moisture retention, the amounts used are usually less than 0.5% of the foodstuff. These levels are generally too low to have a significant physiological effect on leptin levels and body fat percentages.

Therefore, the present invention also provides compositions and processed foodstuffs intended for mammalian ingestion that comprise an amount of viscous polysaccharides effective to lower the percentage of body fat or the amount of leptin in the bloodstream. Such compositions or foodstuffs can be consumed alone or in combination with other foods to meet the daily caloric requirements of the mammal. Preferably, the viscous polysaccharides of the invention are administered or consumed in sufficient amounts throughout the day, rather than in a single dose or amount.

In contrast to the small amounts employed in commercially available compositions and processed foodstuffs, the compositions and foodstuffs that are the subject of the present invention preferably comprise about 2 to about 20 weight percentage of one or more viscous polysaccharide, preferably about 3 to about 15 weight percentage, more preferably about 4 to about 12 weight percentage viscous polysaccharide(s). At these levels, about 3 g to about 20 g, preferably about 4 g to about 15 g, more preferably about 5 g to about 12 g, even more preferably about 6 g to about 10 g of viscous polysaccharides are ingested daily by a large mammal such as a human.

Therefore, to achieve a useful leptin-lowering or body fat percentage-lowering effect, an adult would ingest about 1 g to about 5 g per meal, preferably about 1.5 g to about 4 g per meal, and more preferably about 2 g to about 3 g per meal of a viscous polysaccharide, such as a beta-glucan or hydroxypropyl methylcellulose. However, dosages can vary and can be even higher for some human patients with highly elevated leptin or body fat levels.

The apparent viscosity of aqueous solutions of the viscous polysaccharides of this invention is proportional to the molecular weight or chain length of the compound. However, the average viscosity of an aqueous solution of the viscous polysaccharides of the invention is also directly proportional to the concentration of polysaccharide present in the solution. Hence, the viscosity of a composition or foodstuff can be adjusted by modulating either the molecular weight of the polysaccharide or the concentration of the polysaccharide.

8

The viscosities reported herein are measured in centipoises (cps) or centpoise (cP) or Pascal seconds (P·s) or milliPascal seconds (mPa·s), where 10 centipoise is 1 Pascal second. To obtain such viscosity measurements, a 1 or 2% by weight aqueous solution of polysaccharide at 20° C. can be measured in a rotational viscometer. The viscosity of the 2% aqueous solutions of polysaccharide employed in the invention is desirably in the range of about 50 cps to about 200,000 cps, and preferably in the range of about 75 to about 100,000 cps, most preferably within the range of about 100 to about 10,000 cps. A "high viscosity" polysaccharide possesses a viscosity of at least 10,000 cps.

The average molecular weight of polysaccharide useful in lowering the leptin or body fat levels in mammals is at least about 10,000 daltons. If the viscosity is adjusted by modulating the molecular weight, the molecular weight can be increased. For example, the molecular weight can be increased to at least about 25,000 daltons, and preferably at least about 50,000 daltons. In some embodiments, the molecular weight can range from about 100,000 to about 250,000 daltons. The weight average molecular weight will be 3–10 times the number average molecular weight.

Many of the cellulose-like polysaccharides for use in the invention are available to one of skill in the art. For example, HPMC can be purchased under the trade name METHOCEL™ from Dow Chemical, Midland, Mich. Cellulose-like polysaccharides for use in the invention can also be made by the reaction of cellulose pulp with various chemical reactants in the presence of caustic soda. For example, methylcellulose can be made by reacting chloromethane with cellulose pulp and HPMC can be made using propylene oxide and chloromethane as reactants. For example, see C. R. Noller, Chemistry of Organic Compounds, W. B. Saunders Co., London (2d ed. 1957) at pages 404–405.

The polysaccharides of the invention can be administered in solution or in powder form, or may be combined with other food ingredients. Preferably, the polysaccharides of the invention are administered in combination with food or as a foodstuff. However, the polysaccharides of the invention can also be administered as pharmaceutical compositions. Pharmaceutical compositions containing the polysaccharides of the invention can be administered with a pharmaceutically acceptable carrier in a pharmaceutical unit dosage form. Pharmaceutically acceptable carriers include tableting excipients, gelatin capsules, or carriers such as a polyethylene glycol, a natural gel, and the like. Pharmaceutical unit dosage forms include tablets, capsules, gelatin capsules, pre-measured powders, pre-measured solutions, and the like. Hence, the polysaccharides may be formulated as tablets, granules, capsules, suspensions and the like.

While the method of administration or consumption may vary, the polysaccharides are preferably ingested by a human as an ingredient of his or her daily diet. The polysaccharides can be combined with a liquid vehicle, such as water, milk, vegetable oil, juice, and the like, or with an ingestible solid or semi-solid foodstuff. A number of foodstuffs are generally compatible with polysaccharides of the invention. Examples of such foodstuffs are disclosed by M. K. Weibel et al., U.S. Pat. No. 4,923,981, the disclosure of which is incorporated by reference herein.

For example, it may be mixed into foods such as milk shakes, milk shake mixes, breakfast drinks, juices, flavored drinks, flavored drink mixes, yogurts, puddings, ice creams, ice milks, frostings, frozen yogurts, cheesecake fillings, candy bars, including "health bars" such as granola and fruit bars, gums, hard candy, mayonnaise, pastry fillings such as fruit fillings or cream fillings, cereals, breads, stuffings,

**EXHIBIT A**

US 6,899,892 B2

**9**

dressings and instant potato mixes. An effective amount of the present polysaccharides can also be used as a fat-substitute in salad dressings, frostings, margarines, soups, sauces, gravies, mayonnaises, mustards and other spreads.

Therefore, "food ingredients," as the term is used herein, includes those ingredients commonly employed in recipes for the above foodstuffs, including flour, oatmeal, fruits, milk, eggs, starch, soy protein, sugar, sugar syrups, vegetable oils, butter, emulsifying agents such as lecithin, and the like.

The viscous polysaccharides can be partially or fully hydrated before they are orally ingested. For example, the viscous polysaccharides may be dispersed in a sufficient amount of water, milk, juice, flavored water, hot chocolate, soy milk, cream, or other liquid to make a drink item that can be consumed to administer an effective amount of the present polysaccharides. The viscous polysaccharides may be dispersed in a sufficient amount of water to make a syrupy liquid that is then mixed with one or more food ingredients such as flours, oatmeal, cornmeal, rice, barley, wheat germ, and other cereal products to made a paste or dough, the latter being subsequently treated to create an appealing foodstuff by procedures such as baking, extruding, and the like, to provide edible foodstuffs. Of course, colorings and flavorings may be added as may be appropriate to add to the attractiveness of the foodstuff. Food ingredients with which the viscous polysaccharides may be combined can be metabolizable and can have predetermined caloric values to create a diet item, diet drink or diet bar.

Therefore, in one embodiment the invention provides a composition comprising a food, drink or snack item, such as a cereal, milkshake or health bar, for reducing the percentage of body fat in a mammal comprising functionally effective amount of a viscous polysaccharide.

In another embodiment the invention provides a composition comprising a food or snack item, such as a cereal or health bar, for reducing the level of leptin in the plasma of a mammal comprising functionally effective amount of a viscous polysaccharide.

A functionally effective amount of viscous polysaccharide is described as described above.

Preferably the reduction of body fat levels is about 5% to about 30%, although this amount can be varied depending on the amount and duration of administration of the viscous polysaccharide. More preferably, the reduction in body fat levels is about 10% to about 20%.

Leptin plasma levels can be reduced similarly. Hence, the level of leptin in the blood can be reduced by about 5% to about 50%, preferably about 10% to about 40% and more preferably about 15% to about 35%.

The desired dosage or amount of viscous polysaccharides that can be included in the diet will vary depending on the size and sex of the human patient as well as the patient's leptin levels and/or percent body fat. For example, the foodstuffs and food items described above will typically be formulated to comprise from about 2% to about 20% of total polysaccharide, depending on the viscosity grade polysaccharide used and the type of foodstuff or food item. Combinations of concentration and viscosity would have to be determined experimentally to some extent. For example, in a milk shake or pudding, the weight percentage can be 10 to about 20%. However, in baked goods, a lesser amount ranging from, for example, about 2% to about 5% by weight, might be preferred to avoid possible negative effects on the rheological characteristics of the product. Of course, the amount of viscous polysaccharide incorporated into a pharmaceutical unit dosage form can be much higher, since taste

**10**

and rheology are not primary considerations, e.g., from about 20–98%, preferably about 50–80% of polysaccharide can be used. For 1000 g food the amount of viscous polysaccharide can range from about 20 g to about 200 g, preferably about 30 g to about 150 g, more preferably about 35 g to about 125 g of viscous polysaccharides are present per 1000 g food.

The present invention is further described by the following non-limiting examples.

**EXAMPLE**

Viscous Polysaccharide Consumption Decreases Percent Body Fat

In this example, rats were fed a variety of diets containing different types of water-soluble viscous polysaccharides. After four weeks, rats fed high viscosity β-glucan, or either low or high viscosity hydroxypropylmethylcellulose had significantly lower body fat levels.
Materials and Methods
Animals

The animal-use protocol was approved by the University of Minnesota Animal Care Committee. Fifty Wistar rats (initially around 80–90 g) were purchased from Harlan Sprague-Dawley, Inc (Indianapolis, Ind., USA).

The rats were individually housed in wire bottom cages in a temperature controlled animal room with a daily photo-period of twelve hours of light and twelve hours of dark, with light from 1800 to 0600.

Upon arrival, animals were fed one of the five experimental diets for four weeks. Body weight and 24 hour-food intake were determined weekly for the four weeks that the experimental diets were fed.

The rats were provided the diets and water ad libitum.
Diets

The diets were all nutritionally complete and were based on the AIN-93 G diet (Reeves et al. 1993). All diets contained 20% of protein, 15% of fat and 0.12% of cholesterol. Five diets were prepared that differed only by the type of polysaccharide added, as follows:

Cellulose (CE) (control diet)

Beta-Trim (beta glucan) low viscosity (BT-LV)

Beta-Trim (beta glucan) high viscosity (BT-HV)

Hydroxypropyl methylcellulose (HPMC) low viscosity (HPMC-LV)

Hydroxypropyl methylcellulose (HPMC) high viscosity (HPMC-HV)

The composition of these diets is given in Table 1.

TABLE 1

| Composition of diets containing Cellulose, Beta-Glucan or HPMC for 1 kg of diet | | | | | |
|---|---|---|---|---|---|
| Diet | Cell-ulose (g) | Beta-glucan LV (g) | Beta-aglucan HV (g) | HPMC LV (g) | HPMC HV (g) |
| Cornstarch | 347 | 272.3 | 287 | 347 | 347 |
| Casein | 200 | 195.6 | 193.6 | 200 | 200 |
| Dextrinized cornstarch | 115.2 | 115.2 | 115.2 | 115.2 | 115.2 |
| Sucrose | 87.3 | 87.3 | 87.3 | 87.3 | 87.3 |
| Corn oil | 150 | 150 | 150 | 150 | 150 |
| Cellulose | 50 | 29.1 | 16.4 | 10 | 10 |
| Mineral mix | 35 | 35 | 35 | 35 | 35 |
| Vitamin mix | 10 | 10 | 10 | 10 | 10 |
| L-Cystine | 3 | 3 | 3 | 3 | 3 |

**EXHIBIT A**

US 6,899,892 B2

**11**

TABLE 1-continued

Composition of diets containing Cellulose, Beta-Glucan or HPMC for 1 kg of diet

| Diet | Cellulose (g) | Beta-glucan LV (g) | Bet-aglucan HV (g) | HPMC LV (g) | HPMC HV (g) |
|------|------|------|------|------|------|
| Choline bitartrique | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 |
| BHT* | 0.014 | 0.014 | 0.014 | 0.014 | 0.014 |
| Cholesterol* | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 |
| Beta trim 12% | 0 | 100 | 0 | 0 | 0 |
| Beta-trim 20% | 0 | 0 | 100 | 0 | 0 |
| HPMC K100 | 0 | 0 | 0 | 40 | 0 |
| HPMC K4M | 0 | 0 | 0 | 0 | 20 |
| HPMC K15M | 0 | 0 | 0 | 0 | 20 |

*BHT and cholesterol were added directly diluted in the corn oil.

The HPMC formulations were prepared from different HPMC grades. The low viscosity HPMC was K100 and the high viscosity HPMC mixture was 50% K15M and 50% K4M. At 25° C., two percent solutions of the different HPMC grades have the following viscosities: K100 viscosity is 100 mPa·s; K4M viscosity is 4000 mPa·s; and K15M viscosity is 15,000 mPa·s.

The appropriate formulations have been determined according to previous studies in the lab to examine the correlation between in vivo and in vitro viscosity (unpublished).

Two diets contained BetaTrim (Quaker Oats, Inc) as a beta-glucan source: a 12% BetaTrim diet (10% of diet) and a 20% BetaTrim diet (10% of diet). For these diets, the addition of BetaTrim increased the amount of carbohydrates and protein according to the composition of the BetaTrim (4.4% of protein and 74.4% of starch in 12% BetaTrim and 6.4% of protein and 60.0% of starch in 20% BetaTrim). So, in order to normalize the nutritional content of these diets to match that of the AIN-93 G diet, we compensated by lowering the quantity of casein to obtain a final total of 20% of protein. Cornstarch was used to balance the carbohydrate quantity, while sucrose and dextrinized cornstarch stayed the same.

Two diets contained HydroxyPropylMethylCellulose (HPMC), (METHOCEL, The Dow Chemical Company, Midland, Mich., USA) as polysaccharide source (4% of diet). The amount of cornstarch and casein for these diets was held constant.

Cellulose was used in a control diet, instead of the BetaTrim or the HPMC used in the test diets. However, cellulose was also added to the test diets to make up for the lesser weight percentage of the BetaTrim and HPMC. The amount of cellulose added to 1000 g of the four test diets was determined by adding all the other constituents together except cellulose and subtracting this amount from 1000 g.

Tissue Collection

Rats were fasted overnight before being taken. The following morning, they were anesthetized with ether and blood samples for leptin assay were drawn by cardiac puncture into tubes containing EDTA. Plasma was prepared and stored at −70° C.

The abdominal cavity was opened. The small intestine was removed, the contents were collected in tubes and kept on ice. Then epididymal and retroperitoneal fad pads were removed and weighed. Livers were removed, weighed, and two grams were collected for microsomes preparation. The

**12**

remainder of the livers were wrapped in plastic bags and quickly frozen for cholesterol measurement. The two femurs were removed, one for calcium content measurement and the other one for bone density measurement, and wrapped in plastic bags and frozen.

Plasma Leptin Level

Serum was stored at −70° C. until hormone assay was performed. Plasma leptin level was determined in duplicate by a commercial radioimmunoassay kit using [125]I-labeled rat leptin antiserum (Linco Research, St Charles, Mo.).

Liver Cholesterol Analysis

Samples for liver cholesterol analysis were prepared according to the method of Folch et al. (1957) for lipids extraction, modified and applied to liver. Lipids were extracted from approximately 1 g (exact weight known) of liver. Samples were homogenized and rinsed with chloroform:methanol (2:1) (total 20 mL), filtered through a filter paper, mixed with a 6 mL of 0.9% NaCl solution and centrifuged. The lower phase was kept and evaporated under $N_2$. Samples were reconstituted in 10 mL chloroform:methanol.

Cholesterol assay was performed on 10 uL using a commercial kit (Infinity™ cholesterol reagent, Sigma Diagnostics, St. Louis, Mo.).

Intestinal Content Supernatant Viscosity Measurement

After fasting overnight, animals were fed 7.5 g of diet and allowed 2½ hours for consumption and digestion. The precise amount of diet consumed was recorded. Once the small intestine removed, the contents were stripped out in tubes and centrifuged at 30° C. and 19,500 g for 45 minutes. Then, supernatant was collected and the viscosity of 0.5 ml of sample was measured at 37° C. with a Brookfield-Wells Coneplate viscometer, model LVT-CP (CP-51 cone). Measurements were taken at shear rates, then viscosity versus shear rate was plotted on a log-log scale and viscosity was estimated by extrapolation of the line to a shear rate of 23.0 $s^{-1}$.

Bone Density Determination

The bone density was measured using the method of Archimedes' principle (Keenan et al. 1992, Keenan et al. 1997). The bones were cleaned and hydrated by immersion in distilled water under vacuum for one hour (bone is porous and air in bone must be displaced by immersion in distilled water). Bones were weighed twice with a micro electrobalance (Cahn), first out of water, and then submerged in water. The density was calculated using the formula:

$$P_{bone} = A/(A-B) * P_w$$

where $P_{bone}$ is the density of the bone, $P_w$ is the density of distilled water at known temperature, A is the weight of hydrated bone out of water, B is the weight of hydrated bone submerged in water and A–B is the difference of weight equivalent to the weight of volume displaced by the bone, equivalent of the volume of the bone.

Bone Calcium Content

Calcium in bones was measured by atomic absorption analysis. Bones were ashed for 12 hours at 485° C. Ashes were diluted in 5 mL of 20% trace metal free HCl, then 5 mL of distilled water. Supernatant was removed after ashes settled and diluted 1000 times with 0.5% lanthanum chloride. A Perkin-Elmer flame atomic absorption spectrometer was used to analyze samples for calcium content.

Statistical Analysis

Values were expressed as means±standard error. The significance of differences was analyzed by one-way ANOVA performing PROC GLM in SAS statistical software (SAS Institute 1999). Duncan's multiple range test was used

**EXHIBIT A**

US 6,899,892 B2

**13**

to detect differences among the groups. A significant difference was accepted at $p < 0.05$.

### RESULTS

#### Intestinal Content Supernatant Viscosity

The intestinal contents supernatant viscosities are shown on Table 2. As can be seen, the BT-HV group's viscosity is much lower than the HPMC-HV diet's viscosity in spite of the attempt to match their viscosities. The BT-LV, BT-HV, HPMC-LV, and HPMC-HV diets increased significantly the intestinal viscosity compared to the cellulose and BT-LV diets ($p < 0.05$). The viscosities of the two HPMC diets are not significantly different ($p > 0.05$).

#### TABLE 2

Final Body weight, Peritoneal and Epididymal Fat Pads Weights, and % of fat pads in body weight of rats fed diets cellulose, high and low viscosity Beta glucan and high and low viscosity HPMC.

| Dietary group | Intestine Viscosity (mPa · s) | Final body weight (g) | Retroperitoneal fat pad weight (g) | Epididymal fat pad weight (g) | % of fat pads in body weight |
|---|---|---|---|---|---|
| Cellulose | 8.2[a] | 313.00[a] | 2.35[a] | 2.17[a] | 2.87[a] |
| Beta glucan LV | 533.6[b] | 299.09[ab] | 2.22[ab] | 2.06[ab] | 2.83[a] |
| Beta glucan HV | 997.6[b] | 285.82[b] | 1.64[c] | 1.65[c] | 2.28[b] |
| HPMC LV | 2082[c] | 300.91[ab] | 1.76[bc] | 1.83[abc] | 2.36[b] |
| HPMC HV | 2163.3[c] | 293.09[ab] | 1.51[c] | 1.73[bc] | 2.19[b] |

**14**

#### Body Weight and Fat Pad Weights

The final body weights of the animals for the 5 different diet groups are shown Table 2.

As illustrated by Table 2, there is no significant difference in body weight except between cellulose and BT-HV groups ($p < 0.05$). There were no significant differences in food intake among the five groups, although there was a trend for a lower food intake in the BT-HV group.

The % of fat pads is an index of the % of body fat mass. Table 2 shows fat pads weights and the % of fat pads weight in body weight for each diet group. Fat pad weight decreased when viscosity increased for the two kinds of fat pads, although the effect is more apparent for retroperitoneal fat pads. The BT-LV diet did not have a significant effect on the fat pads weight, but for the rats fed the two HPMC diets the fat pads weights are significantly lower ($p = 0.092$ for epididymal fat pad and $p = 0.008$ for retroperitoneal fat pad). The % of fat pads of body weight is an index of the % of body fat mass. This % is negatively correlated with viscosity ($r^2 = 0.73$) (FIG. 1). The % of fat pads in body weight for the BT-HV, HPMC-LV, HPMC-HV diets fed animals represent reductions of 20%, 18% and 24% of the % of fat pads weight in body weight compared to the cellulose diet.

#### Liver Cholesterol Concentration

Table 3 provides the liver cholesterol concentrations for each of the 5 diets, along with the intestinal viscosity, plasma leptin concentrations, bone density and bone calcium concentrations.

#### TABLE 3

Intestine viscosity, Liver cholesterol concentration, plasma leptin concentration corrected by body weight, bone density and bone calcium content in rats fed cellulose, Beta glucan low and high viscosity, and HPMC low and high viscosity diets

| Dietary group | Intestine Viscosity (mPa · s) | Liver Cholesterol Concentration (mg/g) | Plasma Leptin Concentration, corrected by body weight (g) | Bone Density | Bone Calcium Concentration (mg/g) |
|---|---|---|---|---|---|
| Cellulose | 8.2[a] | 11.89[a] | 11.02[a] | 1.380[a] | 230.17[a] |
| Beta-glucan LV | 533.6[b] | 8.10[b] | 12.68[a] | 1.391[a] | 240.01[a] |
| Beta-glucan HV | 997.6[b] | 7.46[b] | 9.56[b] | 1.380[a] | 233.54[a] |
| HPMC-LV | 2082.0[c] | 7.41[b] | 6.68[b] | 1.366[ab] | 221.65[a] |
| HPMC-HV | 2163.3[c] | 7.82[b] | 6.90[b] | 1.345[b] | 199.89[b] |

Values in the same column with different superscripts are significantly different ($p < 0.05$).

For each of the BT or HPMC diet-fed groups, there was a significant hypocholesterolemic effect in the liver compared to the cellulose diet-fed group ($p = 0.0001$). However, between the two BT diet-fed groups, the difference was not statistically significant, nor was the difference statistically significant between the two HPMC diet-fed groups or between BT groups and HPMC groups.

Liver cholesterol concentration was highly correlated with the log of intestinal contents supernatant viscosity ($r^2 = 0.95$).

**EXHIBIT A**

US 6,899,892 B2

15

**Plasma Leptin Concentration**

As shown in Table 3, the plasma leptin concentration is significantly reduced in the groups fed HPMC, and there was a trend for a reduction in the BT-HV group. A bar graph illustrating the plasma leptin concentration for animals fed the different diets is provided in FIG. 6. Indeed, there was a high inverse correlation between plasma leptin concentration and intestinal contents supernatant viscosity ($r^2$=0.82) (FIG. 2), which was slightly reduced when plasma leptin values were statistically corrected for body weigh ($r^2$=0.72) (FIG. 3).

Plasma leptin concentration was also highly correlated with the % of fat pads in body weight ($r^2$=0.71) (FIG. 4). Similarly, plasma leptin concentration was highly correlated with the % of epididynal fat pad in body weight ($r^2$=0.781) (FIG. 5). A bar graph illustrating the peritoneal fat pad weight for animals fed the different diets is provided in FIG. 7.

**Bone Density and Calcium**

Bone density (Table 3) was significantly lower for animals fed high viscosity HPMC diets compared to the animals fed the cellulose diet or the low or high BT diets. Bone density was also positively correlated with plasma leptin concentration ($r^2$=0.75) (figure not shown).

The bone calcium concentration for the 5 groups is shown in Table 3. The bone calcium concentration of the HPMC-HIV group was significantly lower than the other groups. The bone calcium content and bone density were highly correlated ($r^2$=0.98), as expected (figure not shown).

These data indicate that the low viscosity HPMC diet may be the best diet because this diet causes a decrease in percent body fat, lower plasma cholesterol levels and lower leptin plasma concentrations without significant adverse effects on bone density. The high viscosity HPMC diet also has beneficial effects but tends to have a negative effect on bone density. The lower HV HPMC bone density was not necessarily related to lower leptin concentrations because the LV HPMC diet gave rise to even lower leptin concentration without such a negative bone density effect. The negative effect on bone density may therefore be countered by calcium supplements.

The high viscosity beta-glucan diet also has positive effects on body fat and cholesterol, as well as a positive effect on leptin concentrations without much effect on bone density.

What is claimed:

1. A method of reducing the level of leptin in the bloodstream of a mammal comprising administering a sufficient amount of viscous, water-soluble, non-nutritive, non-starch, indigestible polysaccharide to the mammal for a time sufficient to reduce the level of leptin in the bloodstream of the mammal, wherein the sufficient amount of the polysaccharide is about 2% to about 20% of total polysaccharide in the mammal's diet, the polysaccharide is a polymer of monosaccharides substantially connected by beta (β) glycosidic linkages, and a 2% aqueous solution of the polysaccharide has a viscosity of about 50 cps to about 200,000 cps.

2. The method of claim 1, wherein the method reduces the percentage of body fat in a mammal.

3. The method of claim 2 where the percentage of body fat is reduced about 5% to about 40%.

4. The method of claim 2 where the percentage of body fat is reduced about 10% to about 30%.

5. The method of claim 2 where the percentage of body fat is reduced about 15% to about 25%.

6. The method of claim 1 wherein the monosaccharides are arabinose, fructose, glucose, glucosamine, glucuronic

16

acid, galactose, galactosammine, mannose, N-acetylmuramic acid, N-acetylneuraminic acid, rhamnose, xylose or a mixture thereof.

7. The method of claim 1 wherein the beta glycosidic linkages are 1→2 beta-glycosidic bonds, 1→3 beta-glycosidic bonds, 1→4 beta-glycosidic bonds, 1→6 beta-glycosidic or a mixture thereof.

8. The method of claim 1 wherein the beta glycosidic linkages are 1→3 beta glycosidic linkages or 1→4 beta glycosidic linkages, or a mixture of 1→3 and 1→4 beta-glycosidic linkages.

9. The method of claim 1 wherein the polysaccharide is locust bean gum, guar gum, carrageenan, alginate, modified cellulose, beta-glucan, or glucomannan.

10. The method of claim 1 wherein the polysaccharide has Formula I:



wherein

each R is separately hydroxy, lower alkyloxy, or hydroxy (lower(alkyloxy));

n is an integer ranging from about 500 to about 2500; and

X is an R group or a covalent bond to the oxygen at the first position of the adjacent monosaccharide.

11. The method of claim 1 wherein the polysaccharide is methylcellulose, hydroxypropyl methylcellulose, 2-hydroxypropyl methylcellulose, 2-hydroxyethyl methylcellulose, 2-hydroxybutyl methylcellulose, 2-hydroxyethyl ethylcellulose, 2-hydroxypropyl cellulose, methyl ethylcellulose, or 2-hydroxyethylcellulose.

12. The method of claim 1 wherein the polysaccharide is β-glucan.

13. The method of claim 1 wherein the polysaccharide is hydroxypropyl methylcellulose.

14. The method of claim 1 wherein the sufficient amount of polysaccharide is an amount that provides an intestinal viscosity of about 1000 mPa·s to about 3000 mPa·s.

15. The method of claim 1 wherein the sufficient amount of polysaccharide is an amount that provides an intestinal viscosity of about 1500 mPa·s to about 2500 mPa·s.

16. The method of claim 1 wherein the sufficient amount of polysaccharide is about 1 g to about 5 g polysaccharide per meal.

17. The method of claim 1 wherein the sufficient amount of viscous polysaccharide is about 2 g to about 3 g polysaccharide per meal.

18. The method of claim 1 wherein the time sufficient for reducing the level of leptin in the bloodstream of a mammal is at least about two to at least about ten weeks.

19. The method of claim 1 wherein the time sufficient for reducing the level of leptin in the bloodstream of a mammal is at least about three weeks to at least about eight weeks.

20. The method of claim 1 wherein the time sufficient for reducing the level of leptin in the bloodstream of a mammal is at least about four to at least about six weeks.

21. The method of claim 1 wherein the polysaccharide is administered indefinitely.

22. The method of claim 1 where the level of leptin in the bloodstream of a mammal is reduced by about 5% to about 50%.

US 6,899,892 B2

| 17 | 18 |

23. The method of claim 1 where the level of leptin in the bloodstream of a mammal is reduced by about 10% to about 40%.

24. The method of claim 1 where the level of leptin in the bloodstream of a mammal is reduced by about 15% to about 35%.

25. The method of claim 1 where the mammal is a human.

26. The method of claim 1 where the polysaccharide is administered in an applesauce, a cereal, a cookie, a cracker, a flavored drink, a fruit juice, an ice cream, a milk shake, a pudding or a snack bar.

27. The method of claim 1, wherein the method reduces the percentage of body fat in a mammal without substantially changing the mammal's weight.

28. The method of claim 1, wherein the method reduces the percentage of body fat in the mammal and wherein the polysaccharide gives rise to an intestinal viscosity of about 1000 mPa·s to about 3000 mPa·s.

29. The method of claim 1 wherein the method reduces the percentage of body fat in a mammal without substantially changing the mammal's food intake.

* * * * *

**EXHIBIT A**

**Exhibit B**



## IMAGENETIX AND TRIPHARMA
## AMENDED AND RESTATED EXCLUSIVE
## MARKETING AND SUPPLY AGREEMENT

This AMENDED AND RESTATED EXCLUSIVE MARKETING AND SUPPLY AGREEMENT ("Agreement") is entered into as of October 1, 2007, (the "Effective Date") by and between TRIPHARMA LLC, a Delaware limited liability company ("TRIPHARMA"), located at 1153 Glenneyre, Laguna Beach, California 92651, and IMAGENETIX INC. ("IMAGENETIX"), a Nevada corporation, located at 10845 Rancho Bernardo Road, Suite 105, San Diego California, 92127, with reference to the following facts:

### RECITALS

A.  IMAGENETIX and Tripharma, a Nevada limited liability company ("Tripharma NV"), originally entered into an Exclusive Marketing and Supply Agreement dated June 27, 2006, a First Amendment to Exclusive Marketing and Supply Agreement dated January 17, 2007, and a Second Amendment to Exclusive Marketing and Supply Agreement dated May 18, 2007 (collectively, the "Original Agreement").

B.  Tripharma NV desires to assign all of its rights and obligations under the Original Agreement to TRIPHARMA, and IMAGENETIX is willing to consent to such assignment.

C.  TRIPHARMA and IMAGENETIX desire to amend and restate the Original Agreement in its entirety on the terms set forth herein.

D.  IMAGENETIX has obtained a license from the University of Minnesota ("UM") for the exclusive rights to use UM's recently awarded patent (#6,899,892) covering a natural compound for lowering the body's levels of leptin, a circulating hormone that regulates fat storage ("UM Patent"). In addition, IMAGENETIX has an exclusive license from E.H.P. to use patent #5,569,676 ("EHP Patent") (collectively, the UM Patent, and EHP Patent are collectively referred to as the "Patents").

E.  By utilizing the Patents, IMAGENETIX is capable of manufacturing a fat and weight reducing nutritional supplement products in capsule and raw ingredient forms, as well as other products based upon the Patents or clinical studies related thereto (collectively, the "Product"). The formula utilized to manufacture the Product (the "Formula") has been clinically studied at various labs, institutions, research facilities, etc., including without limitation, the University of Connecticut, University of Minnesota and Pennington Biomedical Research Laboratory and has been tested for its efficacy in assisting healthy fat reduction, weight reduction, Leptin reduction, increased Adiponectin, and enhanced body composition as measured by fat to muscle ratio.

F.  TRIPHARMA desires to obtain an exclusive license from IMAGENETIX to distribute the Product worldwide, and IMAGENETIX is willing to grant such a license on the terms and conditions set forth herein.

**EXHIBIT B**

NOW THEREFORE, for in consideration of the mutual promises made herein and intending to be legally bound, the parties hereby agree as follows:

1. <u>Appointment of Distributor</u>.  IMAGENETIX hereby appoints TRIPHARMA as IMAGENETIX's exclusive distributor of the Product worldwide, except as provided in Section 1.9, and TRIPHARMA accepts such appointment on the terms set forth herein.

1.1   <u>Exclusivity</u>.  IMAGENETIX, to the extent that it is legally permitted to do so, (a) shall not appoint any distributor or servicer for the Product other than TRIPHARMA, (b) shall not, and shall cause any Affiliate (as defined in Section 1.8) not to, knowingly sell the Formula or any Product to any person other than TRIPHARMA or a party designated by TRIPHARMA for use or resale (except pursuant to any agreement effective at the time this Agreement became applicable to the service so provided), and (c) shall use its best efforts to prevent any party other than TRIPHARMA from seeking customers for the Product, from establishing any branch related to the distribution of the Product, or from maintaining any distribution depot with respect to the Product.

1.2   <u>Maintenance of Exclusivity</u>.  In order to maintain TRIPHARMA's exclusivity, TRIPHARMA must make the following minimum number of unit orders of the Product on or before ten (10) days after the expiration of the following time periods:

a)        ███ kilograms of powdered formula in various forms (bulk powder, encapsulated pills; encapsulated and bottled pills) ("Powdered Formula") must be made on or before███████

(b)   An additional ███ kilograms of Powdered Formula must be made on or before███████

(c)   An additional ███ kilograms of Powdered Formula must be made on or before███████

(d)   An additional ███ kilograms of Powdered Formula must be made in advance per each calendar quarter for the calendar year███ i.e., by January 1, April 1, July 1, and October 1);

(e)   An additional ███ kilograms of Powdered Formula must be made in advance per each calendar quarter for the calendar year███ (i.e., January 1, April 1, July 1, and October 1;

(f)   An additional ███ kilograms of Powdered Formula must be made in advance per each calendar quarter for the calendar year███ (i.e., January 1, April 1, July 1, and October 1; and

(g)   An additional ███ kilograms of Powdered Formula must be made in advance per each calendar quarter for all calendar years beyond███ (i.e.. January 1, April 1, July 1, and October 1).

2

**EXHIBIT B**

1.3   <u>Referrals.</u>  If IMAGENETIX or any Affiliate is contacted by any party inquiring about the purchase of the Product (other than TRIPHARMA or a party designated by TRIPHARMA), IMAGENETIX shall, or shall cause that Affiliate to, refer such party to TRIPHARMA for handling.

1.4   <u>Relationship of the Parties.</u>  TRIPHARMA is an independent contractor and is not the legal representative or agent of IMAGENETIX for any purpose and shall have no right or authority (except as expressly provided in this Agreement) to incur, assume or create in writing or otherwise, any warranty by IMAGENETIX.  IMAGENETIX shall have no control over any of TRIPHARMA's employees, all of whom are entirely under the control of TRIPHARMA, who shall be responsible for their acts and omissions. TRIPHARMA shall, at its own expense, during the term of this Agreement and any extension thereof, maintain full insurance under any worker's compensation laws effective in the state or other applicable jurisdiction covering all persons employed by and working for it in connection with the performance of this Agreement, and upon request shall furnish IMAGENETIX with satisfactory evidence of the maintenance of such insurance. TRIPHARMA accepts exclusive liability for all contributions and payroll taxes required under federal social security laws and state unemployment compensation laws or other payments under any laws of similar character in any applicable jurisdiction as to all persons employed by and working for it.  Nothing contained in this Agreement shall be deemed to create any partnership or joint venture relationship between the parties.

1.5   <u>Sale of the Product by TRIPHARMA.</u>  TRIPHARMA shall exercise its commercially reasonable efforts to develop the market for the Product.

1.6   <u>Advertising and Marketing.</u>  TRIPHARMA shall be entitled, during the term of this Agreement to advertise and hold itself out as the sole exclusive and authorized distributor of the Product.  At all times during the term of this Agreement, TRIPHARMA shall have the right to use the Original Trademark and logo in advertisements and other activities conducted by TRIPHARMA to promote the sale of the Product.   IMAGENETIX grants TRIPHARMA an irrevocable license to exclusively utilize the Patents, marketing claims and studies or clinical information conducted on and for the Product.  TRIPHARMA shall also have the right to market the Product under any other trade names selected by TRIPHARMA ("New Trademarks").

1.7   <u>Intellectual Property.</u> All right, title and interest in and to the Original Trademark shall belong exclusively to TRIPHARMA.  If TRIPHARMA exercises the right to market the Product using New Trademarks, all right, title and interest in the New Trademarks shall belong exclusively to TRIPHARMA.  IMAGENETIX shall have no right, title or interest in the Original Trademark or the New Trademarks.   Except for the foregoing, each party shall continue to own its existing patents, trademarks, copyrights, trade secrets and other intellectual property.

1.8   <u>Affiliate.</u>   For purposes herein, "Affiliate" shall mean any person, corporation or other entity: (i)  which owns, now or hereafter, directly or indirectly, twenty-five percent (25%) or more of any class of the voting stock of IMAGENETIX or is, now or hereafter,

3

**EXHIBIT B**

directly or indirectly, in effective control of IMAGENETIX; or (ii) twenty-five percent (25%) or more of any class of the voting stock of which IMAGENETIX, or a party described in paragraph (i), owns, now or hereafter, directly or indirectly, or of which IMAGENETIX, or a party described in paragraph (i), is, now or hereafter, directly or indirectly, in control.

1.9    Exclusivity Limitation.    TRIPHARMA's worldwide exclusivity rights shall not apply to sales initiated and completed at retail stores located in physical buildings, otherwise known as retail stores, located outside of North America ("Exclusivity Carveout"). Notwithstanding the foregoing, the Exclusivity Carveout may be eliminated by mutual agreement between IMAGENETIX and TRIPHARMA. IMAGENETIX and TRIPHARMA will confer on or before ██████████ to discuss the elimination of the ("Exclusivity Carveout") which provides TRIPHARMA with no exclusive limitations.    To eliminate this ("Exclusivity Carveout"), the parties may agree to increase the minimum quarterly purchase requirements by approximately ████ kilos per quarter.

2.    Terms of Purchase and Sale of the Product.

2.1    Purchase from IMAGENETIX.    TRIPHARMA shall purchase all of its requirements of the Product exclusively from IMAGENETIX during the term of this Agreement In the event IMAGENETIX is unable to timely deliver the Product pursuant to the terms of the Agreement, and such failure continues for a period of thirty (30) days thereafter ("**Production Delay**"), whether due to casualty or any other reason, then TRIPHARMA may, at its option, seek an alternative source for production of the Product. In furtherance thereof, if a Production Delay occurs and TRIPHARMA elects to exercise its right to seek an alternative source of production, then IMAGENETIX shall immediately assign to TRIPHARMA and its designee(s) any and all of IMAGENETIX's rights to manufacture the Product so that TRIPHARMA has a production source for the Product to meet the supply requirements under the Agreement. Concurrently with making the assignment, IMAGENETIX shall deliver to TRIPHARMA all documents and other information required to manufacture the Product. IMAGENETIX represents and warrants that it has the right and authority to make the foregoing assignment.

2.2    Supply of the Product.    Subject to the terms set forth herein, IMAGENETIX shall use its best efforts to supply to TRIPHARMA its requirements of the Product.

2.3    Placement of Orders.    All orders for the Product shall be placed by TRIPHARMA by way of a standardized purchase order form used by IMAGENETIX with a minimum notice of sixty (60) days required for shipment.

2.4    Packaging.    The Product will be supplied in finished trade-packaged, bottled and labeled form using either the Original Trademark or the New Trademarks, or as a raw material/bulk powder, as determined by the TRIPHARMA in its sole discretion.   The packaging shall be suitable to permit shipment of the Product; provided, however, that if TRIPHARMA requests a modification of those procedures, IMAGENETIX shall make the requested modification and TRIPHARMA shall bear any reasonable expenses incurred by IMAGENETIX in complying with such modified procedures which are in excess of the expenses which IMAGENETIX would have incurred in following its standard procedures.

4

**EXHIBIT B**

2.5    <u>Pricing</u>.  The cost of the Product to be sold to TRIPHARMA may vary during the term of this Agreement and may be based upon the type of Product being procured in various forms (bulk powder, encapsulated pills; encapsulated and bottled).  The base price at the execution of this Agreement stated as the cost per kilogram ("kg.") of the Product as bulk powder shall be as follows (the "Base Price"):



On a per order basis:

   (a)     An order totaling less than ███████ @ ████ per kg.;

   (b)     An order totaling more than ███ kgs. but less than ███ kgs. @ ████ per kg.;

   (c)     An order totaling more than ███ kgs. but less than ████ kgs. @ ███ per kg.;

   (d)     An order totaling more than ███ kgs. but less than ███ kgs. @ ███ per kg.

   (e)     An order totaling more than ███ kgs. @ ████ per kg.

Product purchased as encapsulated "finished goods" shall be priced based upon a per capsule price. The per capsule price shall be determined by the price per kilo divided by the number of capsules per kilo (based upon the number of milligrams per capsule) as calculated pursuant to the following formula:.

     Price Per kg. ÷ # capsules per kg. = Per Capsule price

For example, if the price is ████ /kg., and the capsules are 400 milligrams each, then the cost per capsule would be ████ ÷ 2500 ( 1,000,000 mgs. (1kg) ÷ 400 mg. (capsule size)) = ████ per capsule, which represents the raw material only and is exclusive of encapsulation costs.

In addition to Base Price, if TRIPHARMA elects to have IMAGENETIX supply the Product in bottled and labeled form, then TRIPHARMA shall pay to IMAGENETIX commercially reasonable costs for bottling and labeling services provided by IMAGENETIX.

Payment for all Product shipped shall be 50% down with order and 50% when Product is ready to ship.  The Base Price shall not increase, except to cover actual increase in out of pocket production costs, but in no event shall the Base Price increase by more than eight percent (8%) per annum.

2.6    <u>Delivery</u>.  All deliveries of Product sold by IMAGENETIX to TRIPHARMA pursuant to this Agreement shall be made F.O.B. IMAGENETIX's manufacturing facility located in San Diego, California (the "Delivery Point"), and title to and risk of loss of Product shall pass from IMAGENETIX to TRIPHARMA at the Delivery Point. TRIPHARMA, at its sole cost, may elect to have IMAGENETIX drop ship the Product directly to TRIPHARMA's customers, and in such case, IMAGENTIEX agrees to affix only a

**EXHIBIT B**

TRIPHARMA label on the Product. The labels will be supplied by TRIPHARMA at its expense. When the Product is drop shipped directs to TRIPHARMA's clients, the risk of loss shall pass from IMAGENETIX to TRIPHARMA at the Delivery Point. TRIPHARMA shall be responsible for arranging all transportation of Product, but if requested by TRIPHARMA, IMAGENETIX shall, at TRIPHARMA's expense, assist TRIPHARMA in making such arrangements. TRIPHARMA shall also procure insurance for the transportation of the Product, and such insurance shall be of a kind and on terms current at the port of shipment. In the event that IMAGENETIX is requested to assist TRIPHARMA in arranging for transportation, TRIPHARMA shall reimburse IMAGENETIX for all costs applicable to the Product following their delivery to TRIPHARMA, including, without limitation, insurance, transportation, loading and unloading, handling and storage. TRIPHARMA shall pay all charges, including customs duty and sales tax, incurred with respect to the Product following their Delivery to the carrier or forwarder.

2.7     Inspection.     Promptly upon the receipt of a shipment of Product, TRIPHARMA shall examine the shipment to determine whether any item or items included in the shipment are in short supply, defective or damaged. Within ten (10) days of receipt of the shipment, TRIPHARMA shall notify IMAGENETIX in writing of any shortages, defects or damage which TRIPHARMA claims existed at the time of delivery. Within ten (10) days after the receipt of such notice, IMAGENETIX will investigate the claim of shortages, defects or damage, inform TRIPHARMA of its findings, and deliver to TRIPHARMA Product to replace any which IMAGENETIX determines, in its reasonable discretion, were in short supply, defective or damaged at the time of delivery.

3.     Term of Agreement.     This Agreement shall continue in full force for a period of five (5) years commencing from the date of this Agreement and shall automatically renew for an additional period of five (5) years, unless one party has given a notice of non-renewal at least sixty (60) days prior to the end of the current term, or the Agreement is otherwise terminated as provided for herein. At the end of the term, as previously extended, the Agreement shall continue until terminated by either party on at least sixty (60) days prior written notice; provided, however, IMAGENETIX shall not have the right to terminate this Agreement pursuant to this Section if TRIPHARMA has ordered more than ███████ kilograms of Powdered Formula during the last twelve months of the then existing term.

4.     Representations and Warranties.

4.1     By TRIPHARMA.     TRIPHARMA represents and warrants to IMAGENETIX that TRIPHARMA is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware and has the right and power to enter into this Agreement

4.2     By IMAGENETIX.     IMAGENETIX represents and warrants to TRIPHARMA as follows:

4.2.1     Formation and Authority.     IMAGENETIX is a corporation duly organized, validly existing and in good standing under the laws of the state in which it is formed and has the right and power to enter into this Agreement.

**EXHIBIT B**

4.2.2   Licensed Rights.   IMAGENETIX has been granted a license from UM to exclusively use the UM Patent for the Product. IMAGENETIX has also been granted a license from E.H.P to exclusively use the EHP Patent in manufacturing the Product.

4.2.3   Product Compliance.   The Product sold and delivered to TRIPHARMA will comply with all applicable laws, codes or regulations relating to the Product and shall be free of adulteration, impurities or defects. All lot numbers for product manufactured for TRIPHARMA shall bear an expiration date of a minimum of twenty-four (24) months from the date of shipment to TRIPHARMA.   In the event any Product shall be found to be unsaleable as a result of the foregoing IMAGENETIX agrees to replace any such Product at its sole cost and expense and to defend, indemnify, and hold harmless TRIPHARMA and its members, managers, employees, agents, and representatives for any damages (including attorneys' fees and consequential damages) associated therewith as set forth herein.

5.   Additional Indemnity.   It is expressly understood and agreed that TRIPHARMA shall not be liable for and that IMAGENETIX shall defend, indemnify, and hold harmless TRIPHARMA and its members, managers, employees, agents, and representatives from any obligations, claims, demands, costs, losses, damages, suits, judgments, penalties, expenses and liabilities of any kind or nature arising directly out of or in connection with any adulteration, impurity, defect or other problem associated with the Product, including, without limitation, any costs, expenses, court costs and reasonable attorney fees incurred by TRIPHARMA by reason of any defense to any claims or lawsuits relating to the Product to which TRIPHARMA has been named a party.

6.   Assignment.   TRIPHARMA shall have the right to assign any and all of its rights under this Agreement to a third party, so long as TRIPHARMA provides at least twenty (20) days advance written notice of such assignment to IMAGENETIX.

7.   Termination.   Either party, at its election, may treat this Agreement breached and, without prejudice to any other of its rights, may forthwith terminate this Agreement by written notice to the other party on occurrence of any of the following events:

(a)   There shall be a material failure by the other party to perform one or more of its obligations hereunder which shall not have been cured within thirty (30) days after written notice specifying the nature of such failure.

(b)   TRIPHARMA has determined that it will no longer be promoting, advertising or selling the Product and has provided IMAGENETIX with thirty (30) days notice of such determination.

(c)   The other party shall file a petition for reorganization or liquidation or other chapter proceeding under the provisions of federal bankruptcy laws.

(d)   The other party shall become or be declared insolvent or bankrupt.

8.   Interpretation and Enforcement.

7

**EXHIBIT B**

8.1   <u>Notices</u>.   Any notice, request, demand, or other communication required or permitted hereunder shall be deemed to be properly given when (i) given by Federal Express or other reputable overnight delivery service, in which event such notice will be deemed effective one day after being mailed, (ii) by personal delivery, in which event such notice will be deemed effective upon receipt or (iii) deposited in the United States mail, postage prepaid, certified mail, return receipt requested, in which event such notice will be deemed effective five days after being mailed, addressed:

(a)   In the case of TRIPHARMA, to TRIPHARMA, at the address indicated above, or to such other person or address as TRIPHARMA may from time to time furnish to IMAGENETIX.

(b)   In the case of IMAGENETIX, to William Spencer, at the address indicated above, or to such other person or address as IMGENETIX may from time to time furnish to TRIPHARMA.

8.2   <u>Controlling Law</u>.   This Agreement is governed by and shall be construed in accordance with the laws of the State of California, subject to the exclusive jurisdiction of the state and federal courts located in San Diego County in the State of California.

8.3   <u>Execution and Non-Assignment</u>.   No party may assign this Agreement without the prior consent of the other party in writing. This Agreement may be executed in counterparts and is effective as of the date of the last signature.

8.4   <u>Completeness of Instrument</u>.   This instrument contains all of the agreements, understandings, representations, conditions, warranties, and covenants made between the parties hereto. All modifications and amendments hereto must be in writing signed by the parties hereto.   To the extent it is found that any provision of this Agreement is unreasonably broad or otherwise unenforceable, the parties agree, and hereby request, that the unreasonable or unenforceable provision(s) be modified to the least extent possible to make such provision(s) reasonable and enforceable.

8.5   <u>Arbitration</u>.   Any disputes or claims concerning the interpretation and enforcement of this agreement and the duties of either party, including any resulting tort claims between the parties, shall be settled by binding arbitration before and under the rules of a mutually agreed upon arbitration forum in San Diego County, California, or if the parties cannot agree on a arbitration forum, under the rules of the American Arbitration Association.

8.6   <u>Attorneys' Fees</u>.   If any legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees or other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

8

**EXHIBIT B**

8.7    <u>Force Majeure</u>.  Neither party shall be liable for loss or damage or deemed to be in breach of this Agreement if its failure to perform obligations results from any of the following:

        (a)    compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state, municipal or foreign government or any department or agency thereof;

        (b)    acts of God;

        (c)    fires, strikes, embargoes, war or riot; or

        (d)    any other similar event or cause.

Any delay resulting from any of said causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that said causes shall not excuse payments of amounts owed at the time of such occurrence or payments due for the Product thereafter.

      IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Effective Date.

TRIPHARMA, LLC,                           IMAGENETIX, INC.
a Delaware limited liability company      a Nevada corporation

By: _____                     By: _____
Name: Evan Dameshek                       Name: William Spencer
Title:  Managing Member                   Title:  President

9

**EXHIBIT B**

**Exhibit C**

eServe
Package Cover Sheet
Powered By



This Package contains legal documents for service upon the recipients listed below.  If any of the documents are incomplete, missing, illegible or unreadable please contact eLaw at (800) 352 - 5267 and reference this cover sheet.

Package #: 157002

Jurisdiction: USA

ADR provider: JAMS-Arbitration

Branch Office: San Diego

Case No: 1240020032

Case Name: Imagenetix, Inc. v. TriPharma, LLC., et al.

Served By: Rani Bijlani of JAMS

Address: Santa Monica, CA,United States

1 Document(s) Included:
1. Final Award - 38 Page(s)

Service List:
1. eLaw Tracking # 156401 Eric Schindler (eServe User)
2. eLaw Tracking # 156402 Erwin Shustak (eServe User)
3. eLaw Tracking # 156403 Robert Hill (eServe User)
4. eLaw Tracking # 156404 Robert McKennon (eServe User)
5. eLaw Tracking # 156405 Terry Friedman (eServe User)

EXHIBIT C

eServe
Document Separator Sheet
Powered By



If any of the documents are incomplete, missing, illegible or unreadable please contact eLaw at (800) 352 -
5267, and reference this cover sheet.


1. Final Award Final Award - 38 Page(s)


Package #: 157002

Jurisdiction: USA

ADR provider: JAMS-Arbitration

Branch Office: San Diego

Case No: 1240020032

Case Name: Imagenetix, Inc. v. TriPharma, LLC., et al.

EXHIBIT C

<div align="center">

**JAMS ARBITRATION CASE**
**Case No. 1240020032**

</div>

Imagenetix, Inc.,
      Claimant,

<div align="center">

v.

</div>

TriPharma, LLC, and Evan Dameshek,
      Respondents.

------

TriPharma, LLC,
      Counter-Claimant

<div align="center">

v.

</div>

Imagenetix, Inc., William B. Spencer
and Does 1-10
      Counter-Respondents

------

<div align="center">

**FINAL AWARD**

</div>

**Counsel**:

Erwin Shustak, Esq.
Robert Hill, Esq.
Shustak Frost & Partners
401 West "A" Street
San Diego, CA 92101
Tel: (619) 696-9500
Fax: (619) 615-5290
shustak@shufirm.com
rhill@shufirm.com

Counsel for Claimant and Counter-Respondents

Robert J. McKennon, Esq.
Eric J. Schindler, Esq.
Reid A. Winthrop, Esq.

<div align="center">

1

</div>

<div align="center">

EXHIBIT C

</div>

McKennon Schindler LLP
20321 Southwest Birch Street, Suite 200
Newport Beach, CA  92660
Tel: (949) 436-7529
Fax: (949) 464-9714
rm@mslawllp.com
es@mslawllp.com
rw@mslawllp.com

Counsel for Respondents and Counter-Claimant


**Arbitrator:**

Judge Terry Friedman (Ret.)
JAMS
1601 Cloverfield Blvd
Suite 370 – South
Santa Monica, CA  90404
Tel: (310) 309-6206
Fax: (310) 396-7576
tfriedman@jamsadr.com

**Place of Arbitration**:  San Diego, California

**Date of Final Award**:  November 2, 2011


　　　　The undersigned arbitrator, having been designated in accordance with the signed Stipulation of the Parties, and having read and considered the submissions, documentary and testimonial proof, arguments and allegations of the parties, finds and concludes and issues this Interim Award, as follows:

I.　　**INTRODUCTION AND PROCEDURAL STATEMENT**

　　　　Claimant and Counter-Respondent Imagenetix, Inc. is a Nevada corporation whose principal place of business is San Diego, California.  Counter-Respondent William B. Spencer is the President and Chief Executive Officer of Imagenetix. Counter-Claimant TriPharma, LLC, is a Delaware limited liability company whose principal place of business is Laguna Beach, California.  Evan Dameshek is the Managing Member of TriPharma.

　　　　TriPharma filed an action against Imagenetix and Spencer in U.S. District Court, Southern District of California, on April 30, 2010.  Exh. 289.  Imagenetix and Spencer did not file a response to the complaint.  Instead, on June 17, 2010, Imagenetix filed a Demand for Arbitration Before JAMS, naming TriPharma and

EXHIBIT C

Dameshek as Respondents. TriPharma then dismissed its federal action and on July 1, 2010, TriPharma and Dameshek filed an Answer to Imagenetix' Notice of Claim and TriPharma filed a Counter-Claim against Imagenetix and Spencer. Imagenetix and Spencer filed a Reply and Answer to TriPharma's Counter-Claim on July 15, 2010. These filings with JAMS are the operative pleadings in this arbitration.

Imagenetix alleges three claims against TriPharma and Dameshek: declaratory relief, breach of contract and rights to attorney's fees and costs. TriPharma alleges seven claims against Imagenetix and Spencer: counterfeiting, false marking, breach of contract, breach of the covenant of good faith and fair dealing, right of publicity, unfair competition, injunctive relief, unjust enrichment and imposition of constructive trust, declaratory relief, promissory fraud and accounting.[1]

Two court actions involving Imagenetix and TriPharma pending in the U.S. District Court, Central District of California, are related to this arbitration: *TriPharma v. Solstice International, et al.*, Case No. SACV 10-00222 and *TriPharma v. Max International, LLC, et al.*, Case No. SACV 10-00196. Each action is stayed awaiting the ruling in this arbitration.

The Arbitrator entered orders prior to the Arbitration Hearing: Scheduling Order No. 1 (September 17, 2010), Ruling on TriPharma Request to File Summary Disposition Motion (October 14, 2010), Protective Order (October 25, 2010), Order re Requests to Take Depositions (November 1, 2010), Orders re Motions to Dismiss (November 1, 2010), Order re Respondents / Counter-Claimant Counsel's Motion to be Relieved (December 3, 2010), Scheduling Order No. 2 (February 3, 2011), Order re Imagenetix Motion to Clarify That Imagenetix is the Claimant and TriPharma the Respondent in This Arbitration and Scheduling Order No. 4[2] (June 8, 2011), Order re Discovery Motions and Scheduling Order No. 5 (June 16, 2011), Order re Imagenetix Motion for Protective Order and Scheduling Order (June 21, 2011) and Order re Discovery Motions and Scheduling Order No. 7 (June 24, 2010). One Order was issued at the conclusion of the Hearing: Scheduling Order No. 4 (August 5, 2011). In addition, after the conclusion of the Hearing, the Arbitrator entered Scheduling Order No. 8 (October 7, 2011), Report of Telephonic Conference and Scheduling Order No. 9 (October 13, 2011) and Order No. 10 (October 26, 2011). The Scheduling Orders established procedures for the arbitration.

The parties exchanged information.

<u>The Evidentiary Hearing</u>. The hearing was conducted on July 7-8, July 11-15, July 18-20, 2011 and August 1-2, 2011.

---

[1] TriPharma neither briefed, argued or presented evidence regarding its claims for right of publicity or for unjust enrichment and imposition of constructive trust. Therefore, this Award will not address those claims.

[2] This Scheduling Order was misnumbered. It should have been No. 3.

3

EXHIBIT C

Each side offered documentary evidence at the hearing, and such evidence was admitted. Joint Exhibits ("JE") Nos. 1-22, 101-106, 109-112, 115-119, 122-124, 126-127, 129, 131-135, 137-140, 142-144, 146, 152-157, 159-161, 163-164, 166-169, 173-183, 185-193, 195-202, 204-211, 213-225, 227-230, 232-240, 242-258, 260-277, 279-294, 296-303, 305-312, 314-322, 324-330, 332-339, 341-348, 350-357, 359-365, 367-375, 377-383, 385-392, 394-400, 402-409, 411-418, 420-427, 429-436, 438-445, 447-454, 456-460, 462, 464-471, 473-479, 481-487, 489-497, 499-506, 508-515, 517-524, 526-533, 535-541, 543-550, 552-558, 560-568, 570-577, 579-587, 589-596, 598-609, 611-668, 670-671, 673-678, 680-729, 1000-1100, 1102-1118, 1120-1154, 1156-1192, 1194-1204, 1209, 1211, 1213, 1215-1270, 1272-1275, 1277-1278, 1280, 1282, 1285-1313, 1315-1320, 1322-1323, 1325-1335, 1337-1364, 1367, 1370-1399, 1401-1468, 1471, 1473-1498, 1500-1535, 1537-1544, 1546, 1548-1549 and 1560-1608 were admitted into evidence. Evidentiary objections were sustained to JE Nos. 226, 730-732, 1155, 1536, 1545, 1547 and 1550-1559. Evidentiary objections were overruled to JE Nos. 227-230, 232-235, 1005-1008, 1010, 1021-1022, 1028-1029, 1156, 1158, 1162-1164, 1266, 1292, 1349, 1357, 1479, 1497, 1510, 1518-1519, 1524, 1540-1544, 1546, 1548-1549 and 1560-1564.

Each side called and cross-examined witnesses: Derek Boosey, Kenneth Cole, Alysha Dameshek, Evan Dameshek, Daniel Gallaher, James McPartland, John Payne, Andrea Rodriguez, James Roufs, Debbie Spencer, William Spencer, Scott Stewart (by telephone) and Jandra Thomas.

At the conclusion of the presentation of evidence on August 2, 2011, the parties stated that they had no further evidence to offer. Counsel presented closing arguments and agreed to file post-hearing briefs.

The Interim Award was issued on September 12, 2011, which, among other things, ordered the parties to submit briefs on the issues of attorneys' fees, costs and pre-judgment and post-judgment interest. TriPharma filed its Motion for Fees, Costs and Interest on September 22, 2011 and Imagenetix filed its Opposition on October 3, 2011.

TriPharma filed a letter on October 3rd requesting post-hearing relief and a re-opening of the Hearing to consider it. Imagenetix filed a response to that letter on October 7, 2011. On October 6, 2011, TriPharma filed another letter, which requested clarification of two issues in the Final Award. Imagenetix filed a response to that letter on October 11, 2011. On October 7th, the Arbitrator temporarily ordered that the Hearing be re-opened for the sole purpose of considering TriPharma's requests and conducted a telephonic conference regarding the post-hearing issues on October 10, 2011. Scheduling Order No. 8. In the conference, the Arbitrator set a briefing schedule and hearing date for TriPharma's anticipated Motion to Re-Open the Hearing. Scheduling Order No. 9. After receiving, reading and considering TriPharma's Motion and Imagenetix' Opposition, the Arbitrator

EXHIBIT C

issued a tentative ruling on October 24, 2011. TriPharma filed a letter on October 25, 2011 requesting that the hearing on its Motion be vacated, that the Final Award be issued and that the Final Award address its previous two requests for clarification. Imagenetix filed a response that day. On October 26, 2011, the Arbitrator vacated the hearing on TriPharma's Motion, awarded attorneys' fees incurred in opposing the Motion to Imagenetix, re-closed the Hearing and stated that neither TriPharma's Oct. 25th letter nor Imagenetix' Oct. 25th letter would be considered in his rulings on TriPharma's request for clarification. Order No. 10.

## II.    FACTS

The following is a statement of those facts found by the Arbitrator to be true and necessary to the Award. Facts not pertinent or necessary to the Award are omitted. To the extent that this recitation differs from any party's position, that is the result of the Arbitrator's determinations as to credibility, determinations of relevance, burden of proof considerations, and the weighing of the evidence, both oral and written.

### A.    Parties

Imagenetix manufactures nutritional supplement and pharmaceutical products.

William Spencer founded Imagenetix in 1998 after working in the vitamin industry for 12 years at Natural Alternatives, where he served as Executive Vice-President, President and Chairman. Spencer grew Natural Alternatives from a company with $1 million annual sales to one with $65-70 million. While there, he learned how to create formulas for various nutritional products. Spencer is a San Diego native who obtained a degree in finance in 1974 and an MBA in 1979 from San Diego State University. He also attended graduate banking school at the University of Virginia and Oklahoma University.

TriPharma was formed by Evan Dameshek and James McPartland in 2006 to sell and distribute a weight loss formula manufactured by Imagenetix.

Evan Dameshek received a BA in History from Claremont College in 1983. He worked in the financing industry from 1986 to 1996. He then started his own lease finance company, which operated by several Milestone names, in Orange County. He then formed an automobile title lending company, known as Carbucks and related names. Between 1999 and 2002, he formed six separate companies. Prior to forming a business partnership with his friend McPartland in 2004 or 2005, Dameshek had no experience in the nutritional products industry.

### B.    University of Minnesota Patent

5

EXHIBIT C

Dr. Daniel Gallaher and fellow academics at the University of Minnesota conducted research on reducing cholesteral in the early-mid 2000s. In the course of this research, they stumbled on a discovery that if polysaccharides, such as cellulose, starch and glycogen, were mixed with body fluids to achieve a certain viscosity, they could reduce the amount of the leptin hormone in mammals. The reduced leptin, in turn, reduced the percentage of body fat in the mammals. Dr. Gallaher learned, too, that any viscous polysaccharide could be used, including plant extracts. It was the viscous level of the polysaccharides, not the various mixes that mattered. In fact, he determined that there were an infinite number of combinations of viscous polysaccharides that could be effective in reducing leptin. He concluded that lower viscosity levels likely would have a lesser effect in reducing body fat just as higher levels had a greater effect. Gallaher understood that the same viscosity level can be achieved by formulating viscous fibers in different ways.

A patent for Dr. Gallaher's invention was issued on May 31, 2005. U.S. Patent No. 6,899,892 ("892 Patent"). The 892 Patent is entitled "Methods to Reduce Body Fat." The Abstract for the patent states: "The invention provides methods and compositions for reducing the percentage of body fat in a mammal and/or the level of leptin in the bloodstream of the mammal. Such methods involve administering to the mammal a diet containing viscous polysaccharides." The patent was assigned to the Regents of the University of Minnesota ("UMinn"). Exh. 101.

Spencer knew Dr. Gallaher because he conducted numerous studies of Celadrin for Imagenetix.[3] Also, Gallaher joined Imagenetix' medical advisory board. Spencer was aware of Gallaher's body fat reduction research. As soon as he received the 892 Patent, Gallaher contacted Spencer. Along with Imagenetix' Director of Research, Dr. Robert Hesslink, Spencer travelled to UMinn in Summer 2005 to meet with Gallaher and various UMinn officials in order to understand what the patent meant and how it would work.

UMinn executed an exclusive license agreement with Imagenetix to "use, develop and commercialize" the 892 Patent, effective September 2, 2005. Exh. 102. Among other things, the license permitted Imagenetix to sublicense its rights or to assign all of its rights under the agreement. ¶¶3.1.2. and 3.1.3. Further, it obligated Imagenetix to deliver to UMinn written reports of its and its sublicensees' efforts to commercialize the 892 Patent and to provide sales reports. ¶¶ 5.3 and 6.3. The agreement required Imagenetix to make a $10,000 up-front payment and to pay a 7.5% sales royalty with a $25,000 annual minimum, as well as make certain payments for granting third party sublicense rights. Schedule A, §6.

---

[3] Celadrin is an anti-inflammatory product initially licensed to and now owned by Imagenetix, and which is the subject of a separate method patent for the treatment of osteoarthritis, Patent No. 5,569,676, known as the Diehl patent. Exh. 103.

6

EXHIBIT C

Imagenetix combined various mixes of polysaccharides and liquids to make them viscous. It developed LepiTrim™, a trademarked product comprised of certain of those mixes or formulas, including its product Celadrin.

### C.   University of Connecticut Clinical Study

Imagenetix contracted with the University of Connecticut ("UConn") on January 2, 2006 to perform a controlled, clinical test on humans. The research was supervised by Dr. William Kraemer and Dr. Jeff Volek. Imagenetix agreed to pay UConn $98,233 to conduct the study. Clinical Research Agreement. Exh. 109. The Statement of Work described the research according to a protocol entitled "Influences of a Dietary Supplement in Combination with an Exercise and Diet Regimen on Adipocytokines and Adiposity in Women Who Are Overweight."

The protocol stated that the purpose of the investigation was to determine whether LepiTrim™ supplementation would be effective in lowering leptin and body fat, when combined with a diet and exercise regimen. It described LepiTrim™ as a "blend of polysaccharides containing Celadrin and HPMC (hydroxypropyl-methlcelluloses). It referred to the UMinn preliminary research as showing that "LepiTrim regulates leptin." Participants in the protocol were to consume 2 capsules of LepiTrim™ twice daily. Exhs. 110 and1000. The protocol did not state the quantity of LepiTrim™ in each capsule to be consumed.

Spencer testified that Imagenetix was still developing formulas when it entered the clinical study contract with UConn. Through a process of trial and error, he selected the formula for UConn to study in April or May 2006. There was no documentary evidence presented regarding a formula Spencer provided UConn to study.

The UConn study was completed in mid-2007. According to the UConn manuscript published online by the European Journal of Applied Physiology on December 2, 2008, human study participants twice a day consumed three 400 mg capsules of Trisynex, described as "a proprietary blend of modified cellulose and cetylated fatty acids." Further, the modified cellulose was "a food grade ingredient that has GRAS[4] status." Exh. 112. Spencer testified that Imagenetix filed for a trademark for Trisynex on December 8, 2006. The trademark was registered on July 29, 2008. Exhs. 106 and 1523. Imagenetix later funded a UMinn study of Trisynex conducted by Dr. Gallaher. Gallaher prepared a series of slides regarding the study. The UMinn logo was placed at the top of each slide. The first slide, entitled "Study Design," stated: "Two diet groups, fiber at 4%. Cellulose. Trisynex, proprietary mixture of acacia fiber derivatives." However, Gallaher testified that he did not include the language "Trisynex, proprietary mixture of acacia fiber derivatives" on the Study Design slide he prepared.

---

[4] GRAS is an undefined, unexplained term.

7

**EXHIBIT C**

Dr. Gallaher was familiar with the UConn human clinical study and is pleased that it confirmed his rat study findings. He interpreted various aspects of the UConn study. For instance, he concluded that viscosity levels different than what UConn studied could lead to different results. He considers it reasonable to expect that a product having substantially similar viscosity to what UConn studied would show comparable, but not exact results. He found nothing magic about any one formulation and therefore assumed it was unreasonable to expect different results in products with the same viscosity.

### D.   John Payne

John Payne is an entrepreneur who distributed Imagenetix products, including Celedrin and a fruit and vegetable blend for diabetics. In late 2005, Kenneth Cole, another Imagenetix distributor with whom Payne had worked to distribute the fruit and vegetable blend, told him about a new weight loss product manufactured by Imagenetix. Payne was interested in marketing this product to the diabetes community. He testified that, on behalf of his company, Pacific Tiger Group, he signed a Marketing and Supply Agreement with Imagenetix in November 2005 to market his own formula of the weight loss product. Exhs. 126 and 1168. Payne placed an order for the product in early 2006.

The Marketing and Supply Agreement recited that "A. Imagenetix has obtained a license from (UMinn) for the exclusive rights to use (UMinn's) recently awarded patent covering a natural compound for lowering the body's levels of leptin, a circulating hormone that regulates fat storage ("Patent"). B. By utilizing the Patent, Imagenetix is capable of manufacturing a fat reducing nutritional supplement formula in capsule form in assisting healthy fat reduction . . . and other products based upon the patent or clinical studies (collectively, the "Product")." Payne testified that thereafter, on January 12, 2006, he assigned Pacific Tiger Group's rights in this Agreement to Regenx, another company he controlled. Exh. 127 and 1170.

Spencer testified that Exhibit 126 was created and signed in 2010 at the request of Payne's attorney. On the first day of his testimony, Payne testified that his attorney, who was present during his testimony, had had the original version of the Marketing and Supply Agreement at his office in South Carolina since Payne sent it him in May or June 2010. He also testified that he expected that Imagenetix possessed a copy of it. On the second day of his testimony, however, Payne produced a copy of the Marketing and Supply Agreement, entered into on November 30, 2006. Payne was not surprised that the language in this Agreement "other products based upon the Patent" was consistent with subsequent 2006 Imagenetix agreements because Imagenetix agreements used the same language.

Spencer first testified that Payne had called him to say his documentation showed that the Agreement was executed November 30, 2005, not November 30, 2006. Spencer later testified that the reason Payne wanted to correct the date was

8

EXHIBIT C

that his attorney had brought it up to him. Spencer clarified that he had shipped product to Payne pursuant to the Agreement in May 2006, which confirmed in his mind that the Agreement for it had to have been made in 2005. Spencer said that it did not matter to him when the Agreement was executed, so he instructed his secretary to prepare a new document on which it stated that it was entered into on what he believed was the correct date, November 30, 2005.

Spencer testified that he did not know if the document by which Payne assigned Pacific Tiger Group's interest in the Marketing and Supply Agreement to Regenx was created in 2005 or 2010. However, he acknowledged that Imagenetix invoiced a purchase of 10,008 bottles of LepiTrim™ to Pacific Tiger Group in 2006 and had never invoiced any sale of product to Regenx.

A federal grand jury returned a 24 count indictment against Payne on April 27, 2005, alleging that he conspired to smuggle goods into the United States by means of making false statements to customs officials, and that he committed mail fraud and wire fraud. Exh. 1158. On February 21, 2007, Payne entered into a plea agreement with the U.S. Government, in which he admitted to importing and selling adulterated devices, a misdemeanor offense. Exh. 1159. Pursuant to his guilty plea, Payne was placed on unsupervised probation for 12 months and ordered to pay $99,041 in restitution to two victims. Exh. 1160.

### E.    Payne, Dameshek, McPartland Business Relationship

James McPartland was a college athlete who worked in the gym business after graduation. In 1987, he invested in a company named Unison, which later became Star Trac. Star Trac manufactured exercise equipment for health clubs. He worked there for 18 years, first as national sales manager when the company had virtually no sales. As the company grew, he took on more responsibilities, becoming Chief Operating Officer in 1998 when sales were approximately $50 million annually. He then served as President from 2000 to 2006, building sales to approximately $150 million a year. At that time, he served on the Board of Directors and had an equity interest. Thereafter, he invested in a health club chain and later built 18 clubs in Brazil. Governor Pete Wilson and President George W. Bush appointed McPartland to state and national physical fitness and sports councils. Currently, he consults on corporate wellness with Fortune 500 companies.

Dameshek and McPartland met and became friends while training for triathlons in 1998 or 1999. According to Payne, he met McPartland in early 2006. McPartland remembers meeting Payne in 2003 when Payne presented a frozen fruit product idea to Star Trac. When he got involved in the health club chain, McPartland contacted Payne about his fruit and vegetable product, but nothing come of it. Later, according to McPartland, they reconnected over ideas of spa creams enhancing youthful vitality and beds that could accelerate injury recovery. When McPartland formed a new company, he became interested in Payne's fruit and vegetable products to market to sports clubs. On long bike rides, he and Dameshek would

9

# EXHIBIT C

discuss whether fruits and vegetable supplements might be a "magic bullet" to reduce the health club attrition rate of people who were resistant to exercising.

McPartland introduced Dameshek to Payne. Awhile later, Payne, McPartland and Dameshek discussed forming a business to develop some of Payne's product ideas, such as weight loss, fruits and vegetables, skin care and therapeutic beds. Eventually, they formed a company, Regenisys. They executed the Operating Agreement of Regenisys, LLC, on March 12 and 15, 2006. Exh. 129. It provided that of its three members, Payne would hold 50% of the votes and Dameshek and McPartland each would hold 25%. Dameshek and McPartland each contributed $5000 capital. Exhibit A to Exh. 129. Payne was to contribute to Regenisys his right to sell and distribute various products formulated by Imagenetix, including "products used in the treatment of weight loss and regulation of fat storage, such as LepiTrim™. Exhibit B to Exh. 129. However, any contributions or rights Payne had previously given to Regenyx or certain other companies were excluded. Neither Dameshek nor McPartland asked Payne about what he had contributed to those other companies. Nevertheless, they relied on Payne's representations that the rights to LepiTrim™ were held by Pacific Tiger Group and Payne had not conveyed them to any other company.

Soon after the formation of Regenisys, McPartland was concerned that none of Payne's ideas were coming to fruition. Payne was pushing them to move forward on the weight loss product LepiTrim™, asserting that because it was patented and being clinically studied at UConn it was a unique product to which he had rights or access. Attracted by the patent and clinical support for LepiTrim™ and the possibility it might be a legitimate, provable weight loss product that could be profitable, McPartland and Dameshek pressed Payne to provide some evidence of his rights to it, such as an agreement, but Payne resisted. Neither did Payne show them Articles of Incorporation or any other documentation for Pacific Tiger Group. He also seemed reluctant to introduce them to anyone at Imagenetix. Finally, Payne produced a letter from Spencer to him, dated April 24, 2006, which stated that Imagenetix and Pacific Tiger Group had formalized an alliance and entered an Exclusive Formula Agreement to market LepiTrim™, for which Pacific Tiger Group carried "the rights to establish licensing and distributors to assist in marketing . . . " Further, the letter stated that "Pacific Tiger Group has secured rights to use existing and future clinicals as well as marketing use of the U.S. patent number . . . " Exh. 132.

At some point, at Payne's suggestion and as a sign of goodwill to Imagenetix, Regenisys purchased 10,008 bottles of LepiTrim™ at a price of $68,500. According to Dameshek, Payne said this was necessary to get Spencer's attention and help them obtain the rights to all Imagenetix' weight loss products.

     **F.**     **<u>Dameshek and McPartland's First Meeting with Spencer</u>**

<div align="center">10</div>

<div align="center">EXHIBIT C</div>

Dameshek and McPartland did meet with Spencer on April 28, 2006. Also present for awhile was Imagenetix executive Derek Boosey. At the meeting, they told Spencer that, on behalf of Regenisys, they were interested in obtaining a full, exclusive license to sell all formulas for weight loss products made by Imagenetix under the UMinn patent. Spencer was receptive and told them that they would have a unique opportunity and that this could be a breakthrough product for Imagenetix. Dameshek told Spencer that he and McPartland would "hit the ground running" to pursue direct response television for the product immediately.

Following this meeting, and believing that they had a deal for an exclusive sublicense in principle with Imagenetix, Dameshek began taking steps to market the product. For example, on May 1, 2006, Dameshek sent an email to Randy Argue, a television producer, soliciting a bid and inquiring about costs to produce infomercials. Exh. 322. By May 10, 2006, Dameshek had moved forward to make plans for shooting infomercials and had begun to spend "an inordinate sum of time and money . . . marketing the Lepitrim," as he described in an email to Spencer that also reiterated the importance of an exclusive agreement between Regenisys and Imagenetix. Exh. 325.

Spencer testified that the parties did not reach a distribution agreement at the meeting or make any commitment other than to set another meeting. He denied that he agreed to give Regenisys or Dameshek worldwide distribution rights.

### G.    April 24, 2006 Letters

Spencer testified that Payne called him on April 24, 2006 to request a letter memorializing their marketing agreement. Payne did not explain why he needed it. Since he was at the San Diego airport returning from a vacation, Spencer said he dictated the letter by telephone to his secretary. Exh. 132. A little later, Spencer realized that he wanted to make clear that there would be other companies that could market a similar formula and could use the patent number and clinicals as Imagenetix deems appropriate. Although Payne knew this, Spencer testified that he did not know what Payne would do with the first letter, so he dictated a second letter. Exh. 133. Spencer testified that he then drove to his office and signed the letters.

Spencer testified that at a subsequent meeting in June 2006, Dameshek and McPartland seemed "curious" when he said that others would be selling the product. So, to make sure "everyone is on the same page," after the meeting ended, he raced after them to give them copies of both April 24th letters. McPartland does not remember this. Dameshek testified that he never saw Spencer's second letter stating that other companies could market a similar formula, and, if he had, he would not have proceeded with Imagenetix, or in other words, "Game over."

### H.    Exclusive Marketing and Supply Agreements Between Imagenetix and Regenisys and TriPharma

EXHIBIT C

Following the April 28, 2006 meeting, the parties began working toward an agreement. They met again on May 18, 2006. Also present at that meeting was Cole, a former Australian basketball star and coach who was a highly enthusiastic salesman and distributor of Imagenetix products, including LepiTrim™, who had been a consultant for Imagenetix since 2000. According to Dameshek and McPartland, they again conveyed to Spencer their need for an exclusive right to market and sell Imagenetix' patented and clinically studied weight loss product. They testified that neither Spencer nor any Imagenetix representative informed them that other companies would be selling a variation of the product or making the same patent and clinical study claims they could make based on Spencer's representations that they would have an exclusive to the patented and clinically studied product. Spencer and Cole recall that Cole talked about his going on a national automobile tour to sell LepiTrim™.

Within one week, on May 24, 2006, Spencer emailed a first draft of an agreement to Dameshek, McPartland and Payne. Exh. 1192. It defined "product" as "Regenysis' exclusive, specific and effective formulation." Dameshek disapproved this definition and responded to Spencer with a an entirely new, revised draft prepared by Regenisys' attorney, Andrew Leitch, rather than a red-line amended version of Spencer's draft on May 31, 2006. Exh. 1203. Dameshek's draft at Recital B stated: "By utilizing the Patent, Imagenetix is capable of manufacturing a fat reducing nutritional supplement in capsule form which has been tested for its efficacy . . . and other products based upon the Patent or clinical studies related thereto (collectively, the "Product"). Spencer replied on June 1, 2006, by adding the words "specific, clinically studied" before and to modify "fat reducing nutritional supplement." Exh. 335. Dameshek informed Spencer that this language was too narrow, but he did not propose any changes to that section. Exh. 339.

On June 12, 2006, the Exclusive Marketing and Supply Agreement between Imagenetix and Regenisys was entered. Exhs. 139 and 1215. Recital B of this Agreement contained the language modified by Spencer on June 1, 2006, adding "specific, clinically studied." Dameshek and McPartland executed the Agreement on behalf of Regenisys. Payne did not sign it. By late May, 2006, Dameshek and McPartland had decided to end their business relationship with Payne, having lost confidence and trust in him. Exh. 1220. Accordingly, on June 27, 2006, Dameshek and McPartland entered an identical agreement with Imagenetix on behalf of a new company they had formed, TriPharma, a Nevada limited liability company, in which they were the only two members. Exhs. 152 and 1224. This Agreement provided, in relevant part, that:

    Recital A:  Imagenetix has obtained a license from UMinn for the exclusive rights to use UM's 892 Patent.

    Recital B:  "By utilizing the Patent, Imagenetix is capable of manufacturing a specific, clinically studied fat reducing nutritional supplement in capsule form which as been tested for its efficacy in assisting healthy fat reduction and enhanced body composition as measured by fat to muscle ratio, and

EXHIBIT C

other products based upon the Patent or clinical studies related thereto (collectively, the "Product").

Recital D: "TriPharma desires to obtain an exclusive license from Imagenetix to distribute the Product worldwide, and Imagenetix is willing to grant such a license on the terms and conditions set forth herein."

¶1: "Imagenetix hereby appoints TriPharma as Imagenetix's exclusive distributor of the Product worldwide . . . and TriPharma accepts that appointment on the terms set forth herein."

¶1.1: "Exclusivity.  Imagenetix, . . . (a) shall not appoint any distributor . . . for the Product other than TriPharma, (b) shall not . . . knowingly sell Product to any person other than TriPharma . . . and (c) shall use its best efforts to prevent any party other than TriPharma from seeking customers for the Product . . . "

¶1.2: <u>Maintenance of Exclusivity</u>.  In order to maintain TriPharma's exclusivity, TriPharma must make . . . minimum number of cumulative unit orders of the Product . . . "

¶1.6: " . . . Imagenetix grants TriPharma an irrevocable license to exclusively utilize the Patent, marketing claims and study or clinical information conducted on and for its Product. . . "

For some reason, Dameshek alone, this time on behalf of TriPharma, a Delaware limited liability company, entered yet another Exclusive Marketing and Supply Agreement with Imagenetix, also dated June 27, 2006.  Exh. 153.  Dameshek testified that he did not sign this version before TriPharma, Delaware was formed September 14, 2007, at a time McPartland was no longer his partner.  This Agreement contained different verbiage in Recital B: "By utilizing the Patent, Imagenetix is capable of manufacturing a specific fat reducing nutritional supplement in capsule form which has been clinically studied at certain labs, institutions, etc., including without limitation, the University of Connecticut, and tested for its efficacy . . . and other products based upon the Patent or clinical studies related thereto (collectively, the "Product")."  Dameshek did not recall who proposed or made this language change.

Based on its belief that it possessed an exclusive sublicense for the product, TriPharma proceeded to market and sell it during June to December 2006.  These efforts included developing a website, producing direct response television commercials, creating a trademark to market the product as Xellex and exploration of potential worldwide markets.  Exhs. 1241, 1246, 1249 and 1252.  Dameshek kept Spencer informed of these efforts in numerous emails.  Exhs. 337, 344, . . .  At no point did Spencer ever tell Dameshek or McPartland that Imagenetix was selling a variation of the product to other companies who were making the same Patent and clinical study claims as TriPharma. Cole testified that during much of this time he was in contact with Dameshek and informed Dameshek that he was distributing the product to a company called Youngevity, which sold it as SlenderFX.  Dameshek denied that Cole told him that any other company, including Youngevity, was selling the weight loss product.

EXHIBIT C

### I.      Gentleman's Agreement

Spencer emailed a red-lined amended version of the Agreement to Dameshek and McPartland on December 8, 2006. Exh. 1272. He described the revisions as "clarification points." Spencer's proposed amended version made two changes in the Recital B definition of "Product." It removed the language "and other products based upon the Patent or clinical studies related thereto," and it added this language: "Attached is TriPharma's clinically studied and exclusive formula (see Attachment "A")." Attachment A was a chart entitled "Xellex UConn Studied Formula" which listed two ingredients, Trisynex and Celadrin, and noted the viscosity factor and mg. per capsule for Trisynex. Exh. 370.

McPartland responded by email to Spencer on December 12, 2006, stating that "you may have accidentally modified one section of the document," referring to Recital B omitting language "which may materially impact our exclusivity." Exh 1274. Spencer immediately replied that the proposed revision was "simply clarification of your exclusivity of the specific UConn studied formula . . . just clarification of the definition of your product." Exh 1275. That same day McPartland emailed back to Spencer that: "It seems we need a conversation as it appears we will have both internal and external competition to XelleX. We have operated, promoted, and invested in this based on our signed exclusivity agreement. I am now confused and need your help. Please let me know if I understand the picture now. We have a version of the formula. And, other Imagenetix partners / distributors have a version of the formula. There are and will be active groups (including SlenderFX) promoting a similar product to XelleX with the ability to be making similar claims. Is that accurate? Our marketing and total investment to date was built around exclusivity. If my assumption of the picture above is correct, the solution is not readily apparent to me. Please help clarify as we have a whole lot riding on your response." Exh. 1275. He reiterated these concerns on December 14, 2006. Exh. 1278.

Spencer responded on December 15, 2006, saying: "I do not see or understand the confusion – I just see the grandest of opportunity for you and your company. You do not have just a 'version' of the formula, but 'The' UConn studied formula." Exh. 379.

McPartland sent Spencer a long, sharply worded reply on December 18, 2007, in which he expressed his and Dameshek's adamant position that the Agreement contained indisputable terms establishing TriPharma's exclusivity which they had recently discovered had been breached by Imagenetix' dealings with Youngevity. Exh. 1280. This email prompted a meeting between Spencer, Dameshek and McPartland. Believing that they had resolved the conflict at that meeting, Dameshek sent Spencer an email on December 26, 2006, in which he set forth his understanding that:

14

## EXHIBIT C

1.     Youngevity was the only other current reseller of a product based on the UMinn Patent.

2.     Imagenetix and TriPharma implemented a "gentleman's agreement" whereby Imagenetix would not court other vendors to sell product based on the UMinn formula until TriPharma either disclaims its exclusivity or is unable to meet its minimum purchase requirements.

3.     Imagenetix would require Youngevity to modify its claims to not impede on TriPharma's exclusive rights.

4.     The wholesale price for the product would be reduced to $5.75.

Spencer sent Dameshek and McPartland an email on January 3, 2007, in which he stated that he, too, thought they had a good meeting. He further conveyed some of the key terms from a business and scientific perspective and how they could define them. He then stated that "within our gentleman's agreement, there could be some check points of success . . . " He concluded by saying "Based on your email and my notes above, let's modify our Agreement accordingly." Exh. 382. In his testimony, Spencer denied that there was a "gentleman's agreement."

### J.     Imagenetix Dealings with Third-Parties in 2007

TriPharma actively worked to market the product during 2007. At the same time, Dameshek testified that he learned information that Imagenetix continued to market the product to others. Dameshek sent an email to Spencer on July 24, 2007, which he termed a "formal demand that Imagenetix cease and desist from selling any and all Unauthorized Products to any other party." including Youngevity and TrimScience. Exh. 1308. Dameshek charged that, in breach of the Exclusive Marketing and Supply Agreement, there was a proliferation of Imagenetix products in the marketplace which were based on the UMinn Patent and the UConn clinical study.

Spencer consulted with Boosey, Payne and Cole before responding to Dameshek. Based on their perspectives, he explained to Dameshek that originally Payne expressed a desire for a specific, exclusive fat reducing product formula, which resulted in Imagenetix' original agreement with Regenisys, and later, TriPharma. Spencer further stated that Boosey, Payne and Cole held the exact understanding, independent of Imagenetix, that other similar products would be sold. Exh. 1311. Dameshek confirmed a follow-up conversation with Spencer on August 10, 2007, in which he stated that he was amenable to Spencer's suggestion that TriPharma would sell the product to third parties to whom Imagenetix already was selling the product, so long as TriPharma retained a small royalty and passed the remaining proceeds on to Imagenetix. Exh. 1312.

### K.     Amended and Restated Agreement

15

EXHIBIT C

In the latter part of 2007, TriPharma made contact with Max International, a large multi-level marketing ("MLM") company, whose business model was to distribute science-based exclusive products. Dameshek met with eight Max executives in December 2007 to discuss an agreement whereby TriPharma would sell its exclusive, patented weight loss product to Max. On January 15, 2008, the parties entered a Letter of Intent for Purchase or Exclusive License of Ingredients or Private Label of TriPharma raw materials. Exh. 1323. Max insisted that it obtain an exclusive sublicense for the product.

Both Imagenetix, as the manufacturer, and TriPharma, as the seller, stood to gain from TriPharma finalizing a large deal with Max. Accordingly, Dameshek and Spencer exchanged numerous emails in January 2008 to clarify the extent of TriPharma's exclusive. Spencer wrote to Dameshek on January 28, 2008 that "TriPharma maintains the exclusive on the exact formula which was: 1) Clinically studied by UConn, and 2) Used in the Pennington Laboratories and new UMinn studies . . . The previous Agreement and this new version as well reflects the exclusivity to be the studied formula. It does not preclude selling a different formula – so we need to clarify and reconcile this feature between us. You would have the total 2400mg formula with Celadrin comprising 300mg of the 2400mg formula." Exhs. 462 and 1327.

Dameshek responded immediately. He acknowledged that TriPharma and Imagenetix held different understandings regarding the scope of TriPharma's exclusive, but suggested that the opportunities for both companies were so great that they should agree on a framework for the future. In that regard, Dameshek proposed that TriPharma guarantee significantly greater minimum purchases of the product. Exhs. 464 and 1325.

At this time, Dameshek's attorney was drafting a new agreement. The parties exchanged emails regarding its terms. In one email on January 30, 2008, Spencer said to Dameshek: "[§]1.9 needs to say something like the following: Worldwide (United States: All channels within the U.S. and international: MLM as well as television). Evan, internationally you get the MLM channel and infomercials. United States you own the market. This is a long way from having a specific formula and goal of establishing your own brand." Exh. 1333. Spencer testified that what he meant by saying Dameshek had come a "long way" in that email was that the agreement gave him the right to sell the product in bulk powder, not just in bottled capsules.

Finally, on January 31, 2008, Spencer wrote Dameshek that "Imagenetix originally consummated our existing Agreement with you to protect *your specific formula and brand*. . . However, after saying this, I feel comfortable with the new agreement and new exclusive after my most recent modifications." Exhs. 159 and 1334.

<div align="center">16</div>

<div align="center">

# EXHIBIT C

</div>

The parties signed the Imagenetix and TriPharma Amended and Restated Exclusive Marketing and Supply Agreement ("Amended and Restated Agreement") on February 1, 2008, but backdated it to October 1, 2007. Exhs. 161 and 1508. The relevant provisions of this agreement are:

Recital C: TriPharma and Imagenetix desired to amend and restate the Original Agreement in its entirety.

Recital D: Imagenetix obtained a license from UMinn for the exclusive rights to use UMinn's recently awarded 892 Patent covering a natural compound for lowering the body's levels of leptin.

Recital E: "By utilizing its Patents, Imagenetix is capable of manufacturing a fat and weight reducing nutritional supplement products in capsule and raw ingredient forms, as well as other products based upon the Patents or clinical studies related thereto (collectively, the "Product"). The formula utilized to manufacture the Product (the "Formula") has been clinically tested at various labs . . . " including UConn.

Recital F: "TriPharma desires to obtain an exclusive license from Imagenetix to distribute the Product nationwide, and Imagenetix is willing to grant such a license on the terms and conditions set forth herein."

¶1: "Imagenetix hereby appoints TriPharma as Imagenetix's exclusive distributor of the Product worldwide . . . and TriPharma accepts such appointment on the terms set forth herein."

¶1.1: "Exclusivity. Imagenetix, . . . (a) shall not appoint any distributor . . . for the Product other than TriPharma, (b) shall not . . . knowingly sell Product to any person other than TriPharma . . . and (c) shall use its best efforts to prevent any party other than TriPharma from seeking customers for the Product . . . "

¶1.2: Maintenance of Exclusivity. In order to maintain TriPharma's exclusivity, TriPharma must make . . . minimum number of unit orders of the Product . . . "

¶1.6: " . . . Imagenetix grants TriPharma an irrevocable license to exclusively utilize the Patent, marketing claims and study or clinical information conducted on and for its Product . . . "

## L.    Imagenetix Dealings with Third Parties in 2008 and 2009

In March 2007, James Roufs learned about the UConn clinical trial of Imagenetix' weight loss product Trisynex from Dr. Hesslink at a conference on slimming in Berlin. At that time (and currently), Roufs was a consultant for Nutrilite, the dietary supplement brand of Amway, one of the largest MLMs in the world. He began to pursue Trisynex for Nutrilite and for SCN, a Swedish company interested in distributing it in Europe. Roufs exchanged numerous emails with Spencer and Boosey. Exhs 620 638, 639 and 1519. Nutrilite wanted the exact clinically studied product. Roufs testified that no one at Imagenetix ever informed him that Imagenetix would tweak the clinically studied formula to sell to other companies or that it was in fact selling to more than one other company. He testified that anytime the dosage or ingredients of a clinically studied formula are

17

EXHIBIT C

changed, it is no longer the clinically studied product. Roufs testified that neither Spencer nor Boosey ever mentioned TriPharma or its exclusive. In one email exchange on December 10, 2007, Spencer answered Roufs' question about the order volumes Imagenetix would require for Nutrilite to obtain an exclusive license. Exh. 1519, Bates ## 6192-6193. Roufs continued to communicate and negotiate with Imagenetix in 2008. When he was introduced to Dameshek in early 2008, Roufs observed that the weight loss product Dameshek was pitching appeared to be the same as Trisynex.

According to its sales reports, Imagenetix sold weight loss product in 2008 to Unicity Network, Inc., Costco Wholesale, Pipeline Nutraceuticals, Goldwind International USA, and One on One Service, LLC. Exhs. 1099 and 1101. Additionally, Imagenetix sold weight loss product to TrimScience, Fountain of Youth, Gerber, Gold Wind International, Hope Science, Pharmax Bio USA Corporation, Sun Research, Inc., Gateway Health Alliances, Inc. and Zoi Vi. At least as of January 30, 2008, Imagenetix was supplying Youngevity with SlenderFX product because on that date Spencer notified Youngevity that it would not longer supply it with the product and requested that Youngevity remove references to the UMinn patent in its marketing. Exh. 468. On March 31, 2008, Dave Bagley, a Max executive, informed Dameshek that QSlim likely was distributing competing product that referenced the UMinn patent. Exhs. 1545 and 1378.

In May 2008, one month after TriPharma entered a distribution agreement with Max, a brief meeting occurred in Salt Lake City between Spencer and Boosey for Imagenetix and Fred Ninow and Bagley for Max. Spencer testified that he knew nothing about the meeting until by happenstance Ninow and Bagley appeared at an airport lounge. Boosey testified that the Max executives raised pricing issues about the product. Dameshek testified that neither Spencer nor Boosey informed him about the meeting.

## M.   TriPharma Dealings with Third Parties in 2008 and 2009

In 2008, Dameshek pursued a deal with Sylmark Holdings Limited, a large direct television company. On December 20, 2008, TriPharma and Sylmark executed a License Agreement, whereby TriPharma granted Sylmark an exclusive license to distribute XelleX in North America and U.S. territories, subject to certain express carve-outs. Exh. 1551. Later, on August 20, 2009, the companies entered a similar agreement permitting Sylmark to market the product through Spanish language television. Exh. 1553. Sylmark began to purchase the product from TriPharma, but ultimately it decided to cease purchases because of many competing products in market and also because it was not getting anticipated results.

## N.   Amendments to Amended and Restated Agreement

The parties executed several amendments to the Amended and Restated Agreement, dated April 19, 2008, April 16, 2008, December 5, 2008, May 7, 2009

EXHIBIT C

and February 26, 2010.  Exhs. 163, 164, 167, 168 and 169.  These amendments modified the minimum order amounts required to be made by TriPharma.

### O.    Termination of Amended and Restated Agreement

On May 3, 2010, Imagenetix notified TriPharma that it was in default based upon its failure to make an order or royalty payment as required by the Agreement. Exh. 173.  Thirty days later, on June 3, 2010, Imagenetix terminated the Agreement on the ground that TriPharma had failed to timely cure the default.  Exh. 174.

### III.    APPLICABLE LAW

The substantive law of California and the California Arbitration Act together with the JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules) apply in this proceeding.  Sch. Order No. 1.

There are numerous issues in the action, but the core issue is contract interpretation.  A contract must be interpreted to give effect to the mutual intent of the parties at the time of contracting, if it is ascertainable.  Civil Code §1636.  The intention of the parties to a written contract is to be ascertained from the writing alone, if possible.  CC §1639.  However, when through fraud a written contract fails to express the real intent of the parties, the erroneous parts of the writing are to be disregarded.  CC §1640.  In cases of uncertainty, the language of the contract should be interpreted against the party who caused the uncertainty.  CC §1654.

The substitution of a new obligation for an existing one is a novation.  CC §1530.  The elements of novation are a previous valid obligation, the agreement of all parties to the new contract, extinguishment of the old contract and validity of the new contract.  *Olympic Finance Co. v. Thyret*, 337 F.2d 62, 65 (9th Cir. 1964).  In the event of a novation, "all rights are to be measured and determined under the new substituted obligation as completely as though it had never been preceded by an earlier contract."  *Beckwith v. Sheldon* (1913) 165 C. 319, 324.

The parol evidence rule bars extrinsic evidence of prior or contemporaneous agreements to modify the terms of an unambiguous integrated written agreement. CC §1856(a); *Masterson v. Sine* (1968) 68 C2d 222, 225.  However, other evidence of the circumstances under which the agreement was made or to explain an ambiguity or otherwise interpret the terms or to establish fraud is not excluded.  CC §1856(g); *Pacific State Bank v. Greene* (2003) 110 CA4th 375, 379; *Kashmiri v. Regents of University of California* (2007) 156 CA4th 809, 838.  Parol evidence is admissible to ascertain the meaning of an agreement.  *Delta Dynamics v. Arioto* (1968) 69 C2d 525, 528.

Where an actual controversy exists regarding a written contract, a party to the contract may seek a declaration of his or her rights or duties under the contract. CCP §1060.

19

## EXHIBIT C

To obtain a permanent injunction, a plaintiff must prove the elements of a cause of action involving the wrongful act to be enjoined and the grounds for equitable relief, which most importantly include the inadequacy of a damages remedy. *DVD Copy Control Association, Inc. v. Kaleidescape, Inc.* (2009) 176 CA4th 697, 721. A permanent injunction may be granted to prevent the breach of an obligation where damages would be inadequate or where it would be difficult to ascertain the amount of adequate compensation. CC §3422. The wording of a permanent injunction must give fair and precisely drawn notice of what it actually prohibits. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 US 423, 444 (1974).

A party to a contract who cannot perform an obligation due to the conduct of the other party may be excused from non-performance. *U.S. v. Peck* (1880) 102 US 64.

Implied in every contract is a covenant by each party not do or refrain from doing anything which would deprive the other party of the benefits of the contract. *Harm v. Frasher* (1960) 181 CA2d 405, 417.

A cause of action for an accounting requires a showing that a relationship exists between the plaintiff and defendant that requires an accounting, and that some balance is due that can only be ascertained by an accounting. *Teselle v. McLoughlin* (2009) 173 CA4th 156, 179.

Other issues relate to contract damages, punitive damages, promissory fraud, alter ego liability and various statutory claims.

Damages for breach of contract must be clearly ascertainable. CC § 3301. The measure of damages is the amount which will compensate the party aggrieved for all the detriment proximately caused or which in the ordinary course would likely result. *ProMex, LLC v. Hernandez* 2011 WL 837789 (C.D. Cal. 2011). Such damages include all amounts necessary to place the plaintiff in the same position as if the breach had not occurred. *Applied Equipment Corp. v. Litton Saudi Arabia, Ltd.* (1994) 7 C4th 503, 515 (1994). The award can include damages for lost profits, even if the breach occurred before any profits were realized. *Western Geophysical Co. of America v. Bolt Associates, Inc.*, 584 F. 2d 1164, 1172 (2nd Cir. 1978). Three criteria must be satisfied before lost profits can be awarded in a new venture situation: the lost prospective profits are the direct and proximate result of the breach, profits were contemplated by the parties when they entered the contract and there is a rational basis on which to calculate lost profits. *Perma Research & Development Co. v. Singer Co.*, 402 F.Supp. 881, 898 (S.D.N.Y. 1975). A defendant's post-breach profits may form a rational basis for calculating lost profits. *Western Geophysical, supra* at 1173. Disgorgement of profits is appropriate where a licensor's conduct prevented the licensee from performing, especially where the

EXHIBIT C

plaintiff had yet to earn any profits. *Id.,* at 1174. Damages for loss of goodwill to a business are recoverable. *Stott v. Johnston* (1951) 36 C2d 864, 872.

The elements of fraud are misrepresentation, whether direct or by concealment or nondisclosure, knowledge of falsity, intent to defraud, justifiable reliance and resulting damage. *OCM Principal Opportunities Fund v. CIBC World Markets Corp.* (2007) 157 CA4th 835, 840. Promissory fraud occurs when a party makes a promise without the intention to perform or fraudulently induces another to enter a contract. *Lazar v. Superior Court* (1996) 12 C4th 631, 638. A corporate officer or director is jointly and severally liable for tortuous acts committed by the corporation if he or she authorizes, directs or in some meaningful sense actively participates in the wrongful conduct. *Frances T. v. Village Green Owners Association* (1986) 42 C3d 490, 503-504.

Punitive or exemplary damages may be recovered in an action for the breach of an obligation not arising from contract where it is proven by clear and convincing evidence that the defendant is guilty of oppression, fraud or malice. CC §3294(a). Such damages may be awarded to a plaintiff who establishes that the defendant committed promissory fraud in inducing a contract. *Lazar v. Superior Court* (1996) 12 C4th 631, 649.

A corporate identity may be disregarded where 1) there is a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the two do not exist and 2) an inequity would result if the acts in question were treated as those of the corporation alone. *Sonora Diamond Corp. v. Superior Court* (2000) 83 CA4th 523, 538. Among the factors to consider in establishing alter ego are commingling of funds of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership, use of same offices and employees and the use of one as a mere shell or conduit for the affairs of the other. *Id.,* at 538-539.

Federal patent law prohibits intentionally deceptive acts or intentional counterfeiting to mark upon or use in advertising the name or imitation of the name of a patentee, a patent number or the word "patent" without the consent of the patentee. 35 USC §292. The false patent marking statute is penal in nature and, therefore, must be strictly construed. *U.S. Gypsum Co. v. Pacific Award Metals, Inc.,* 438 F.Supp.2d (N.D.Cal 2006). Finding of intent to deceive the public is a prerequisite to finding party guilty of false marking or false advertising. *G. Leblanc Corp. v. H. & A. Selmer, Inc.,* 310 F.2d 449 (7th Cir. 1962). A fine of up to $500 shall be assessed for every offense. Federal patent law also imposes substantial damages when a violation of any right of a registrant of a mark registered in the Patent and Trademark Office is established, to include the defendant's profits, plaintiff's damages and costs. Unless there are extenuating circumstances, the greater of the damages for profits or damages shall be trebled. 15 USC §1114 and 1117.

EXHIBIT C

A cause of action for unfair competition exists where a defendant intentionally and deceptively imitates the goods of another with the purpose of misleading the public into believing the imitation was really the original. *Lutz v. De Laurentiis* (1989) 211 CA3d 1317, 1324.

## IV.   ANALYSIS

The primary issue in this action is the scope of the exclusive sublicense Imagenetix granted to TriPharma.  Imagenetix contends the sublicense was limited to the one precise, specific formula of weight loss product clinically studied at UConn.  TriPharma claims the sublicense broadly encompassed all products under the 892 UMinn patent.

### A.   Wording in Amended and Restated Agreement

The starting point in determining the scope of TriPharma's exclusive sublicense is looking at the language in the agreements granting it.  There are several agreements and many variations of the crucial terms.  Although each agreement has legal significance for the time it was in effect, it is useful first to consider the language in the final one, the Amended and Restated Agreement.

The statement of the exclusive license is contained in ¶1: "Imagenetix hereby appoints TriPharma as Imagenetix's exclusive distributor of the Product worldwide . . . and TriPharma accepts such appointment on the terms set forth herein."  Hence, TriPharma's license relates to distribution of the "Product."

Recital E of the Amended and Restated Agreement defines "Product" as follows:  "By utilizing its Patents, Imagenetix is capable of manufacturing a fat and weight reducing nutritional supplement products in capsule and raw ingredient forms, as well as other products based upon the Patents or clinical studies related thereto."  This language is broad and plural.  A minor grammatical error creates some uncertainty.  The offending clause reads "a fat and weight reducing nutritional supplement products."  Unfortunately, the singular "a" modifies the plural "products."

Another more significant complication in Recital E arises from the connection between the definition of "Product" and the following definition of "Formula."  Indeed, as defined, "Formula" ("The formula utilized to manufacture the Product") is described as having been clinically tested at various labs including UConn.  This raises a critical question.  Does the definition of "Formula" add to or modify the prior definition of "Product?"  On the one hand, the definition of "Product" appears complete and makes no reference to formula.  Indeed, ¶1, which grants the license to TriPharma, refers only to an exclusive right to distribute "the Product," and makes no mention of "Formula."  Yet, the parties must have had a reason for defining "Formula" and then describing it as having been clinically tested at UConn.

22

EXHIBIT C

Although the most reasonable interpretation of "Product" in the Amended and Restated Agreement relies on the single sentence broadly defining it, this interpretation is blurred by the ambiguity arising from the connected definition of "Formula." Therefore, consideration of extrinsic evidence is helpful to interpreting "Product." Three categories of extrinsic evidence require review: the prior written agreements between the parties, the circumstances leading to the Amended and Restated Agreement and the credibility of the parties and witnesses.

### B.    Wording in Prior Agreements

The original June 12, 2006 Exclusive Marketing and Supply Agreement between Imagenetix and Regenysis and the subsequent June 27, 2006 Agreement between Imagenetix and TriPharma (Nevada) contained identical language defining the "Product:" "Recital B. By utilizing the Patent, Imagenetix is capable of manufacturing a specific, clinically studied fat reducing nutritional supplement in capsule form which has been tested for its efficacy in assisting healthy fat reduction and enhanced body composition as measured by fat to muscle ratio, and other products based upon the Patent or clinical studies related thereto." Notably, neither Recital B, nor any other provision of these Agreements defined "formula," which sheds no light on why the Amended and Restated Agreement did. The definition of "Product" in these early agreements is similar to the definition of "Product" in the Amended and Restated Agreement. One difference is that the earlier definition modified "nutritional supplement" and "other products" with the word "specific." If this has any significance, it would tend to limit the scope of the licensed product. Hence, if anything, insofar as the actual definition of "Product," the language in the Amended and Restated Agreement clarifies the wide breadth of the licensed product.

The next Agreement between Imagenetix and TriPharma (Delaware), entered in September 2007, added "which has been clinically studied at certain labs, institutions, etc., including without limitation, the University of Connecticut" following language stating what Imagenetix is capable of manufacturing. This addition does not appear to have significance to interpreting the Amended and Restated Agreement.

### C.    Circumstances Leading to Amended and Restated Agreement

The scope of the license was a significant issue of concern to the parties from the outset of their relationship. Dameshek and McPartland testified that at their first meeting with Spencer on April 28, 2006, they expressed their interest in a full, exclusive license for weight loss products made by Imagenetix under the UMinn patent. Dameshek's actions to market the product immediately after the meeting, though perhaps overly enthusiastic, reflected his belief that Spencer had agreed to grant them an exclusive license. Spencer denied that he agreed to give Regenisys such rights. Dameshek and McPartland testified that again at their second meeting

23

EXHIBIT C

with Spencer on May 18, 2006, they expressed their need for an exclusive right to market Imagenetix' patented and clinically studied product. They also testified that Spencer did not inform them that other companies would sell a variation of the product, but rather that Spencer said they would have an exclusive to the patented and clinically studied product. Following the second meeting, the parties exchanged drafts of an agreement. Spencer's first draft defined "product" as "Regenysis' exclusive, specific and effective formulation," which Dameshek rejected as too narrow. The principals held at least one further meeting in June 2006. Spencer testified that after that meeting he gave Dameshek and McPartland copies of his second April 24, 2006 letter to Payne stating that there would be other companies that could market a similar formula and could use the patent number and clinicals as Imagenetix deems appropriate. Dameshek and McPartland denied that Spencer ever gave them this letter.

Once the initial Exclusive Marketing and Supply Agreement was in place, and relying on his belief that it entitled him to an exclusive sublicense, Dameshek endeavored to market the product worldwide. He kept Spencer informed of his actions. Dameshek testified that Spencer never told him that Imagenetix was selling a variation of the product to other companies who were making similar claims as TriPharma. Cole testified that he informed Dameshek that he was distributing the product to Youngevity, which Dameshek denied.

In December 2006, Spencer presented a proposed amended version of the Agreement to Dameshek and McPartland to clarify the definition of "product." This definition was linked to a formula contained on an attached chart listing the product's ingredients, viscosity factor and mg. per capsule. McPartland and Dameshek replied, expressing their belief that the proposed amendment might materially impact their exclusivity. This led to McPartland's December 12, 14 and 18, 2006 emails to Spencer in which he presented his and Dameshek's view that if other companies were distributing a version of their product and making similar claims it would undermine their marketing campaign based on exclusivity and constitute a breach of the agreement by Imagenetix.

Spencer met with Dameshek and McPartland soon thereafter in an attempt to resolve the dispute. Dameshek confirmed his understanding that the principals had indeed resolved their conflict by reaching a so-called "gentleman's agreement" at the meeting that would re-establish TriPharma's exclusivity. Specifically, Dameshek recounted that the parties had agreed that there would be a moratorium on Imagenetix courting other vendors to sell product based on the UMinn patent and that Imagenetix would require Youngevity to modify its claims so as not to impede TriPharma's exclusive rights. Although Spencer referred to the "gentleman's agreement" in his response to Dameshek on January 3, 2007, he denied in testimony that there was any "gentleman's agreement."

Conflicts regarding the scope of TriPharma's exclusive continued in 2007. Dameshek sent a formal cease and desist letter to Imagenetix in July 2007,

24

EXHIBIT C

demanding that Imagenetix stop selling the weight loss product to various distributors and calling Imagenetix' actions a breach of their Agreement. Spencer said that he, along with Boosey, Payne and Cole, understood that it was always clear that Imagenetix would sell similar products to various distributors, and that he had so informed Dameshek and McPartland.

By late 2007, Dameshek was engaged in serious negotiations with Max to distribute the product. Because Max insisted on buying only an exclusive product, Dameshek and Spencer exchanged numerous emails to clarify the scope of TriPharma's exclusive. It was evident to both Dameshek and Spencer that each held a different understanding of the scope. This led to negotiations for a revised agreement. The parties characterize these negotiations quite differently. Dameshek points to Spencer's email saying "Evan, internationally you get the MLM channel and infomercials. United States you own the market. This is a long way from having a specific formula . . . " as confirming Spencer's agreement to give TriPharma a broad exclusive. Spencer, however, stated that he was just referring to giving TriPharma the right to sell the product in bulk powder and further, that he reiterated the existing Agreement merely protected TriPharma's "specific formula and brand."

Following execution of the Amended and Restated Agreement, the parties continued to dispute the scope of TriPharma's license.

### D.   Credibility of Witnesses

The parties' testimony differed sharply about actions and understandings leading up to the Amended and Restated Agreement. Consequently, evaluation of the parties' credibility, as well as that of the witnesses who testified about these circumstances, is critical. This evaluation is based on the Arbitrator's analysis of the content of witnesses' testimony, observation of the witnesses' demeanor and manner of testimony, consideration of whether witnesses' testimony was consistent or inconsistent with pre-litigation documentary evidence and determination whether disinterested witnesses or documentary evidence corroborated their testimony.

Dameshek presented as an earnest, intelligent, emotional, somewhat desperate individual who frequently sought to "spin" events and circumstances to his benefit. Overall, he seemed to testify honestly and completely.

McPartland corroborated Dameshek's testimony about his business relationship with Payne, his initial meetings with Spencer and his later negotiations with Spencer. McPartland is not a party and disclaimed any financial interest in the outcome of this action. Nevertheless, he had been Dameshek's business partner and, despite the unexplained ending of that relationship, appeared to be quite friendly with Dameshek. Yet, McPartland testified straightforwardly and did not appear to be biased. His enormous self-confidence was not a factor affecting his credibility.

EXHIBIT C

TriPharma's other principal witness, James Roufs, had neither a personal nor a financial interest in this action. He presented as an unbiased, neutral third party, who possesses considerable knowledge about key events in the Imagenetix-TriPharma dispute and about the nutritional supplement industry. His testimony about his communications with Spencer was at odds with Spencer's testimony. Most important, he disputed Spencer's testimony that Imagenetix informed him that it was selling different formulations of the "clinically studied" weight loss product to other companies. Roufs raised a serious question about Spencer's business model when he testified that Imagenetix' practice of selling slightly tweaked versions of a patented and clinically tested product was contrary to his experience in the industry.

In contrast to TriPharma's generally credible key witnesses, Imagenetix' chief witnesses were strikingly not credible. John Payne not only is a convicted misdemeanant, who gave misleading testimony about his actions that led to his federal indictment. More troubling was his manner of testifying, his business practices and his role in Imagenetix' relationship with Dameshek. Payne is highly intelligent, which is why his tip-toeing, overly careful, selectively remembered testimony appeared to be intentional. His business style can be described as "wheeler-dealer." This style was evident from the beginning of his partnership with Dameshek, when he tried to hide evidence of his supposedly exclusive contract with Spencer to distribute LepiTrim™. Later, he withheld from Dameshek the truth about the Pacific Tiger Group's purchase of LepiTrim™. Payne's last-minute discovery of the supposedly original, signed version of his 2005 agreement with Imagenetix was contrived and blatantly dishonest. So, too, was his role in the questionable second April 24, 2006 Spencer letter to Dameshek. Finally, Payne's combative refusal to respond to many legitimate questions posed to him in cross-examination further undermined his credibility. The Arbitrator finds that Payne's entire testimony was infected with lies, and cannot attribute any weight to anything he said. Unfortunately for Spencer, who relied on Payne as a business associate and as a witness, the infection spread.

Cole's testimony was not as important as Payne's but it was similarly biased, clearly hostile to TriPharma and exceptionally selective in what he recalled. His evident charm could not hide his bias. He was unconvincing in disclaiming authorship of his April 23, 2007 email to Youngevity, in which he attempted to downplay Youngevity's concern about TriPharma's XelleX product violating Youngevity's exclusive.

Yet another Imagenetix witness whose cross-examination testimony was exceedingly non-responsive, evasive and antagonistic was Boosey. He refused to explain the meaning of his words in numerous emails. Perhaps, as an employee of Imagenetix, his bias was understandable, but that hardly excused his failure to give fully truthful testimony.

26

EXHIBIT C

Finally, the most telling testimony of all was given by Spencer. He is highly intelligent and capable. In answering direct examination questions, he demonstrated a remarkable capacity to remember events and details. By contrast, his responses to cross-examination were frequently confused, repetitious, non-responsive and self-serving. In fact, many of his answers were absolutely undecipherable. Given his intelligence and full responsiveness to direct examination, the contrast was stunning and revealing. Spencer's "Jekell and Hyde" testimony evidenced a calculated attempt to avoid answering tough questions that might expose him to liability. He even admitted to directing his secretary to prepare a new, earlier dated version of Imagenetix' Marketing and Supply Agreement with Payne's Pacific Tiger Group. As a result, the Arbitrator cannot trust Spencer's testimony on any disputed issue, including the possibly backdated agreement between Imagenetix and Pacific Tiger Group; the already questionable second April 24, 2006 letter that conveniently informed Dameshek (in direct, clear language that never again appeared in any communication from Spencer to Dameshek) that Imagenetix would sell the weight loss product to other companies that would make similar clinically tested claims; whether he reached a preliminary agreement with Dameshek and McPartland at their first meeting on April 28, 2006; whether he ever informed Dameshek that he intended to sell tweaked versions of TriPharma's exclusive to other companies; whether the parties made a "gentleman's agreement" and what it covered; whether Imagenetix fully and accurately reported its sales to UMinn. The fact that Spencer relied on the entirely unethical Payne or the untrustworthy Cole reinforces his lack of credibility.

### E. <u>Interpretation of Amended and Restated Agreement</u>

All factors – the wording of the prior agreements, the circumstances leading to adoption of the Amended and Restated Agreement and the comparative credibility of witnesses – reinforce the most reasonable interpretation of the wording of the Amended and Restated Agreement granting to TriPharma a broad exclusive right to Imagenetix' patented and clinically tested weight loss product. Accordingly, Imagenetix' theory that the Amended and Restated Agreement constituted a novation of the prior agreements, while legally correct, is factually immaterial. Indeed, all the agreements provide TriPharma a broad, exclusive license, effective June 17, 2006.

### F. <u>Breach of Contract</u>

Imagenetix breached the Exclusive Marketing and Supply Agreements and the Amended and Restated Agreement in several ways. First, it violated the exclusive distribution license to the Product it granted TriPharma pursuant to Recital E and ¶¶1 and 1.1(a) & (b) of the Amended and Restated Agreement and related provisions in prior Agreements, by knowingly selling that Product to numerous companies, including Youngevity, TrimScience, Fountain of Youth, Costco, Wholesale, Gerber, Gold Wind International, Hope Science, One on One Service, LLC, Pharmax Bio USA Corporation, Pipeline Nutraceuticals, Sun Research, Inc., Unicity

EXHIBIT C

Network, Inc., Gateway Health Alliances, Inc. and Zoi Vi, and by selling its own product TrimFit. This conduct began soon after the parties entered the first Agreement in 2006 and continued until Imagenetix terminated the Agreement in 2010.

Second, Imagenetix breached ¶1.1(c) of the Amended and Restated Agreement and related provisions in prior Agreements, by failing to use its best efforts to prevent any party other than TriPharma from seeking customers for the Product. Third, Imagenetix breached the ¶1.6 of the Amended and Restated Agreement and related provisions in prior Agreements, by violating TriPharma's exclusive license to utilize the Patent, marketing claims and study or clinical information conducted on and for the Product.

TriPharma's failure to maintain minimum orders of the Product did not constitute a breach of the Amended and Restated Agreement because its inability to maintain such minimum orders was caused by Imagenetix' breaches.

### G.     Breach of Covenant of Good Faith and Fair Dealing

Spencer acted to deprive TriPharma of the benefits of the Amended and Restated Agreement. Spencer took steps to interfere with TriPharma's exclusive license by negotiating with Amway to sell the "Product" to it and by engaging in highly questionable discussions with Max regarding pricing of the "Product."

### H.     Fraud

Consistent with the Arbitrator's findings that much of Spencer's testimony lacked credibility, the Arbitrator also finds that from the outset of his relationship with Dameshek, Spencer misrepresented his intention to sell the same weight loss product to other companies. He purposefully did not disclose that his business model was to sell slightly tweaked versions of the product to numerous companies, including TriPharma and allow each buyer to make the same or similar clinical claims. Likewise, he intentionally concealed from TriPharma that he sold its supposedly exclusive product to numerous companies and did not inform those companies that TriPharma held an exclusive right to market, sell and distribute that product. The most plausible reason Spencer so readily agreed in the very first meeting to award an exclusive license for Imagenetix' weight loss product to Dameshek and McPartland, who at the time were inexperienced and somewhat gullible businessmen in the nutritional supplements industry, is that he never intended to give them more than a very narrow exclusive. The Arbitrator also finds that Spencer fabricated the second April 24, 2006 letter after the fact. Although there was insufficient evidence to determine whether this document was created solely to influence this arbitration, at a minimum it is clear that it was written and dated to defraud TriPharma.

# EXHIBIT C

By not disclosing to TriPharma his true intent to distribute the Product to other companies despite TriPharma's exclusive license, Spencer knowingly and intentionally misrepresented the true facts. Spencer never intended to perform the Agreements with TriPharma when he entered them, but instead made promises to grant TriPharma an exclusive license in order to induce TriPharma to enter those Agreements. TriPharma and Dameshek were justified in relying on Spencer's promises, although as it became known to Dameshek that Spencer failed to abide by the parties' prior Agreements, Dameshek's willingness to still trust Spencer to abide by amended Agreements became less justified. Nevertheless, despite Spencer's repeated and ongoing breaches, Dameshek justifiably relied on Spencer's further representations that the Product was so unique and desirable that both companies likely would reap substantial profits from their entering further exclusive distribution agreements. Moreover, when Dameshek and McPartland confronted Spencer in late 2007 about Imagenetix' sales to other companies in violation of the Marketing and Supply Agreement, Spencer promised to change his ways. This "gentlemans' agreement" was a separate instance of Spencer's promissory fraud. As a consequence of Spencer's misrepresentations and fraud, TriPharma suffered significant financial losses. These findings are based on clear and convincing evidence.

Spencer personally directed and controlled Imagenetix and committed promissory fraud regarding all the Agreements with TriPharma. Therefore, Imagenetix and Spencer are jointly and severally liable for the fraud.

## I.   Statutory and Other Claims

TriPharma contends that Imagenetix violated federal false marking law by marketing and advertising its own product TrimFit as clinically studied at Costco. There was insufficient evidence to establish if, when and how much of the offending bottle of encapsulated TrimFit offered into evidence (Exh. 1605) was marketed, advertised and sold at Costco. Likewise, there was insufficient evidence to establish counterfeiting pursuant to the extensive and highly technical federal Lanham Act. Finally, the Arbitrator cannot find that the products, which Imagenetix sold to other companies, were imitations of TriPharma's XelleX that Imagenetix sold to mislead the public into believing they were the original. Rather, a more accurate characterization of those sales is that Imagenetix intended for the other companies to market the product as separate or different from the original.

## J.   Remedies

The remedies for Imagenetix' breaches and fraud include declaratory relief, permanent injunction, damages, alter ego liability and accounting.

### 1.   Declaratory Relief

29

EXHIBIT C

Consistent with finding that Imagenetix breached the exclusivity and related provisions of all its Agreements with TriPharma, the Arbitrator will declare that the Amended and Restated Agreement, just as the Exclusive Supply and Marketing Agreements that preceded it, grants to TriPharma an exclusive sublicense to market, sell and distribute any and all products covered by the 892 Patent and to exclusively market and sell the Product by referencing the 892 Patent and the UConn clinical study, to the exclusion of all others.

The Arbitrator denies Imagenetix' request for a declaration that it properly terminated the Amended and Restated Agreement.

### 2.    Permanent Injunction

TriPharma seeks a permanent injunction reinstating the Amended and Restated Agreement, extending the term of the Agreement by two years, delaying imposition of TriPharma's minimum unit order obligations pursuant to ¶1.1 of the Agreement by six months and enjoining Imagenetix from selling or distributing any weight loss product based on the 892 Patent to anyone other than TriPharma.

Inasmuch as the Arbitrator denied Imagenetix' request for a declaration that it properly terminated the Amended and Restated Agreement and found that TriPharma's failure to maintain minimum orders of the Product did not constitute a breach of the Agreement, it is appropriate and necessary to order reinstatement of the Agreement. Furthermore, it would be impossibly speculative at this time to determine the monetary damages that TriPharma would incur over the remaining term of the Agreement due to Imagenetix' breaches to date.

Once the Agreement is reinstated, it will understandably take time for TriPharma to re-enter the market after Imagenetix terminated the Agreement in June 2010. Therefore, reinstatement of the Agreement without a reasonable period of forebearance of TriPharma's minimum unit order obligations would be pointless. Six months forebearance is reasonable. So, too, is TriPharma's request that the term of the Agreement be extended two years from its current termination on October 1, 2012 to October 1, 2014. Otherwise, TriPharma would have a very limited one-year window in which to exploit the benefits of the Agreement.

Finally, it is plain that Imagenetix must now comply with the terms of the Agreement prohibiting it from selling or distributing any weight loss product based on the 892 Patent to anyone other than TriPharma. Issuing a permanent injunction prohibiting Imagenetix from engaging in such conduct provides TriPharma a further remedy to ensure that Imagenetix changes its ways. From the testimony of several witnesses, it appears that both parties are likely to benefit if they each abide by their Agreement.

### 3.    Damages

30

# EXHIBIT C

TriPharma seeks six categories of damages: lost past profits, lost prospective profits, marketing expenses, enforcement expenses, punitive damages and attorneys' fees and costs.

### a.     Lost Past Profits

TriPharma is entitled to damages for profits it would have made had Imagenetix not breached the Agreements by failing to refer to TriPharma the third party customers to whom it sold the weight loss product.  These lost profits were the direct and proximate result of Imagenetix' breach and were clearly contemplated by the parties when they entered the Agreements.  TriPharma's damages calculations lack back-up data regarding its costs.  Therefore, its claim in the amount of $4,482,428.29 damages for lost profits it would have made had Imagenetix referred all third party distributors to TriPharma is insufficiently substantiated.  Yet uncertainty may not bar recovery so long as there is a rational basis for calculating damages.  Evidence of Imagenetix' post-breach profits forms such a rational basis.  Imagenetix' profits on those sales amounted to $1,707,072.18.

### b.     Lost Prospective Profits

TriPharma also asks for lost prospective profits sustained as a result of the termination of its negotiations with Amway and the termination of its contract with Sylmark.  It is uncertain whether TriPharma would have consummated a contract with Amway and unknowable what would have been the terms of such a contract.  Therefore, any lost prospective profits from a possible deal with Amway are entirely speculative.  Similarly, even though the evidence from Dameshek's testimony is that Sylmark decided to cease purchasing the product from TriPharma because there were many competing products in the marketplace, it is uncertain how much of the product Sylmark actually would have purchased from TriPharma.

### c.     Marketing Expenses

TriPharma surely incurred marketing and advertising expenses in performing under the Agreements which produced no benefit because of Imagenetix' breach.  However, it is insufficient merely to present categorical totals of such expenses without back up data or testimony linking these expenses to activities that produced no benefit to TriPharma.

### d.     Enforcement Expenses

TriPharma is entitled to damages for expenses it has incurred in its litigation against Max International and Solstice International Partners which it undertook because Imagenetix' breached its covenant to use its best efforts to prevent third parties from infringing on TriPharma's exclusive license.  The evidence established that these expenses amount to $394,912.93.

31

EXHIBIT C

e.     **Punitive Damages**

Having found by clear and convincing evidence that Spencer and Imagenetix committed promissory fraud, and having received evidence of Spencer's net worth, the Arbitrator will impose against Spencer and Imagenetix an award of punitive damages in the amount of $250,000.

f.     **Attorneys' Fees and Costs**

TriPharma is entitled to its reasonable attorneys' fees and costs in this action. Request

4.     **Alter Ego Liability**

There was insufficient evidence to establish that Spencer is Imagenetix' alter ego. There was limited, if any, commingling of funds, Imagenetix did not hold itself out as liable for Spencer's debts, nor was there such a unity of interest or ownership between Imagenetix and Spencer to indicate that the separate personalities of the two did not exist. Moreover, Imagenetix is a public company. Finally, there was no evidence to show that an inequity would result if the acts in question were treated as those of the corporation alone. Spencer is personally liable for his own tortuous acts, but he is not the alter ego of Imagenetix.

5.     **Accounting**

Accounting is essentially a discovery tool. Absent a specific request by TriPharma stating exactly what accounting it seeks, the Arbitrator is unable to render an order for accounting.

K.     **Request for Post-Hearing Clarification**

After the hearing, Imagenetix requested clarification of two issues. First, it asked that the Final Award clarify that Trisynex is determined to be the Original Trademark under the Amended and Restated Agreement and that TriPharma has the exclusive right to use that name in its marketing, advertising and sale of the product. Second, it requested that the Interim Award specify that the six month delay in imposing TriPharma's minimum unit order obligations be triggered upon issuance of the Final Award.

TriPharma seeks a determination that Trisynex is the Original Trademark on the grounds that absent such explicit language it will be more difficult to enforce its exclusive rights the trademark against third party infringers and because a potential customer has requested use of that trademark. Imagenetix opposes this request on the grounds that that would be contrary to TriPharma's position in this proceeding and contradicts the Amended and Restated Agreement.

32

**EXHIBIT C**

TriPharma's request regarding the Trisynex trademark seeks more than a mere clarification of the Interim Award. Instead, the request raises a substantive issue. The Arbitrator declines to consider making a substantive modification of the Interim Award absent re-opening the Hearing. The Hearing is closed. There is no basis to reopen it; indeed, the parties agree that a Final Award should be issued forthwith. The Arbitrator will not reconsider a substantive issue addressed in the Hearing. Therefore, this request is denied.

Imagenetix did not address TriPharma's second request regarding the trigger date for the six month delay in imposing TriPharma's minimum unit order obligations. Since an Interim Award is not enforceable, the Arbitrator intended that the order delaying imposition of the minimum unit obligations would take effect upon issuance of the Final Award.

### L.   Attorneys' Fees and Costs

The Amended and Restated Agreement and the preceding Exclusive Marketing and Supply Agreements provide that the prevailing party in actions regarding a dispute, breach, default or misrepresentation in connection with the agreement is entitled to reasonable attorneys' fees and costs. Therefore, as the prevailing parties in this action TriPharma and Dameshek are entitled to their reasonable attorneys' fees and costs.

TriPharma asks for attorneys' fees in the amount of $1,224,965.63 and costs in the amount of $66,270.16. TriPharma bases its fee request principally on the grounds that its attorneys at McKennon Schindler are highly experienced and charged reasonable rates and that this action was highly demanding, involving extensive discovery and a long, complicated arbitration Hearing. Further, it contends that it is entitled to a 1.25 multiplier because of the extraordinary result it obtained, its delay in getting paid and the risk McKennon Schindler took by handling the action on a contingency fee basis.

Imagenetix does not dispute TriPharma's entitlement to reasonable fees and costs but contends that the total requested fees are facially excessive, the hours expended unreasonably high and the hourly rates excessive. It also argues that there are no extenuating circumstances or other grounds to warrant an enhancement of the attorneys' fee award.

The amount to be awarded in reasonable attorneys' fees is left to the sound discretion of the trial court. *Vella v. Hudgins* (1984) 151 CA3d 515, 522. To determine what is a reasonable attorney's fee, the court "begins with the 'lodestar,' the number of hours reasonably expended multiplied by a reasonable hourly rate." *PLCM Group v. Drexler* (2000) 22 C4th 1084, 1095. The reasonable hourly rate is that prevailing in the community for similar work. *Id.* The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided. *Serrano v. Priest* (1977)

33

EXHIBIT C

20 C3d 25, 49. Once the lodestar calculation is made, the court may consider other factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case. *PLCM, supra,* at 1096. A court should award a multiplier for exceptional representation only when it far exceeds the quality of representation that would have been provided by an attorney with comparable skill and experience, billing at the same rate. *Ketchum v. Moses* (2001) 24 C4th 1122, 1139. The lodestar may be enhanced to reflect the risk that an attorney retained on a contingency basis will not be paid. *Id.,* at 1138.

For the most part, TriPharma's counsel McKennon Schindler expended a reasonable amount of hours in this action. There were numerous discovery disputes, which were vigorously contested by the parties. Preparation for the Hearing required counsel to review and analyze more than 20,000 pages of documents. Furthermore, this action is related to several other cases pending in federal court, two of which were stayed until findings regarding TriPharma's sublicense were made in this action. Therefore, it was entirely reasonable that the managing partners did most of the work.

Sometimes, as Imagenetix argues, the practice of blockbilling renders attorney time records vague. To the contrary, McKennon Schindler's records provide sufficient information for the Arbitrator to evaluate the time its attorneys expended. However, there are a few entries that Imagenetix correctly challenges. The Arbitrator finds the following fees unreasonable:
- 5/20/10: 6.8 hours regarding litigation against Solstice International Partners ($4080)
- 12/30/10: 4 hours to prepare and attend hearing on Motion to Withdraw ($2400)
- 5/9/11: 1 hour work on another matter ($600)
- 8/5/11: 8.5 of 20.5 hours claimed for work on post-closing brief ($5100)

The hourly rates for McKennon Schindler attorneys are reasonable. Managing partners Robert McKennon and Eric Schindler charge $600/hour, which is comparable to Imagenetix' counsel Shustak Frost & Partners' managing partner Erwin Shustak's $575/hour rate[1] and appropriate for attorneys highly experienced in major business litigation. Similarly, the $375/hour rate for associates Reid Winthrop and Scott Calvert is comparable to Shustak Frost & Partners associate Robert Hill's $325/hour rate. It was not unreasonable, as Imagenetix claims, for the managing partners of McKennon Schindler to have performed the majority of TriPharma's legal representation. The stakes were high for all parties in this case, but most critical for TriPharma, which essentially was unable to operate its business due to the conduct of Imagenetix.

---

[1] In his Declaration in Support of Application for Legal Fees and Disbursements, Mr. Shustak stated that his rate was $595/hour.

34

EXHIBIT C

Thus, the lodestar for TriPharma's attorneys' fees is $967,792.50.

McKennon Schindler achieved substantial success in this litigation and its chief trial attorney Robert McKennon demonstrated exceptional skill in cross-examining Spencer, Boosey, Payne and Cole. Indeed, those examinations exposed the lack of credibility of those witnesses, which was a decisive factor in the Arbitrator's findings and rulings. Nevertheless, such exceptional skill is what the Arbitrator would expect to be displayed by an experienced trial attorney who charges $600 an hour. Thus, the success achieved and the skill involved in achieving it are not grounds for enhancing the lodestar in this case. The Arbitrator declines to enhance the lodestar to compensate McKennon Schindler for accepting this case on a contingency fee basis. The law firm's representation of TriPharma in this action is part of its general representation of TriPharma in several related cases. Therefore, the normal calculation of risk in accepting a single contingency fee case does not apply here. There is no basis for the Arbitrator to assess the factors relied on by McKennon Schindler in agreeing to represent TriPharma in this action. Moreover, while a withdrawn tentative ruling favoring TriPharma's interpretation of the Amended and Restated Agreement in the stayed related federal court actions was not admitted into evidence in this action, the fact of that tentative ruling likely caused McKennon Schindler to reduce the degree of risk it calculated it would bear in taking on this action. Accordingly, the Arbitrator denies TriPharma's request to enhance the lodestar by a 1.25 multiple.

The Arbitrator awarded to Imagenetix its reasonable attorneys' fees incurred in opposing TriPharma's Motion to Re-Open, which TriPharma withdrew after the Arbitrator issued a tentative ruling denying the Motion. Order No. 10. Imagenetix submitted a Declaration by Erwin Shustak stating that the amount of these attorneys' fees and costs was $56,128.71 if calculated from October 4, 2011, when Imagenetix began to respond to TriPharma's October 3, 2011 letter requesting post-hearing relief or $41,739.61, if calculated from October 7, 2011, when Imagenetix began to prepare for the telephonic conference that set a hearing on TriPharma's Motion to Re-Open. TriPharma filed an Opposition to Shustak's Declaration.

The appropriate time period for calculating the amount of attorneys' fees and costs for which Imagenetix is entitled pursuant to Order No. 10 is October 13th, the date of the telephonic conference at which the Arbitrator set TriPharma's Motion for hearing, through October 26, 2011, the date the Arbitrator vacated the hearing and issued Order No. 10. The Arbitrator calculates that the amount of attorneys' fees Imagenetix claims that it incurred during this period was $30,418. On its face, this amount of attorneys' fees for opposing a single motion is excessive. Indeed, the total attorneys' fees which Imagenetix incurred in this *entire* case, encompassing extensive discovery, multiple motions, hearing preparation and 12 full days of

35

EXHIBIT C

Hearing, was $518,340.61.[2]  It is patently unreasonable for Imagenetix to expend nearly 6% of that total to prepare its Opposition to TriPharma's Motion to Re-Open. Moreover, as Shustak points out in arguing that Imagenetix should be awarded fees for the legal work his firm performed to respond to TriPharma's October 3rd and October 6th letters, much of the research and analysis in the Opposition had already been done.  Yet, Imagenetix cannot request the fees for performing that earlier work because Order No. 10 expressly limited Imagenetix' request for attorneys' fees to "only the fees incurred by Imagenetix in filing its formal Opposition to the Motion to Compel, and not any fees it incurred in responding to (TriPharma's) earlier letter requests."

The Arbitrator finds that the reasonable amount of attorneys' fees incurred by Imagenetix in preparing its Opposition to TriPharma's Motion to Re-Open, including its reasonable fees to prepare its Declaration seeking the fees, is $5000.  In addition, Imagenetix' is entitled to its reasonable costs, which amount to $144.71.

In its Opposition to Imagenetix' Declaration in support of attorneys' fees, TriPharma requests that the Arbitrator offset any fees awarded to Imagenetix by the amount of JAMS invoices now due and owing which Imagenetix has not paid.  JAMS Rule 31(c) provides that "In the event that one Party has paid more than its share of (JAMS) fees, compensation and expenses, the Arbitrator may award against any other Party any such fees, compensation and expenses that such Party owes with respect to the Arbitration."  TriPharma submitted no evidence in support of its assertion that it has paid $3,928.91 in JAMS invoices owed by Imagenetix. Therefore, without prejudice to TriPharma requesting a reallocation of fees pursuant to JAMS Rules 24(j) and 31(c), the Arbitrator prefers not to further delay issuance of the Final Award pending resolution of this matter.

Imagenetix questions only two costs sought by TriPharma.  Lacking any explanation, TriPharma's claim for $836.75 for a Delta Airlines flight on July 5, 2011 is denied.  Imagenetix mistakenly suggests that TriPharma's $852.50 charge for miscellaneous expense is unsupported.  That charge is merely the total of several detailed miscellaneous expenses.  Accordingly, the Arbitrator will award costs to TriPharma in the amount of $65,433.41.

In summary, TriPharma is entitled to an award of attorneys' fees in the amount of $962,792.50 minus $5000, resulting in a final total of $957,792.50, and costs in the amount of $65,433.41, minus $144.71, resulting in a final total of $65,288.70.

        **M.**     <u>**Interest**</u>

---

[2] This figure was asserted by Imagenetix' in its Opposition to TriPharma's Motion for Attorneys' Fees and Costs.

EXHIBIT C

TriPharma is entitled to pre-judgment and post-judgment interest at the legal rate of 10% for the period from the time of Imagenetix' breach. Civil Code §§3287(b) and 3289(b); *Moreno v. Jessup Buena Vista Dairy* (1976) 50 CA3d 438, 448. It calculates that it is due $504,471.14 in interest based on $1,707,072.18 in lost profits caused by Imagenetix' breach of contract for selling competing weight loss products and is due $54,885.86 in interest based on its expenses of $384,912.93 to enforce its rights under the Agreement caused by Imagenetix's breach of its contractual obligation to enforce those rights.

Imagenetix challenges TriPharma's calculation of interest due to lost profits. It argues that because the Arbitrator found that the Amended and Restated Agreement constituted a novation of all prior Agreements, the earliest date to begin adding interest is February 1, 2008, the date the Amended and Restated Agreement took effect. In fact, as stated above in §IV. E.: "Imagenetix' theory that the Amended and Restated Agreement constituted a novation of the prior agreements, while legally correct, is factually immaterial. Indeed, all the agreements provide TriPharma a broad, exclusive license, effective June 17, 2006." Essentially, Imagenetix' argument seeks reconsideration of findings made in the Interim Award, which the Arbitrator declines to do.

Imagenetix is entitled to interest in the amount of $559,357.

## V.   CONCLUSION

For the reasons stated above, the Arbitrator finds and declares that:

1. Imagenetix and Spencer breached the Amended and Restated Agreement and the preceding Exclusive Marketing and Supply Agreements.
2. Imagenetix and Spencer breached the covenant of good faith and fair dealing.
3. Based on clear and convincing evidence, Imagenetix and Spencer committed promissory fraud.
4. Imagenetix and Spencer are not liable for false marking, counterfeiting or unlawful competition.
5. The Amended and Restated Agreement and the preceding Exclusive Marketing and Supply Agreements grant to TriPharma an exclusive sublicense to market, sell and distribute any and all products covered by the 892 Patent and to exclusively market and sell the Product by referencing the 892 Patent and the UConn clinical study, to the exclusion of all others.
6. Imagenetix did not properly terminate the Amended and Restated Agreement.
7. TriPharma and Dameshek are the prevailing parties in this action.

Based on these findings, the Arbitrator orders that:
1.     A permanent injunction issue to:

37

EXHIBIT C

    a.  Reinstate the Amended and Restated Agreement, as amended.

    b.  Extend the term of the Amended and Restated Agreement by two years until October 1, 2014.

    c.  Delay imposition of TriPharma's minimum unit order obligations pursuant to ¶1.1 of the Agreement by six months from issuance of the Final Award.

    d.  Enjoin Imagenetix from selling or distributing any weight loss product based on the 892 Patent to anyone other than TriPharma.

2.    Imagenetix and Spencer jointly and severally pay to TriPharma, as follows:

    a.  Breach of contract damages:  $2,101,985.11

    b.  Punitive damages:  $250,000

    c.  Reasonable attorneys' fees: $957,792.50

    d.  Costs: $65,288.70

    e.  Prejudgment and post-judgment interest at the legal rate of 10%: $559,357

DATED:     November 2, 2011

_____

Judge Terry Friedman (Ret.)
Arbitrator

38

EXHIBIT C

eServe
Document Separator Sheet
Powered By



End of Document Package

Package #: 157002

Jurisdiction: USA

ADR provider: JAMS-Arbitration

Branch Office: San Diego

Case No: 1240020032

Case Name: Imagenetix, Inc. v. TriPharma, LLC., et al.

EXHIBIT C

**Exhibit D**

1  Erwin J. Shustak (119152)
   shustak@shufirm.com
2  Thomas C. Frost (185187)
   tfrost@shufirm.com
3  Robert L. Hill (241624)
   rhill@shufirm.com
4  SHUSTAK FROST & PARTNERS, P.C.
   401 West "A" Street, Suite 2330
5  San Diego, CA 92101
   Telephone: (619) 696-9500
6  Facsimile: (619) 615-5290

7  Attorneys for Imagenetix, Inc. and William Spencer

8

9                 **UNITED STATES DISTRICT COURT**

10              **SOUTHERN DISTRICT OF CALIFORNIA**

11

12 IMAGENETIX, INC., a Nevada corporation    ) Case No. 11cv2570 JAH JMA
   and WILLIAM SPENCER, an individual,       )
13                                           ) Petition Filed : November 4, 2011
                   Petitioners,              )
14                                           ) **DECLARATION OF ROGER J.**
          v.                                 ) **CATARINO**
15 TRIPHARMA, LLC, a Delaware limited        )
   liability company, and EVAN DAMESHEK, an  ) **HEARING DATE:**
16 individual,                               ) DATE:      January 9, 2012
                                             ) TIME:      2:30 p.m.
17                 Respondents.              ) ROOM:      11
                                             )
18                                           )
                                             )
19 _____  )

20        I, **ROGER J. CATARINO,**  Declare as follows:

21        1.      I have personal knowledge of the facts stated below.  If called to testify to these

22 facts, I could and would competently do so.

23        2.      I am the President and Chief Executive Officer of First Fruits Business Ministry,

24 LLC ("First Fruits"), a South Carolina limited liability company.  First Fruits was formed in 2002

25 and maintains offices at 213 Leaning Tree Road, Columbia, South Carolina.  First Fruits is in the

26 business of acquiring and generating revenue from intellectual property assets.

27

28

                        DECLARATION OF ROGER J. CATARINO
                                                                        11cv2570 JAH JMA
                              **EXHIBIT D**

3.     In early 2011, First Fruits learned that Imagenetix, Inc. was interested in selling the rights to United States Patent, Patent No. 6,899,892 (the "892 Patent), a Federal patent covering a "Method to Reduce Body Fat". Imagenetix had been manufacturing a weight loss product, covered by the Patent, which weight loss product had been studied at various universities and in clinical studies with success.   First Fruits was interested in acquiring patent rights to a weight loss product to be used in a consumer beverage and for other, commercial purposes. On behalf of First Fruits, I communicated with William Spencer, President of Imagenetix, to discuss purchasing the '892 Patent rights from Imagenetix. Mr. Spencer told me Imagenetix was the exclusive, long term licensee of the '892 Patent, which patent, in turn, was owned by the University of Minnesota "(UMinn") where the patent had been developed. Mr. Spencer explained that as the exclusive, long term licensee of that UMinn '892 Patent, Imagenetix had the right to purchase the '892 Patent from UMinn.

4.     After some negotiations between Mr. Spencer and myself, we agreed that Imagenetix would acquire ownership of the '892 Patent from UMinn and, in turn, sell that '892 Patent to First Fruits. Our negotiations were arms length and First Fruits agreed to pay Imagenetix several million dollars for full ownership of the '892 Patent and all rights relating to that patent. We further agreed Imagenetix would execute an Assignment of Patent to First Fruits which Assignment would be held in escrow until such time as First Fruits paid an agreed upon portion of the purchase price to Imagenetix.

5.     Imagenetix acquired the '892 Patent from UMinn by Patent Assignment dated March 1, 2011. On March 7, 2011, Imagenetix, in turn, assigned all rights to the '892 Patent to First Fruits. A true and correct copy of the Patent Assignment from Imagenetix to First Fruits, dated March 7, 2011, is attached as Exhibit "A". After First Fruits made the required payments to Imagenetix, Imagenetix released the Patent Assignment from escrow and caused it to be recorded with the United States Patent and Trademark Office ("USPTO"). The actual recording was done by the USPTO on July 28, 2011. Attached as Exhibit "B" is a copy of the publicly available records

1  obtained from the USPTO web site reflecting the Assignment of the '892 Patent from UMinn to

2  Imagenetix and, in turn, from Imagenetix to First Fruits Business Ministry, LLC.

3      6.    To the best of my knowledge, when Imagenetix assigned the '892 Patent to First

4  Fruits there was no legal impediment to Imagenetix assigning exclusive rights to the '892 Patent to

5  First Fruits I was not then, nor am I now aware of any lien or encumbrance on the '892 Patent, or

6  any injunction or other legal restraint which prevented Imagenetix from conveying complete and

7  exclusive ownership and rights in and to the '892 Patent to First Fruits. From and after March 7,

8  2011, through today, First Fruits Business Ministry, LLC is the sole and exclusive owner of the

9  '892 Patent, and all commercial rights relating thereto, to the exclusion of any other person, firm or

10 entity. (There only is one, very minor exception contained within the attached Patent Assignment

11 which is irrelevant. UMinn retained a very limited, educational/research right in the Patent for non-

12 profit, non-commercial research purposes only.  First Fruits, however, owns all rights to

13 commercially use and exploit the '892 Patent).

14     7.    Although I am not an attorney, and am not familiar with all of the legal details, I

15 understand that following an arbitration between Imagenetix and TriPharma, LLC, the arbitrator,

16 amongst other relief,  re-instated an agreement between Imagenetix and TriPharma which

17 essentially gave TriPharma a license to (i) purchase from Imagenetix and resell the weight loss

18 product covered by the '892 Patent or (ii) if Imagenetix could not or did not provide that patented

19 weight loss product to TriPharma, TriPharma had the right to obtain the raw ingredients and itself

20 manufacture (and distribute) that weight loss product. Either way, however, it is First Fruits'

21 position and belief that by re-instating a contract between Imagenetix and TriPharma which

22 purports to grant a limited license from Imagenetix to TriPharma to manufacture and distribute

23 weight loss product covered by the '892 Patent, the arbitration award will result in either

24 Imagenetix or TriPharma, or both, violating First Fruits Business Ministry, LLC's exclusive Federal

25 Patent rights to the '892 Patent.

26     8. Once Imagenetix sold the '892 Patent to First Fruits Business Ministry, LLC in March,

27 2011, Imagenetix no longer had the legal right to manufacture and sell TriPharma the weight loss

28

---

DECLARATION OF ROGER J. CATARINO

# EXHIBIT D

1  product covered by the '892 Patent. If Imagenetix did attempt to manufacture the patented weight

2  loss product and sell it to TriPharma, both Imagenetix and TriPharma would violate and infringe

3  upon First Fruits' exclusive, Federal patent rights under the '892 Patent. If, on the other hand,

4  TriPharma decided to obtain the raw materials and manufacture and distribute the weight loss

5  product on its own, it would violate and infringe upon First Fruits' exclusive Federal patent rights

6  under the '892 Patent since only First Fruits Business Ministry, LLC has the right to manufacture

7  and distribute the patented weight loss product. As I understand it, the arbitrator purported to re-

8  instate a previously cancelled contract and gave patent license rights from Imagenetix to TriPharma

9  which Imagenetix no longer owned, and no longer had the legal right to give to TriPharma. If either

10  Imagenetix sells the patented weight loss product to TriPharma, or TriPharma manufactures and

11  distributes that patented weight loss product on its own, First Fruits' Federal patent rights would be

12  violated and either Imagenetix, TriPharma or both would be infringers of First Fruits' federal

13  Patent rights under the '892 Patent.

14      9.   First Fruits does not consent to Imagenetix, TriPharma or any other person, firm or

15  entity violating and infringing First Fruits' exclusive rights under the federally protected '892

16  Patent. First Fruits owns the '892 Patent and it is entitled to all of the federal patent protection

17  afforded owners of federal patents.

18      I declare under the penalty of perjury under the laws of the State of California that the

19  foregoing is true and correct and that this Declaration was signed in Marion, Virginia on November

20  30, 2011.

21

22                          Roger J. Catarino

23                          Roger J. Catarino

24

25

26

27

28

_____
DECLARATION OF ROGER J. CATARINO

11cv2570 JAH JMA

EXHIBIT D

# Exhibit A

08/03/2011

103630181

Form PTO-1595 (Rev. 03-11)
OMB No. 0651-0027 (exp. 03/31/2012)

JUL 2 8 2011

U.S. DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

To the Director of the U.S. Patent and Trademark Office: Please record the attached documents or the new address(es) below.

| 1. Name of conveying party(ies) | 2. Name and address of receiving party(ies) |
|---|---|
| Imagenetix, Inc. | Name: First Fruits Business Ministry, LLC |
| | Internal Address: |
| Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No | Street Address: 213 Leaning Tree Road |

**3. Nature of conveyance/Execution Date(s):**

Execution Date(s): March 7, 2011

☒ Assignment         ☐ Merger
☐ Security Agreement   ☐ Change of Name
☐ Joint Research Agreement
☐ Government Interest Assignment
☐ Executive Order 9424, Confirmatory License
☐ Other_____

City: Columbia

State: South Carolina

Country: United States          Zip: 29223

Additional name(s) & address(es) attached? ☐ Yes ☒ No

**4. Application or patent number(s):**      ☐ This document is being filed together with a new application.

A. Patent Application No.(s)        B. Patent No.(s)

6899892

Additional numbers attached? ☐ Yes ☒ No

| 5. Name and address to whom correspondence concerning document should be mailed: | 6. Total number of applications and patents involved: 1 |
|---|---|
| Name: Shustak Frost & Partners | **7. Total fee (37 CFR 1.21(h) & 3.41)  $ 40.00** |
| Internal Address: Att: Tina Huynh | ☐ Authorized to be charged to deposit account |
| Street Address: 401 West A Street, Suite 2330 | ☒ Enclosed |
| | ☐ None required (government interest not affecting title) |
| City: San Diego | **8. Payment Information** |
| State: California        Zip: 92101 | 07-28-2011 |
| Phone Number: 619-696-9500 | |
| Fax Number: 619-615-5290 | |
| Email Address: | |

**9. Signature:**

_____        07-27-2011
          Signature                        Date

          Robert B. Weir
     Name of Person Signing

Total number of pages including cover sheet, attachments, and documents:  6

Documents to be recorded (including cover sheet) should be faxed to (571) 273-0140, or mailed to:
Mail Stop Assignment Recordation Services, Director of the USPTO, P.O.Box 1450, Alexandria, V.A. 22313-1450

RECEIVED
OPAP/IAP

AUG. 0 2 2011

# EXHIBIT D

EXHIBIT A - PAGE 2

### Assignment of U.S. Patent 6,899,892

WHEREAS, **Imagenetix, Inc.**, a U.S. corporation, formed and existing under the laws of the State of Nevada, having a place of business at 10845 Rancho Bernardo Road, Suite 105, San Diego, CA 92127 ("Imagenetix"), being the sole owner and assignee of all rights and interest in U.S. Patent No. 6, 899,892 ("the Patent") wishes to assign that Patent;

NOW THEREFORE, for **TEN DOLLARS ($10.00)** and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Imagenetix does hereby sell and assign to **First Fruits Business Ministry, LLC**, ("Assignee"), a South Carolina limited liability company having its principal place of business at 213 leaning Tree Road, Columbia, South Carolina 29223, its successors, assigns and legal representatives all right, title and interest in and to the U.S. Patent entitled:

"Methods to Reduce Body Fat"

U.S. Patent No. 6,899,892

Filed: December 19, 2001

Issued: May 31, 2005

Named Inventors: Daniel D. Gallaher and Laura Freiburger

To be held and enjoyed by the said Assignee, its successors, assigns or other legal representatives, to the full end of the term for which said Patent has been granted, as fully and entirely as the same would have been held and enjoyed by Imagenetix if this assignment and sale had not been made. Assignee hereby accepts this assignment.

It is expressly understood and agreed that the conveyance of the Patent is subject to a right reserved by the University of Minnesota for itself and other non-profit research institutions and governmental agencies, a nonexclusive, worldwide, royalty-free, irrevocable license to use and practice the invention claimed in the Patent for non-commercial research purposes only. "Non-Commercial Research Purposes" means use or practice of the invention claimed in the Patent for academic research and other non-profit or scholarly purposes that does not involve the production or manufacture or products for sale or the performance of services for a fee. Without limiting the foregoing (i) "academic research and other not-for-profit or scholarly purposes," includes, in non-limiting fashion, research that leads, or may lead, to patentable or unpatentable inventions that may be licensed or otherwise transferred, either directly or indirectly to third parties; and (ii) neither (A) receipt of license revenues on account of such inventions or receipt of reimbursements for the costs of preparation and shipping of samples of materials provided to third parties as a professional courtesy, in response to post-publication requests or otherwise in

## EXHIBIT D

EXHIBIT A - PAGE 3

accordance with academic custom nor (B) receipt of funding to cover the direct and/or indirect costs of research, shall constitute sale of products or performance of service for a fee. The University of Minnesota has retained these rights for itself and for other non-profit research institutions and governmental agencies.

~~Imagenetix~~ warrants that the title to the Patent is free and clear of encumbrances. Imagenetix makes no other warranties, express or implied, as to the Patent. Imagenetix makes no warranties as to the scope, inventorship or validity of the Patent. Assignee shall be responsible for maintenance of the Patent, and for registering this assignment with the U.S. Patent and Trademark Office.

Imagenetix hereby authorizes and requests that the Commissioner of Patents and Trademarks and/or any other relevant official record and enforce this assignment in favor of Assignee.

For Imagenetix, Inc.:    Signature: _William P. Spencer_

Typed Name: WILLIAM P. SPENCER

Title: PRESIDENT

Date: 3 / 7 / 2011

STATE OF CALIFORNIA)      _see attached_
COUNTY OF  SAN DIEGO)

On this _____ day of _____, 2011 there appeared before me _____, personally known to me, who acknowledged that he signed the foregoing assignment as his voluntary act and deed.


_____
Notary Public


For First Fruits Business Ministry, Inc.:    Signature: _____

Typed Name:

Title:

Date:


# EXHIBIT D

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _San DieGo_

On _march 7, 2011_ before me, _KAren Henry, notary public_
Date                                              Here Insert Name and Title of the Officer

personally appeared _William Spencer_
Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

> KAREN HENRY
> Commission # 1774661
> Notary Public - California
> San Diego County
> My Comm. Expires Oct 21, 2011

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Place Notary Seal Above

Signature _Karen Henry_
Signature of Notary Public

----- **OPTIONAL** -----

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

EXHIBIT D

accordance with academic custom nor (B) receipt of funding to cover the direct and/or indirect costs of research, shall constitute sale of products or performance of service for a fee. The University of Minnesota has retained these rights for itself and for other non-profit research institutions and governmental agencies.

Imagenetix warrants that the title to the Patent is free and clear of encumbrances. Imagenetix makes no other warranties, express or implied, as to the Patent. Imagenetix makes no warranties as to the scope, inventorship or validity of the Patent. Assignee shall be responsible for maintenance of the Patent, and for registering this assignment with the U.S. Patent and Trademark Office.

Imagenetix hereby authorizes and requests that the Commissioner of Patents and Trademarks and/or any other relevant official record and enforce this assignment in favor of Assignee.

For Imagenetix, Inc.:   . Signature: _____

        Typed Name:

        Title:

        Date:


STATE OF CALIFORNIA)
COUNTY OF SAN DIEGO)

On this _____ day of _____, 2011 there appeared before me_____,
personally known to me, who acknowledged that he signed the foregoing assignment as his voluntary act and deed.


        _____
        Notary Public


For First Fruits Business Ministry, Inc.:   Signature: *Roger J. Catarino*

        Typed Name:  ROGER J. CATARINO

        Title: President & CEO

        Date: 3/8/11


# EXHIBIT D

EXHIBIT A - PAGE 6

Roger J. Catarino

Roger J. CATARINO
President & CEO

3/8/11

STATE OF                    )
COUNTY OF                 )

On this 8th day of March, 2011 there appeared before me Roger J Catarino personally known to me, who acknowledged that he signed the foregoing assignment as his voluntary act and deed.

Susan D Hoke 330367
Notary Public

ex-1-31-2015

**EXHIBIT D**

# Exhibit B

 **United States Patent and Trademark Office** 

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Assignments on the Web > **Patent Query**

# Patent Assignment Abstract of Title
### NOTE: Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.

**Total Assignments: 4**

**Patent #:** 6899892    **Issue Dt:** 05/31/2005    **Application #:** 10025633    **Filing Dt:** 12/19/2001

**Publication #:** 20030124170    **Pub Dt:** 07/03/2003

**Inventors:** Daniel D. Gallaher, Laura Freiburger

**Title:** METHODS TO REDUCE BODY FAT

### Assignment: 1

**Reel/Frame:** 012776/0615    **Recorded:** 04/04/2002    **Pages:** 4

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignors:** GALLAHER, DANIEL D.    **Exec Dt:** 03/04/2002

FREIBURGER, LAURA    **Exec Dt:** 03/04/2002

**Assignee:** REGENTS OF THE UNIVERSITY OF MINNESOTA
200 OAK STREET S.E.
450 MCNAMARA ALUMNI CENTER
MINNEAPOLIS, MINNESOTA 55455

**Correspondent:** SCHWEGMAN, LUNDBERG, WOESSNER ET AL
ROBIN A. CHADWICK
P.O. BOX 2938
MINNEAPOLIS, MN 55402

### Assignment: 2

**Reel/Frame:** 025966/0503    **Recorded:** 03/10/2011    **Pages:** 12

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** REGENTS OF THE UNIVERSITY OF MINNESOTA    **Exec Dt:** 03/01/2011

**Assignee:** IMAGENETIX, INC.
SUITE 105
10845 RANCHO BERNARDO ROAD
SAN DIEGO, CALIFORNIA 92127

**Correspondent:** SHUSTAK FROST & PARTNERS
ATT: MS TINA HUYNH
401 WEST A STREET, SUITE 2330
SAN DIEGO, CA 92101

### Assignment: 3

**Reel/Frame:** 026011/0606    **Recorded:** 03/24/2011    **Pages:** 13

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** REGENTS OF THE UNIVERSITY OF MINNESOTA    **Exec Dt:** 03/07/2011

**Assignee:** IMAGENETIX, INC.
10845 RANCHO BERNARDO ROAD
SUITE 105
SAN DIEGO, CALIFORNIA 97127

**Correspondent:** MOLLY A. ROSEN
200 OAK STREET SE
SUITE 360 MCNAMARA CENTER
MINNEAPOLIS, MN 55455-2006

# EXHIBIT D

EXHIBIT B - PAGE 2

**Assignment: 4**

**Reel/Frame:** 026775/0240                **Recorded:** 07/28/2011                **Pages:** 6

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** IMAGENETIX, INC.                **Exec Dt:** 03/07/2011

**Assignee:** FIRST FRUITS BUSINESS MINISTRY, LLC
213 LEANING TREE ROAD
COLUMBIA, SOUTH CAROLINA 29223

**Correspondent:** SHUSTAK FROST & PARTNERS
ATTN: TINA HUYNH
401 WEST A STREET, SUITE 2330
SAN DIEGO, CALIFORNIA 92101

Search Results as of: 11/28/2011 04:41 PM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350. v.2.2
Web interface last modified: July 25, 2011 v.2.2

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

## EXHIBIT D

EXHIBIT B - PAGE 3

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

### SACV12- 404 JST (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
John R. Walton, Esq. (SBN 130666)
Law Offices of John R. Walton
35 North Lake Avenue, Suite 700
Pasadena, California 91101

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| TriPharma, LLC | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | **SACV12-00404 JST (MLGx)** |
| v. | |
| See Attachment | **SUMMONS** |
| DEFENDANT(S). | |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within _____ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, <u>John R. Walton</u>, whose address is <u>35 North Lake Avenue, Suite 700, Pasadena, California 91101</u>.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____MAR 14 2012_____

By: _____**AMY DeAVILA**_____
                Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

## ATTACHMENT TO SUMMONS

FIRST FRUITS BUSINESS MINISTRY LLC, a South Carolina limited liability company; FIRST FRUITS BEVERAGE COMPANY LLC, a Georgia limited liability company; ROGER J. CATARINO; AND does 1-100

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
TriPharma, LLC, a Delaware limited liability company

**DEFENDANTS**
First Fruits Business Ministry LLC, a South Carolina limited liability company;
First Fruits Beverage Company LLC, a Georgia limited liability company; Roger
J. Catarino; and Does 1-100

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Law Offices of John R. Walton
35 North Lake Avenue, Suite 700
Pasadena, California 91101

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** 100,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

SACV12-00404 JST (MLGx)

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No   ☐ Yes
If yes, list case number(s): Uncertain. SACV10-00196 JVS and SACV 10-00222 JVS involve the same patent and one of the same licenses

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Delaware; South Carolina; Virginia |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | San Diego |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date 3/14/2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |